**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Marcel F. Sincich, Esq. (SBN 319508)
msincich@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333 | Fax: (818) 347-4118

**LAW OFFICES OF GRECH & PACKER**
Trenton C. Packer (SBN 241057)
tpacker@grechpackerlaw.com
7095 Indiana Ave Ste 200
Riverside, CA 92506
Phone: (951) 682-9311

*Attorneys for Plaintiff* EDGAR SOLIS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGAR SOLIS,<br><br>  Plaintiff,<br><br>  vs.<br><br>STATE OF CALIFORNIA; and MICHAEL BELL,<br><br>  Defendants. | Case No.: 5:23−cv−00515−HDV−JPR<br><br>[*Honorable Hernán D. Vera*]<br>Magistrate Judge Jean P. Rosenbluth<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION *IN LIMINE* No. 4 TO EXCLUDE DEFENDANTS' TOXICOLOGY EXPERT**<br><br>[(Proposed) Order; Declaration of Marcel F. Sincich and attached exhibits *filed concurrently herewith*]<br><br>**<u>Hearing on Motions *in Limine*</u>**:<br>October 1, 2024 at 09:00 a.m.<br>**<u>Final Pretrial Conference</u>**:<br>October 8, 2024 at 10:00 a.m.<br>**<u>Jury Trial</u>**<br>October 29, 2024 at 09:00 a.m.<br>Ctrm: 10D |

**TO THIS HONORABLE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiff EDGAR SOLIS hereby moves *in limine* for an order excluding the testimony of Defendants retained emergency room toxicology expert Michael Ritter, M.D., on the following grounds:

**1.** <u>Failure to comply with Federal Rule of Civil Procedure 26</u>: First, Dr. Ritter failed to provide his fee schedule as required with his Rule 26 Report. (Sincich Decl ¶12, Exh. I, Ritter Report.) Second, Dr. Ritter failed to list all the documents he relied upon in forming his opinions in his Rule 26 Report. (Sincich Decl ¶13, Exh. J, Ritter Depo 12:17-24.)

**2.** <u>Dr. Ritter's Methodology is Unreliable with Opinions Based on Speculation</u>:

   a. The only video Defendants provided to Dr. Ritter does not even show Mr. Solis in the video. (Exh. J, Ritter Depo 14:10-24).

   b. Never been retained on an officer-involved shooting case before. (Exh. J, Ritter Depo 7:17-19).

   c. Never been retained to opine on the effects of PCP or methamphetamine in a case involving law enforcement before. (Exh. J, Ritter Depo 7:20-8:4).

   d. For medical purposes in the emergency room, generally doctors only perform a qualitative measure of drugs like PCP and methamphetamine. (Exh. J, Ritter Depo 22:3-18).

   e. Being positive for PCP and methamphetamine is irrelevant to the medical procedures performed on Mr. Solis. (Exh. J, Ritter Depo 23:13-24:23).

   f. Dr. Ritter admits that drugs effect everyone differently. (Exh. J, Ritter Depo 26:16-20).

   g. Dr. Ritter admits that a person can be in pain and ask for water while in the ER. (Exh. J, Ritter Depo 29:12-16).

  h. Dr. Ritter admits that Mr. Solis was given Ketamine, which reduces pain. (Exh. J, Ritter Depo 31:8-12).

  i. Dr. Ritter cannot rule out whether EMS gave Mr. Solis pain medication. (Exh. J, Ritter Depo 32:4-16).

  j. Dr. Ritter admits that a person can be in pain in the ER and it not be annotated in the records. (Exh. J, Ritter Depo 32:18-24).

  k. Of the 100,000 patents Dr. Ritter has evaluated, about 1% were under the influence of PCP. (Exh. J, Ritter Depo 8:5-13).

**3.** <u>Dr. Ritter's Opinions are Confusing, Misleading, Not Helpful to the Jury and Not Based on Sufficient Facts and Data.</u>

  a. Dr. Ritter was retained by the defense "to look at the medical records and" explain "if the effects of the drugs that were detected played any role in [Mr. Solis'] behavior and the number of shots required to immobilize him." (Exh. J, Ritter Depo 10:17-21).

  b. Yet, Dr. Ritter does not know how many shots were required to immobilize Mr. Solis. (Exh. J, Ritter Depo 10:22-24).

  c. Dr. Ritter does not even know how many times Mr. Solis was shot during the incident. (Exh. J, Ritter Depo 16:3-5).

  d. Dr. Ritter only reviewed less than 2,700 pages of the over 8,800 total pages of medical records produced to Defendants. (Exh. J, Ritter Depo 13:10-14:9).

  e. Dr. Ritter did not review the deposition of Mr. Solis. (Exh. J, Ritter Depo 15:16-17).

  f. Of the 100,000 patents Dr. Ritter has evaluated, about 1% were under the influence of PCP. (Exh. J, Ritter Depo 8:5-13).

  g. Dr. Ritter does not know the threshold of detection of PCP and methamphetamine that Biotox Laboratory uses. (Exh. J, Ritter Depo 21:18-20).

    h. Dr. Ritter admits that he cannot determine the effects of PCP and methamphetamine on Mr. Solis based on quantitative level of PCP and methamphetamine in his plasma. (Exh. J, Ritter Depo 34:21-35:7).

Nevertheless, Dr. Ritter provides the following opinions, supposedly to the reasonable degree of medical probability, all of which should be excluded:

**1.** "The results of the Bio Tox lab analysis would yield a lower level that what was in his[] system at the time of the shooting due to blood serum dilution…. The combined volume of this Resuscitation is approximately 60-70% of his blood total volume that was replaced. This means that the true value of the PCP and Amphetamine blood levels before his blood loss and replacement would be double to triple those actually obtained from the post-resuscitation blood draw from the effects of dilution." (Exh. I, Ritter Report at 9.)

**2.** "The reason that opioids are present in the urine sample collected at RUHS and not the Bio Tox sample is that the urine was not obtained until 2237 PM, and he had already been given intravenous opioid pain medication while at RUHS." (Exh. I, Ritter Report at 9.)

**3.** PCP can have dissociative effects and Methamphetamine is a stimulant, "Thus, the PCP and methamphetamine in Mr Solis's system had an additive effect on inhibiting his pain perception." (Exh. I, Ritter Report at 10-11.)

**4.** "Mr. Solis had an extremely high pain tolerance [as] a result of the drugs in his system, including PCP and methamphetamine." (Exh. I, Ritter Report at 11.)

**5.** "Evidence of disassociated behavior… Rather than asking for pain medication, he was asking for a glass of water when he arrived at the trauma room." (Exh. I, Ritter Report at 11.)

Plaintiff will suffer specific and extreme prejudice if this Motion *in Limine* is not granted because allowing Dr. Ritter, an emergency room doctor, not a toxicologist, to provide his opinions at trial, which are irrelevant, include information unknown to

Defendant Bell; and have such minimal probative value it substantial risks unfair prejudice, confusing the jury, presentation of cumulative evidence, unnecessarily consuming time and misleading the jury; includes impermissible character evidence; and improper expert opinion. Plaintiff makes this Motion under Federal Rules of Evidence, Rules 401, 402, 403, 404, 602, 701, 702 and the prohibition of hindsight evidence in the reasonableness analysis of use of excessive force cases pursuant to *Glenn v. Washington Cnty.*, 673 F.3d 864, 873 (9th Cir. 2011).

Plaintiff bases this motion on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Marcel F. Sincich in Support of Plaintiff's Motions *in Limine* Nos. 1-5 and Exhibits attached thereto, Plaintiff's [Proposed] Order, any argument raised at the hearing on this motion, and all other pleadings and papers on file with this Honorable Court.

**Statement of Local Rule 7-3 Compliance**: This motion is made following a conference of counsel pursuant to L.R. 7-3 which took place on August 29, 2024 and September 5, 2024, during which no resolution was reached. Present were Dale K. Galipo (in the earlier) and Marcel F. Sincich for the Plaintiff and David Klehm for the Defendants. The conference took place over Zoom and telephonically. Defendants plan on presenting the information identified herein; Defendants do not agree to exclude the information identified; and Defendants will be opposing Plaintiff's motion. (Declaration of Marcel F. Sincich ("Sincich Decl.") ¶¶2, 3.)

Respectfully submitted,

Dated: September 10, 2024,         **LAW OFFICE OF DALE K. GALIPO**
                                    **LAW OFFICES OF GRECH & PACKER**

                                    By _____/s/_____ *Marcel F. Sincich*_____
                                       Dale K. Galipo
                                       Trenton C. Packer
                                       Marcel F. Sincich, *Attorneys for Plaintiff*

-v-                                                       Case No. 5:23−cv−00515−HDV−JPR
PLAINTIFF'S MOTION *IN LIMINE* NO. 4 – TO EXCLUDE DEFENDANTS' TOXICOLOGY EXPERT

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND STATEMENT OF FACTS**

On March 2, 2022, California Highway Patrol ("CHP") Officer Michael Bell shot Plaintiff Edgar Solis, including to his back, while running away, while he was not an immediate threat of death or serious bodily injury to any person. By this Motion, Plaintiff seeks an order excluding Defendants' toxicology expert, Michael Ritter, M.D., from trial – as his opinions are irrelevant or inadmissible.

Defendants use Dr. Ritter as a backdoor for information unknown and to inflame the passions of the jury against Plaintiff with "superhuman" "PCP" testimony. It is undisputed that Defendant Bell did not know whether Plaintiff consumed any drugs on the day of the incident and certainly did not know of Plaintiff's post-incident toxicology results. Defense expert Dr. Ritter provided a report that first failed to meet the standard under Rule 26 by: (1) failing to provide a fee schedule as required (Exh. I, Ritter Report); and (2) failing to list all the documents relied upon in forming opinions as required (Exh. J, Ritter Depo 12:17-24). Nevertheless, Dr. Ritter opinions, supposedly to the reasonable degree of medical probability, are speculative, unreliable, misleading, not helpful, and not based on sufficient facts and data, including the following:

**1.**    "The results of the Bio Tox lab analysis would yield a lower level that what was in his[] system at the time of the shooting due to blood serum dilution…. The combined volume of this Resuscitation is approximately 60-70% of his blood total volume that was replaced. This means that the true value of the PCP and Amphetamine blood levels before his blood loss and replacement would be double to triple those actually obtained from the post-resuscitation blood draw from the effects of dilution." (Exh. I, Ritter Report at 9.)

**2.**    "The reason that opioids are present in the urine sample collected at RUHS and not the Bio Tox sample is that the urine was not obtained until 2237 PM,

1 and he had already been given intravenous opioid pain medication while at RUHS."
2 (Exh. I, Ritter Report at 9.)

3     **3.**    PCP can have dissociative effects and Methamphetamine is a stimulant,
4 "Thus, the PCP and methamphetamine in Mr Solis's system had an additive effect
5 on inhibiting his pain perception." (Exh. I, Ritter Report at 10-11.)

6     **4.**    "Mr. Solis had an extremely high pain tolerance [as] a result of the
7 drugs in his system, including PCP and methamphetamine." (Exh. I, Ritter Report at
8 11.)

9     **5.**    "Evidence of disassociated behavior… Rather than asking for pain
10 medication, he was asking for a glass of water when he arrived at the trauma room."
11 (Exh. I, Ritter Report at 11.)

12 Each of these opinions as described below, are speculative, inflammatory and
13 unreliable. Dr. Ritter has no basis for his opinions because he does not know
14 anything about Plaintiff's drug history; whether he has a tolerance for drugs; when
15 the drugs were used; how much drugs were used; how the drugs were used; or
16 whether the drugs had any effect on Plaintiff at the time. Defendants merely seek to
17 use Dr. Ritter's expert testimony to illicit impermissible character evidence and
18 information unknown to Defendant Bell under the veil of trying to explain Plaintiff's
19 conduct and pain. Thus, Defendants retained expert Dr. Ritter, should be excluded
20 on the grounds that his opinions and testimony are not helpful to the jury, are
21 confusing, are based on speculation and insufficient facts and data, are otherwise
22 unsupported, unreliable, ipse dixit, and not relevant to this matter pursuant to Fed. R.
23 Evid. 402, 403, 404, 702, 703, and 802.

24 **II.**    **LEGAL STANDARD**

25 The admissibility of expert testimony is governed by Rule 702. *Daubert v.*
26 *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). To be admissible, expert
27 testimony must generally satisfy a two-prong test, reliability, and relevance. *Elsayed*
28 *Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002),

amended sub nom. *Mukhtar v. California State Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003) (footnote omitted). To establish relevance, the testimony must be helpful to the trier of fact and beyond the common knowledge of jurors. *Daubert*, 509 U.S. at 597. Rule 702 requires courts to assess the reliability of expert testimony based on scientific, technical, or "other specialized" knowledge before admitting it. *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending the Daubert gatekeeping requirement to "technical" and "other specialized" knowledge).

The proponent of the expert testimony bears the burden of proving admissibility. *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("[i]t is the proponent of the expert who has the burden of proving admissibility"); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("the party presenting the expert must show that the expert's findings are based on sound science"). Assessment of the expert's qualifications to testify is not answered in the abstract but based on whether the expert's "qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (internal quotations omitted). The court determines whether the expert's training and qualifications relate to the specific subject matter of his proposed testimony.

A court may satisfy its "gatekeeping" function by conducting a pretrial hearing, or by ruling on a Rule 702 objection at trial, "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (quoting *Daubert*, 509 U.S. at 597). Although "the gatekeeper inquiry under Rule 702 is ultimately a flexible determination, ... a district court, when faced with a party's objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Goebel*, 215 F.3d at 1088 (citation omitted). To establish

reliability, the testimony must be derived from valid scientific knowledge, the witness must possess sufficient expertise, and the state of pertinent scientific knowledge must permit the assertion of a reasonable opinion. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). Testimony is grounded in valid knowledge if it is "based on the methods and procedures of science [or other expertise] rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Reger v. A.I. DuPont Hosp. for Children of Nemours Foundation*, 259 Fed.Appx. 499, 500, 2008 WL 84540, 1 (3rd Cir. 2008) (quoting *Schneider v. Fried*, 320 F.3d 396, 404 (3rd Cir. 2003), and *Daubert*, 509 U.S. at 590 (to qualify as scientific knowledge, "an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – *i.e.*, "good grounds," based on what is known.").

Federal Rule of Evidence 702 allows opinion testimony by an expert only if the expert is qualified by knowledge, skill, experience, training, or education and only if: (a) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Therefore, the first question for the Court is whether his proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." The next question is whether a reliable methodology was applied to reach the opinions offered.

### III. DR. RITTER'S OPINIONS SHOULD BE EXCLUDED FROM TRIAL

#### A. Dr. Ritter's Opinions Are *Not* Based Sufficient Facts and Data

Dr. Ritter was retained by the defense "to look at the medical records and" explain "if the effects of the drugs that were detected played any role in [Mr. Solis'] behavior and the number of shots required to immobilize him." (Exh. J, Ritter Depo 10:17-21). The crux of Dr. Ritter's opinions is that Solis only felt 25% of the pain

from being shot (a number conceived with no factual basis), thus (1) needed to be shot several times before falling to the ground; and (2) an inference that his damages should lower because he did not feel *all* the pain. The opinions on their face are sufficiently inflammatory to warrant exclusion. Nevertheless, Plaintiff produced 8,878 pages of medical records to the Defense. (Sincich Decl ¶16.) However, Dr. Ritter reviewed only 2,673 pages of those records. (Exh. J, Ritter Depo 13:16-14:7.) Second, Defendants produced 26 videos related to this incident; four of which Solis can be heard making sounds that indicate pain and even saying he is in pain, and two of which Solis can be seen in pain. (Sincich Decl ¶17.) However, Dr. Ritter reviewed only one video that does not show Solis. (Exh. J, Ritter Depo 14:10-24.)

      With opinions like these, specific data is necessary – not merely what some people may experience. Which is the true basis for Dr. Ritter's opinions, not information about Solis. Importantly, and admitted by Dr. Ritter, drugs effect everyone differently. (Exh. J, Ritter Depo 26:16-20.) What Dr. Ritter did know, however, is that Solis had no symptoms of being under the influence of PCP: no waxing and waning behavior, no agitation, not being a "wild animal", no hallucinations, no nystagmus, no psychosis, no muscle rigidity, no uncontrolled movements, no seizures, and no ataxia. (Exh. J, Ritter Depo 47:2-21, 49:6-50:6.)

      Dr. Ritter was retained to detected whether drugs played a role in the number of shots "required" to immobilize him – first improperly assumed the use of force was necessary, yet still, Dr. Ritter does not know how many shots were required to immobilize Mr. Solis. (Exh. J, Ritter Depo 10:22-24.) Dr. Ritter does not even know how many times Mr. Solis was shot during the incident. (Exh. J, Ritter Depo 16:3-5.)

      Additionally, regarding opinions about Solis' pain, Dr. Ritter reviewed Officer Bell's deposition but failed to review the deposition of Solis. (Exh. J, Ritter Depo 15:13-17). Dr. Ritter reviewed the post-incident toxicology results yet does not know the threshold of detection of PCP and methamphetamine that Biotox Laboratory uses. (Exh. J, Ritter Depo 21:18-20.)

1 Dr. Ritter admits that he cannot determine the effects of PCP and Meth on Solis based on quantitative level of PCP and Meth in his plasma – Dr. Ritter cannot give a helpful answer to the question he was hired to analyze because "every person is different in terms of their toxicity with particularly with PCP." (Exh. J, Ritter Depo 34:21-35:7). PCP is highly variable based on many factors including: percentage of body fat, body composition, how and when the drug was taken, if the person recently ate, and individual tolerance to name a few. (Exh. J, Ritter Depo 35:12-21.)

Dr. Ritter <u>does not know whether Solis had a tolerance</u> to PCP or Meth. (Exh. J, Ritter Depo 37:2-4.) Dr. Ritter <u>does not know how</u> Solis took PCP or Meth, and Dr. Ritter <u>does not know when</u> Solis took PCP or Meth. (Exh. J, Ritter Depo 41:19-42-11.) "The clinical effects [of PCP (i.e., half-life)] is four to eight hours." (Exh. J, Ritter Depo 40:11-14, 42:21-22.) Dr. Ritter <u>does not know the dose</u> of the drugs that Solis took. (Exh. J, Ritter Depo 43:9-17.) Dr. Ritter does <u>not know Solis' exact body composition</u>; however, Dr. Ritter knows his height and weight from medical records to know that Solis is on the higher end of body fat composition; and knows that with a higher body fat composition, the drug is stored in the fat and takes longer to leach out. (Exh. J, Ritter Depo 37:17-24, 51:9-15.) Dr. Ritter testified that with more water in a person's system the drugs would have been less effective. (Exh. J, Ritter Depo 38:19-24.) Dr. Ritter <u>does not know how much water</u> Solis' had in his system.

Dr. Ritter simply does not have sufficient facts and data to render these opinions. They are all speculation. Thus, Dr. Ritter must be excluded.

**B.     Dr. Ritter's Methodology is Highly Unreliable**

All of Dr. Ritter's opinions are based on a mistaken assumption that is not supported in the records. Solis did lose a lot of blood from being shot so many times during this incident. Thus, medical providers gave him blood so that he would not die. Dr. Ritter's misleading assumption is that Solis' blood, which was tested for drugs, was drawn <u>after</u> being *so* <u>diluted</u> by the blood given that the toxicology results were actually a fraction of what they would have been prior to the dilution. Thus, Dr.

Ritter opines that the level of PCP and Meth is actually double to triple the results. "Double or triple" does not sound to scientific – it sounds like a guess – because it is. But the first problem with Defendants' failed attempt to exaggerate Plaintiff's level of intoxication to minimize his damages is that **the blood tested was drawn prior to being diluted**. <u>There was no dilution in the sample</u>. The premise falls on which Dr. Ritter builds his opinions. Thus, all his opinions must fail.

The transfusion started at **5:07 p.m.** (Exh. J, Ritter Depo 53:17-24.) Dr. Ritter stated that he "can't tell [] exactly when the specimen was obtained" by medical staff that was ultimately given to Biotox Laboratories. (Exh. J, Ritter Depo 54:15-18.) Looking at the Lab Report, the specimen was collected at 3:05 p.m., which would be impossible because that was before the shooting even occurred. (Exh. J, Ritter Depo 54:23-55:4.) Still, logically, and in Dr. Ritter's own experience, the draw typically is a "very early priority in the resuscitation" efforts. (Exh. J, Ritter Depo 55:5-15.) <u>Dr. Ritter knows from the medical records that the medical staff did a blood draw of Solis *prior* to 5:07</u>, prior to the blood transfusion – stating the obviousness of doing it prior because the medical staff knows "it would mess up future blood typing that has to be done." (Exh. J, Ritter Depo 55:16-20.)

Dr. Ritter cannot point out anywhere in the medical records any indication that there was a blood draw after the transfusion which was then sent to Biotox Laboratories. During questioning by the Defense, it was suggested to Dr. Ritter that the blood draw occurred at 2324 hours based on a police report that Dr. Ritter never even reviewed. (Exh. J, Ritter Depo 74:13-75:6.) Dr. Ritter bases his opinions on the "presumption that the blood draw [] that was sent to Biotox Laboratories was drawn after Mr. Solis had received the transfusion." (Exh. J, Ritter Depo 75:8-13.) Still, Dr. Ritter and the Defense cannot point out any facts or data to support that presumption. In fact, the "police report" specifically states that on "March 2, 2022, at approximately 2324 hours, Riverside County Sheriff's Department Investigator J. Manjarrez [] obtained a blood sample that had been drawn from Edgar Alejandro

Solis. The blood sample was obtained from the lab at Riverside University Health System Hospital." (Sincich Decl ¶10, Exh. G, Blood Sample Report.) The report is clear: the sample had already been drawn; it was not a new draw from Solis; it was a *sample* from the prior draw that was stored *in the lab*. The records even indicate that **the only blood draw on 3/2/2022 was at 1705** – two minutes prior to the transfusion. (Exh. M, Medical Records at 1-3.) Plaintiff believes the Biotox Report mistakenly put 3:05, when it intended to put 5:05.

    If there is no transfusion prior to the blood draw, there is no dilution. Despite that, Dr. Ritter seems to merely assume numbers without any basis at all. Dr. Ritter admits that Solis did in fact feel pain yet testifies that his pain was numbed by "I would say probably more than 75 percent, at least, maybe could be even more than that." (Exh. J, Ritter Depo 59:12-25.) This opinion is facially impossible to form on a scientific basis and Dr. Ritter makes no attempt to perform any scientific analysis on the issue. When asked how he came to determine over 75% reduction of pain, Dr. Ritter testified, "Well, it's just kind of a medical analysis. It's not something that's quantitative we can measure like a heart rate or a temperature…" (Exh. J, Ritter Depo 60:1-4.) Dr. Ritter bases his entire guesswork opinion on one annotation in the records that Solis asked for a glass of water. (Exh. J, Ritter Depo 60:1-9.) Dr. Ritter also admits that it is possible that Solis was in pain and asked for water. (Exh. J, Ritter Depo 29:12-16.) It is also possible that the staff simply did not chart the pain when the request for water was made. (Exh. J, Ritter Depo 32:18-24.) There is no indication in the medical records that the doctors found it odd that a man shot so many times was not in pain. Instead, the medical records indicate pain medication given to Solis because it was medically indicated. (Exh. J, Ritter Depo 31:2-12.)

    Dr. Ritter's methodology is unreliable and unscientific, and he must be excluded. This is precisely the type of speculative evidence Courts have deemed not relevant, particularly where none of the evidence was known to the officers at the time of the incident: "The Court finds that evidence of Decedent's history of

drug/alcohol use, including the toxicology report, has no likelihood of proving any material facts relevant to the claims and would be highly prejudicial. Indeed, 'evidence which the officers were unaware' is not relevant to evaluate the reasonableness of the officers' actions, as the 'prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways." *Glenn v. Washington Cty.*, 673 F.3d 864, 873 (9th Cir. 2011); *V.R. v. Cnty. of San Bernardino*, No. ED-cv-191023-JGB-SHKx, 2022 WL 2285655, at *6 (C.D. Cal. Apr. 12, 2022).

**C.     Dr. Ritter's Opinions Are Not Helpful to the Trier of Fact**

Given there was no dilution and that there is clear video evidence that Solis was in pain Dr. Ritter's testimony will not "help the trier of fact to understand the evidence or to determine a fact in issue." Defendants argue that Dr. Ritter's opinion that the drugs inhibited Plaintiff's pain perception is relevant to Plaintiff's past damages. First, Plaintiff has current pain and suffering. Whether he felt the full pain immediately after the incident for a short time prior to being intubated as compared to the two and half years of surgeries, pain, suffering, and lack of mobility is nearly inconsequential. Nevertheless, there are several videos in this incident that show Plaintiff in pain. The videos were never provided to Dr. Ritter. The only video Defendants provided to Dr. Ritter does not even show Solis in the video. Nevertheless, Dr. Ritter could still hear Plaintiff complaining of pain on scene even in that video. (Exh. J, Ritter Depo 15:5-11, 60:10-13.) Dr. Ritter is not even aware that there are body-worn camera videos that show Solis within 30 seconds after the shooting. (Exh. J, Ritter Depo 61:5-7.). There is even testimony from team leader, Lieutenant Arthur Paez, and the other officer who used deadly force, Deputy Salvador Waltermire, that Solis was complaining of pain after being shot by the police (Exh. C, Paez Depo 30:23-25, 32:3-5; Exh, D, Waltemire Depo 60:9-19.) Not surprisingly, neither deposition was ever provided to Dr. Ritter for review.

Simply put, Dr. Ritter cannot testify as to whether Solis felt pain when being shot and immediately thereafter. Without hearing such testimony from Solis himself,

Dr. Ritter's testimony has absolutely no relation to Solis' potential damages and should be excluded. Indeed, Dr. Ritter's Report has no actual opinion as to how much pain Solis was in after being shot and should not be permitted to opine by surprise at trial as to anything related to damages nor should Defendants be permitted to make inferences as to Plaintiff's damages based on Dr. Ritter's speculative opinions.

## IV.  CONCLUSION

Dr. Ritter's anticipated testimony is part of a larger effort by Defendants to attack Solis personally without providing any relevant, helpful, or reliable evidence. None of Dr. Ritter's opinions are admissible pursuant to Fed. R. Evid. 702, and he should be excluded from trial.

Respectfully submitted,

DATED: September 10, 2024

**LAW OFFICES OF DALE K. GALIPO**
**LAW OFFICES OF GRECH & PACKER**

By:  /s/     *Marcel F. Sincich*
Dale K. Galipo
Trenton C. Packer
Marcel F. Sincich
*Attorneys for Plaintiff*

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiff certifies that this brief contains 3,378 words, which complies with the word limit of L.R. 11-6.1.

DATED: September 10, 2024            **LAW OFFICES OF DALE K. GALIPO**
                                                          **LAW OFFICES OF GRECH & PACKER**

                                                          By:   */s/       Marcel F. Sincich*
                                                                   Dale K. Galipo
                                                                   Trenton C. Packer
                                                                   Marcel F. Sincich
                                                                   *Attorneys for Plaintiff*