# "EXHIBIT A"

EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.
Officer Michael Bell on 05/08/2024

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


EDGAR SOLIS,                        ) CASE NO.
                                   ) 23-cv-00515-HDV-JPR
               Plaintiff,          )
                                   )
     vs.                           )
                                   )
COUNTY OF RIVERSIDE; STATE OF      )
CALIFORNIA; SALVADOR               )
WALTERMIRE; MICHAEL BELL, AND      )
DOES 1-10, inclusive,              )
                                   )
               Defendants.         )
_____   )



DEPOSITION OF OFFICER MICHAEL BELL

APPEARING REMOTELY FROM SAN DIEGO, CALIFORNIA

WEDNESDAY, MAY 8, 2024


REPORTED BY:

JOHANNA MANGUAL LEDESMA, RPR, CSR 6951

APPEARING REMOTELY FROM VENTURA COUNTY, CALIFORNIA

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 2

1   REMOTE VIDEO CONFERENCE DEPOSITION OF OFFICER MICHAEL

2   BELL, TAKEN PURSUANT TO NOTICE ON BEHALF OF THE PLAINTIFF,

3   ON WEDNESDAY, MAY 8, 2024, AT 12:34 P.M., SAN DIEGO,

4   CALIFORNIA, BY JOHANNA MANGUAL LEDESMA, CERTIFIED

5   SHORTHAND REPORTER NO. 6951.

6

7

8                        REMOTE APPEARANCES

9

10   FOR THE PLAINTIFF:

11           LAW OFFICES OF DALE K. GALIPO
             BY:  MARCEL F. SINCICH, ATTORNEY AT LAW
12           21800 BURBANK BOULEVARD, SUITE 310
             WOODLAND HILLS, CALIFORNIA 91367
13           (818) 347-333
             msincich@galipolaw.com
14

15

     FOR THE DEFENDANT STATE OF CALIFORNIA (BY AND THROUGH THE
16   CALIFORNIA HIGHWAY PATROL):

17           ROB BONTA, ATTORNEY GENERAL OF CALIFORNIA
             BY:  DAVID KLEHM, DEPUTY ATTORNEY GENERAL
18           600 WEST BROADWAY, SUITE 1800
             SAN DIEGO, CALIFORNIA 92101
19           (619) 738-9733
             david.klehm@doj.ca.gov
20

21

22

23

24

25

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

```
 1                       I N D E X

 2

 3   WITNESS              EXAMINATION BY           PAGE

 4   OFFICER M. BELL      MR. SINCICH              5

 5

 6

 7

 8

 9

10                       E X H I B I T S

11   NUMBER/LETTER          DESCRIPTION            PAGE

12   EXHIBIT 1           PHOTOGRAPH OF BLACK
                         FORD EXPLORER             112
13
     EXHIBIT 2           PHOTOGRAPH OF OFFICER BELL 112
14
     EXHIBIT 3           PHOTOGRAPH OF FIREARM      114
15
     EXHIBIT 4           PHOTOGRAPHS OF INCIDENT
16                       LOCATION                   116

17

18

19

20   INSTRUCTION NOT TO ANSWER:
                         PAGE       LINE
21                        27          1

22

23

24

25
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 4

```
1         REPORTED REMOTELY FROM VENTURA COUNTY, CALIFORNIA

2              WEDNESDAY, MAY 8, 2024, 12:34 P.M.

3                          OOO

4

5         THE REPORTER:  Good afternoon.  My name is

6    Johanna Ledesma.  I am the California Certified Shorthand

7    Reporter.  My CSR number is 6951.

8             We are here for the deposition of Michael Bell

9    in the matter of Solis versus the County of Riverside, et

10   al.  All parties are appearing remotely via the Zoom

11   platform.

12            And, Mr. Bell, would you please raise your right

13   hand and be sworn?

14            (Whereupon the witness was administered the

15   oath.)

16            THE WITNESS:  I do.

17            THE REPORTER:  Thank you.

18            Mr. Sincich?

19            MR. SINCICH:  Thank you.

20

21                  OFFICER MICHAEL BELL,

22              having been first duly sworn,

23            was examined and testified as follows:

24   ///

25   ///
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 5

```
 1                        EXAMINATION

 2   BY MR. SINCICH:

 3       Q.    Can you please state and spell your name for the

 4   record?

 5       A.    It's Michael Bell, M-I-C-H-A-E-L B-E-L-L.

 6       Q.    Have you had your deposition taken before?

 7       A.    Yes.

 8       Q.    How many times?

 9       A.    Two times.

10       Q.    Were those in one case or two different cases?

11       A.    Two.

12       Q.    Were those cases related to your work in law

13   enforcement?

14       A.    One was.

15       Q.    What was the general circumstances of the one

16   that was related to law enforcement?

17       A.    It was regarding a lawsuit against my

18   department.

19       Q.    Did it have to do with the use of force or

20   detention of a person?

21       A.    Yes.

22       Q.    Were you involved in using force or detention

23   against the person in that case?

24       A.    I did not use force in that case.

25       Q.    Were you a witness officer then?
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 13

```
 1   long as he can hear you.  It might unfreeze.  If it
 2   doesn't unfreeze or so, we can log out and log back in.
 3              But can you hear his audio okay?
 4              MR. SINCICH:  I can hear the audio okay.  I just
 5   want to make sure our court reporter, because like last
 6   time, sometimes they are kind of reading lips as they
 7   type.
 8              Do you want to try to turn your video off and on
 9   real quick to see if that works?
10              MR. KLEHM:  Hit it again.  We've got a spinning
11   blue circle to try to turn it off so --
12              MR. SINCICH:  Okay.  Let's -- I can hear you
13   okay.  So if -- if our court reporter is good, then we can
14   carry on.
15              And I see a head nod, so I'm going to keep
16   going.
17              MR. KLEHM:  Can you repeat the question, sir?
18              MR. SINCICH:  Yes.
19              Actually, can you read back the last question
20   before we discuss that?  Thanks.
21              (Record read.)
22              THE WITNESS:  That would be another approximate,
23   so approximately three to five seconds.
24       Q.    BY MR. SINCICH:  Okay.  Did you have an
25   understanding that when you were using your firearm, that
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 14

```
 1   it could cause death or serious bodily injured?

 2       A.    Yes.

 3       Q.    Generally speaking, when you were firing, were

 4   you aiming your weapon?

 5       A.    Yes.

 6       Q.    Did you intentionally pull the trigger each

 7   time?

 8       A.    Yes.

 9       Q.    Did you intend that each time that you pulled

10   the trigger, that that bullet would strike Mr. Solis?

11       A.    Yes.

12       Q.    Prior to firing your first shot, did you hear

13   any other shots being fired?

14       A.    No.

15       Q.    Is it fair to say that Mr. Solis never fired a

16   weapon at you?

17             MR. KLEHM:  Objection.  Calls for speculation.

18   Lacks foundation.

19             THE WITNESS:  No.

20       Q.    BY MR. SINCICH:  Did you form the impression

21   that Mr. Solis fired a weapon at you?

22       A.    It's simply probable in my opinion.

23       Q.    Okay.  Did you ever see him pull the trigger of

24   a gun?

25       A.    No.
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 15

1      Q.    Did you ever hear the sound of a gunshot coming

2   from his direction?

3            MR. KLEHM:   Objection.  Argumentative.  Calls

4   for speculation.  Lacks foundation.

5            THE WITNESS:  No.

6      Q.    BY MR. SINCICH:  Did you hear or see the impact

7   of a round anywhere near your body?

8      A.    No.

9      Q.    Were you injured at all during the incident?

10     A.    No.

11     Q.    And your video cleared up by the way just to let

12   you know.

13     A.    Yeah, I restarted it.

14     Q.    Okay.  Great.

15           Prior to the incident, had you dealt with high

16   risk individuals before?

17     A.    Yes.

18     Q.    Did you encounter people who had a gun in their

19   hand?

20     A.    Yes.

21     Q.    Approximately how many times?

22     A.    Approximate, well, I'd say more than six.

23     Q.    In those six occasions, were any of the subjects

24   felons with a violent history?

25           MR. KLEHM:  It's vague and ambiguous.  Do you

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 16

1    mean if he knew at the time that he was interacting with

2    them or that he found out later?

3         MR. SINCICH:  Let's just say in general.

4         MR. KLEHM:  Okay.

5         THE WITNESS:  What do you mean in general?  Can

6    you just --

7         **Q.   BY MR. SINCICH:  Meaning whether you knew at the**

8    **time or you found out later.**

9         A.    Take me some time to recall these incidents and

10   think of them individually, but there were -- there were

11   individuals that had felonies, but I wouldn't be able

12   to -- I don't know.  I don't recall off the top of my head

13   that information.

14        **Q.   Of the six individuals that you saw with a gun**

15   **in their hand prior to this incident, do you recall**

16   **knowing at the time that they had a gun in their hand, if**

17   **they were felons?**

18        MR. KLEHM:  Do you understand that question?

19        THE WITNESS:  I don't recall the timing of it,

20   of my knowledge.

21        **Q.   BY MR. SINCICH:  Did you use deadly force in any**

22   **of those instances?**

23        A.    No.

24        **Q.   In your experience prior to this incident, did**

25   **you encounter persons who fled from the police either in a**

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 18

 1   in their hand in certain circumstances.

 2       Q.    BY MR. SINCICH:  Right.  And my question is just

 3   a little bit different.  Just based off that fact alone,

 4   the subject has a gun in their hand, are officers allowed

 5   to use deadly force according to their training?

 6           MR. KLEHM:  Same objections.  Calls for

 7   speculation.  Incomplete hypothetical.  Lacks foundation.

 8   Argumentative.

 9           You can answer if you understand.

10           THE WITNESS:  I guess my answer would be the

11   same that I just said.  I have to know more of the

12   situation and take -- it's guessing here.  You're asking

13   me to guess in a circumstance that I don't have all of the

14   information over this, so I can't say for that

15   application.

16       Q.    BY MR. SINCICH:  All right.  In this scenario,

17   there's no other information.  There's merely a subject

18   standing before you with a gun in their hand.  That

19   information alone, are officers allowed to use deadly

20   force according to their training?

21           MR. KLEHM:  Objection.  Incomplete hypothetical.

22   Lacks foundation.  Calls for speculation.  Argumentative.

23           You can answer if you understand.

24           THE WITNESS:  No.

25       Q.    BY MR. SINCICH:  Is it fair to say that based on

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 19

1    your training, officers should not use deadly force merely

2    because the subject is fleeing?

3         A.    Correct.

4         Q.    Were you ever trained that if you see a person

5    with a gun in their hand, that you're allowed to use

6    deadly force?

7              MR. KLEHM:   Same objections.   Incomplete

8    hypothetical.   Lacks foundation.   Calls for speculation.

9    Argumentative.

10             THE WITNESS:   That would be very similar to the

11   last question.   Without any other information per, in that

12   scenario, somebody just shooting somebody because they

13   have a gun in their hand is no.   That's my answer.

14        Q.    BY MR. SINCICH:   Thank you.

15             Other than this incident, have you ever been in

16   any other officer involved shooting?

17        A.    Not where I was the shooter.

18        Q.    Okay.   Is it fair to say that during this

19   incident, you didn't know what Mr. Solis was thinking?

20             MR. KLEHM:   I'm sorry.   What he was thinking?

21             MR. SINCICH:   Thinking.

22             MR. KLEHM:   Thinking.

23             THE WITNESS:   That's correct.

24        Q.    BY MR. SINCICH:   Did you review any documents in

25   preparation for today?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 20

```
 1     A.   No.
 2     Q.   Have you ever reviewed any documents related to
 3  this incident?
 4     A.   Yes.
 5     Q.   What documents have you reviewed?
 6     A.   I've reviewed a portion of what's called a CIIT
 7  report.  I have reviewed my testimony for my statement for
 8  the day of the shooting or what happened on the day of the
 9  shooting.  I have --
10          MR. KLEHM:  Anything else, anything that was
11  discussed with counsel is privileged, so you don't have to
12  talk about anything that I've read to you --
13          THE WITNESS:  Oh, okay.
14          MR. KLEHM:  -- or things like that.
15          THE WITNESS:  Okay.  I was notified about some
16  paperwork regarding the findings.  I believe it's from my
17  department and from the D.A.'s office if I'm correct.
18  Could be wrong.  Just that I -- I guess that I was --
19  yeah, yeah, that.
20     Q.   BY MR. SINCICH:  Okay.  Anything else?
21  Documents that you reviewed?
22     A.   It don't recall.
23     Q.   Okay.  When was the last time you reviewed the
24  CIIT report?
25          MR. KLEHM:  Objection.  He never said he
```

EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.
Officer Michael Bell on 05/08/2024

Page 43

1    A.    Yes.

2    Q.    Did you have a supervisor that you reported to

3  at C.H.P. as well?

4    A.    No, not for day-to-day work.

5    Q.    Okay.  Now prior to the incident, my

6  understanding is that you got a call regarding a suspected

7  kidnapping vehicle?

8    A.    Yes.

9    Q.    And you essentially got prepared and went into

10  the stealth vehicle with Detective Sobaszek to respond to

11  that call?

12    A.    Yes.

13    Q.    All right.  When you were en route to that call,

14  is that when you remembered something that drew your

15  attention to this incident?

16        MR. KLEHM:  I'm sorry.  Counsel, two questions

17  ago, you said prior to the incident.  And now you're

18  saying is there something that drew your attention to the

19  incident?  So it seems like you're using a term, incident,

20  different ways.  So if you can just be more clear as to

21  what you mean by incident in your current question, that

22  would be great.

23    Q.    BY MR. SINCICH:  That's fair enough.

24        When you were en route to this unrelated call,

25  is that when you learned information that eventually

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 44

1    brought you to the scene of this incident?

2        A.    Yes.

3        Q.    My understanding is that you were checking

4    e-mails or something to that effect?

5        A.    I don't recall how the information came.

6        Q.    Okay.  Essentially you learned that the other

7    call, they had sufficient units?

8        A.    Yes.

9        Q.    And around that time frame, is that when you

10   received the BOLO related to Mr. Solis?

11       A.    No.  I had seen the BOLO prior to leaving the

12   office.

13       Q.    Okay.  Did you do any kind of research on

14   Mr. Solis prior to leaving the office?

15       A.    I learned that he had several felony warrants

16   for, one for a car jacking crime and then one for a

17   robbery.  I can't remember what the other incidents were

18   for.  I believe that he's considered dangerous, possibly

19   armed, and that he was driving like a lime green colored

20   Mustang.  And then I was able to see his picture on the

21   BOLO.

22       Q.    Did you know anything else about Mr. Solis at

23   that time?

24       A.    Not that I recall.

25       Q.    Did you talk to your partner about Mr. Solis at

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 45

1   all prior to the shots being fired?

2       A.    Yes.

3       Q.    Did you learn any additional information about

4   Mr. Solis from your partner?

5       A.    No.

6       Q.    Then essentially the two of you talk about the

7   information that was on the BOLO flier?

8       A.    No.  I guess there's some confusion with your

9   question here, with what I'm saying.  So I had to talk to

10  him about Solis during the dealings with Edgar Solis, when

11  we were, when the incident was taking place, not

12  necessarily talking about his history or things about him.

13      Q.    Okay.  What did you say to your partner about

14  Mr. Solis?

15            MR. KLEHM:  And this is before any shots were

16  fired, correct?

17      Q.    BY MR. SINCICH:  I would say to narrow the

18  field, from the time you received the Polo, excuse me,

19  received the BOLO to the time you exited your vehicle.

20      A.    Oh, nothing that I recall.

21      Q.    In between that time frame, did your partner say

22  anything to you about Mr. Solis?

23      A.    I don't recall.

24      Q.    I recall in your statement saying something

25  that, you saying something that your partner thought he

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 46

1    knew where Mr. Solis might be.

2              Do you recall that?

3        A.    I think there was discussion of where he could

4    be heading or a direction, but nothing about Mr. Solis

5    that I recall.

6        Q.    Sorry.  Go ahead.

7        A.    So not that I recall anymore than that.

8        Q.    Did you learn anything about the location that

9    he might be headed?

10       A.    Somehow I was under the impression that he could

11   be in our area by whatever information we had received

12   from a Flock camera.  And that my partner, my partner or

13   someone thought he might be heading in a certain

14   direction.

15       Q.    Did your partner say why he might be headed in

16   that direction?

17       A.    No, not that I recall.

18       Q.    Okay.  And prior to the day of the incident, had

19   you ever met Mr. Solis before?

20       A.    It's possible, but I don't recall.

21       Q.    Is it fair to say that at the time that you used

22   deadly force, you don't recall ever meeting Mr. Solis

23   before?

24       A.    Yes, I don't recall.

25       Q.    What I mean is at the time you used deadly

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 47

1    force, that you didn't recall meeting Mr. Solis before?

2        A.    That's what I'm saying.  Yes, I don't recall

3    ever meeting him before.

4        Q.    Okay.  Did you have any information about the

5    neighborhood where the incident took place?

6        A.    Nothing specific.

7        Q.    It's a residential neighborhood, right?

8        A.    Yes.

9        Q.    And they're generally mobile homes?

10       A.    Yes.

11       Q.    Had you ever had any calls in that area before?

12       A.    Not that I recall in those specific streets.

13       Q.    Did you have any specific information about

14   whether or not Mr. Solis had ever used drugs or alcohol

15   prior to the incident?

16       A.    I recall some information possibly associated

17   with that BOLO that he had a drug charge or something or

18   some charge associated with drugs, but nothing beyond

19   that.

20       Q.    Did you have any specific information as to

21   whether or not Mr. Solis was under the influence of drugs

22   or alcohol at the time?

23       A.    No.

24       Q.    Did you have any specific information that

25   Mr. Solis had ever physically harmed anyone?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 48

1    A.    Just the charges against him for the warrant

2    that I spoke of.

3    **Q.    What specific information did you have about**

4    **harm that he caused to someone physically?**

5    A.    Just the nature of the crimes.  Carjacking and

6    robbery are typically considered violent crimes.

7    **Q.    Do you know if anyone got hurt during any of**

8    **those crimes?**

9         MR. KLEHM:  Objection.  Calls for speculation.

10   Lacks foundation.

11        THE WITNESS:  I don't have any details regarding

12   his other cases.

13   **Q.    BY MR. SINCICH:  Okay.  On the day of the**

14   **incident, did you have any information that anyone was**

15   **harmed by Mr. Solis that day?**

16   A.    No.

17   **Q.    Did you have any information that Mr. Solis had**

18   **verbally threatened anyone that day?**

19   A.    No.

20   **Q.    Can you describe what he was wearing?**

21   A.    No, I don't recall exactly what he was wearing.

22   **Q.    Was there anything remarkable about what he was**

23   **wearing that informed on your analysis of him?**

24   A.    Not that I recall.

25   **Q.    What did you believe his height to be when you**

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 49

1   saw him?

2           MR. KLEHM:  Vague as to time.  At what point in

3   time?

4           THE WITNESS:  I didn't think of his height when

5   I saw him.  I never, didn't cross my mind.

6       Q.   BY MR. SINCICH:  But you saw Mr. Solis at one

7   point outside of the vehicle, right?

8       A.   Yes.

9       Q.   What would you give as an estimate of his

10  height?

11      A.   Approximately 5' 9".

12      Q.   And what is his approximate weight?

13      A.   Appeared to be over 200 pounds.

14      Q.   What was his age to your understanding?

15      A.   I don't recall.

16      Q.   From seeing him, what did you understand his age

17  to be approximately?

18           MR. KLEHM:  It's vague and ambiguous as to when

19  you're talking about seeing him.  You mean after he was

20  shot up and was in a pool of blood or while he was fleeing

21  on foot?  At what point?

22      Q.   BY MR. SINCICH:  I don't know if those are going

23  to change the age that you would estimate, but on the day

24  of the incident, what age would you estimate he was from

25  your interaction with him on the day of the incident?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 79

1    Q.    Yes.

2    A.    No.

3    Q.    Did you see any civilians inside the house, a

4    house, for instance, through an open door or window?

5    A.    I don't remember what time it was, but I saw an

6    occupant inside the house on, that we had entered where

7    the shooting took place.  I believe it was a female.

8    Q.    Where were you when you saw the female in the

9    house?

10    A.    I would be on the north east side of the house

11    and I had seen her at some point.  And I don't know.  I

12    don't recall what time she opened the door of where, of,

13    of the side of the house where Edgar Solis ended up being

14    handcuffed.

15    Q.    And that was after Deputy Waltermire's shots,

16    right?

17    A.    I believe so.  I'm not sure though.

18    Q.    Did you see her at all prior to your first shot?

19    A.    I don't recall.

20    Q.    Mr. Solis, I understand, went through a swinging

21    gate in order to get to the backyard?

22    A.    I recall.

23    Q.    Was that gate closed?

24    A.    I believe so.

25    Q.    After he went through the gate, did it close

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 80

1  behind him?

2      A.    I think it was swinging still, but I -- and

3  tried to close and open back up or something along those

4  lines.

5      Q.    At the time that Mr. Solis reached the gate, how

6  far away from him were you?

7      A.    Approximately 30 feet.

8      Q.    Were you within the carport area of the house at

9  that time?

10     A.    Approximately.

11     Q.    What did you see Mr. Solis do next?

12     A.    He went through the gate.  There was another

13  fence inside of that gate.  It's like chain-link with

14  slats through the chain-link.  And he turned with the gun

15  pointing my direction facing me as he kneeled down behind

16  that, behind that second gate, that second fence.

17     Q.    Is it your testimony that Mr. Solis pointed the

18  gun at you?

19     A.    Yes.

20     Q.    When he was behind the fence?

21     A.    Against --

22           MR. KLEHM:  Misstates his testimony.

23     Q.    BY MR. SINCICH:  Did Mr. Solis ever shoot the

24  gun at you?

25           MR. KLEHM:  It calls for speculation.  Lacks

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 81

1    foundation.

2              THE WITNESS:  It's probable.

3        Q.    BY MR. SINCICH:  What do you mean by that?

4        A.    Well, I -- I wouldn't be able to see because --

5    it's hard.  It would be hard for me to know if he shot the

6    weapon for several reasons.

7        Q.    What reasons?

8        A.    One of which is when he's behind cover or

9    something's covering the weapon when he fires, I wouldn't

10   see a flash.  I have something, I believe it's called

11   auditory exclusion, so when I shoot or shooting's

12   happening, I don't necessarily hear the sounds of my

13   firearm going off let alone somebody else's.  So I

14   wouldn't hear, hear the shot.  And then he, he had a

15   revolver which doesn't eject spent cartridges.

16       Q.    Who told you that you have auditory exclusion?

17       A.    I know it.

18       Q.    You don't have auditory exclusion?

19       A.    I know that I have it.

20       Q.    How do you know that?

21       A.    Because I don't hear.  I didn't hear my

22   gunshots.

23       Q.    You didn't hear your own gunshots?

24       A.    Yes.  I have no recollection of hearing my own

25   gunshots.

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

1    Q.    When you say that you wouldn't be able to see a

2    muzzle flash of his gun, why is that?

3    A.    I'm saying it's possible that I would not be

4    able to see a flash if it was, if his gun was behind cover

5    when he fired at me.

6    Q.    When Mr. Solis was behind the gate -- strike

7    that.

8          The gate was a plastic white gate, correct?

9          MR. KLEHM:  Objection.  Misstates his testimony.

10         THE WITNESS:  I don't remember any plastic and I

11   don't remember the color.

12   Q.    BY MR. SINCICH:  Okay.  Maybe I'll show a

13   picture later on.

14         The fence itself, that's a metal fence, right?

15   A.    The chain-link fence from what I recall.

16   Q.    Yes, the chain-link fence.

17   A.    Yes.

18   Q.    And it had privacy slats kind of weaved through

19   the chain-links?

20   A.    Yes.

21   Q.    And you said that that created concealment for

22   Mr. Solis?

23   A.    Yes, partially.

24   Q.    And you believe that he ducked behind, ducked

25   down after he went behind the fence, right?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 83

1    A.    I saw him duck down after he turned and pointed

2    the weapon at me, he ducked down behind the fence and I

3    could still see his shape through the slats that he, where

4    he was at.

5    Q.    Are you saying that he pointed the gun at you

6    before he went behind the fence?

7    A.    No.

8    Q.    So was he already behind the fence when he

9    pointed the gun at you?

10   A.    The fence isn't full height, so if I had to

11   approximate, 3 to 4, 3 to 4 feet above the ground so he

12   would be above the fence.  Then he ducked down underneath

13   it.

14   Q.    So he went behind the fence.  And how much of

15   his body were you able to see above the fence?

16   A.    I would say most of his upper body.

17   Q.    From his waist up?

18   A.    It would be approximate.  Yes, around there.

19   Q.    What hand was the gun in when he pointed it at

20   you at that point?

21   A.    I don't recall.

22   Q.    Was his arm stretched out with the gun in his

23   hand in a shooting position?

24         MR. KLEHM:  Objection.  Argumentative.

25         THE WITNESS:  A shooting position doesn't

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 84

1  necessarily mean your arm's stretched out, but the gun was

2  in his hands pointed towards me, both hands.

3      Q.    BY MR. SINCICH:  Demonstrate what you mean.

4      A.    (Indicating.)

5      Q.    So what I'm seeing is your hands collapsed

6  together in a two-hand position.  Is that correct?

7      A.    Yes.

8      Q.    Your arms were bent at about 90 degrees?

9      A.    They're bent.

10      Q.    Was it a bend about 90 degrees that you

11  demonstrated?

12      A.    Yeah, approximately 90 degrees.

13      Q.    And your hands were some 10 inches away from

14  your torso area?

15      A.    Approximately 10 to 12 inches.

16      Q.    Okay.  And you're saying that the gun, because

17  of the height of the fence, would have been above the

18  fence?

19      A.    Yes.

20      Q.    So wouldn't you be able to see the muzzle flash

21  if he fired at that time?

22      A.    Yes.  If he fired while he was above the fence,

23  yes.

24      Q.    Okay.  And did he fire the weapon at you at that

25  time?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 85

1    A.    I didn't see him fire the weapon.

2    Q.    Did you hear him fire the weapon?

3    A.    I didn't hear my weapon or his weapon.

4    Q.    How long after you saw Mr. Solis point the gun

5    at you did you fire your first shot?

6    A.    Immediately.

7    Q.    When you say immediately, do you mean one

8    second, half a second, 5 seconds?

9    A.    I would approximate within a second.

10    Q.    Okay.  Where were you when you fired your first

11    shot?

12    A.    I believe I was just inside of the gate going

13    from the front yard to the backyard.

14    Q.    How far were you from Mr. Solis?

15    A.    Maybe 12, 12 feet approximately.

16    Q.    When you fired your first shot, was Mr. Solis

17    still standing in the position you saw him previously in

18    that you just demonstrated?

19        MR. KLEHM:  Objection.  Vague and ambiguous.

20    You said he was standing.

21        THE WITNESS:  You have to tell me what you meant

22    or what position were you referring to.

23    Q.    BY MR. SINCICH:  You demonstrated the position

24    of Mr. Solis.  Do you recall that?

25    A.    Yes.

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 86

1    Q.    And he was standing in what you demonstrated,

2    right?

3    A.    Yes.

4    Q.    Was he still in that position when you fired

5    your first shot?

6    A.    He was moving, but pretty basically in that

7    position, moving, squatting down, going from that position

8    to a squatting position.

9    Q.    Okay.  Was he moving other than just lowering

10   his body?

11   A.    Yes.  He was trying to get away.

12   Q.    Which direction was he going?

13   A.    He was going, trying to go towards the north.

14   Northeast is where his momentum was going or let's see

15   here.  Sorry.  He's basically going around the back of the

16   house towards the north side of the house is where his

17   momentum continued to go.

18   Q.    And is that generally away from your direction?

19   A.    Yes.

20   Q.    Did you think Mr. Solis was moving backwards?

21   A.    I don't recall.

22   Q.    Did you see Mr. Solis side pedaling?

23   A.    I know he was moving in a direction and trying

24   to stay concealed after trying to shoot me basically,

25   trying to shoot me.

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 89

1    A.    From what I recall, he was on the north side of

2  the home heading towards, from the backyard towards the

3  front area direction.  And he was approximately 15, 15 to

4  20 feet away approximately.

5    Q.    Where were you?

6    A.    I would be close to the back corner of the house

7  on the north side.

8    Q.    Kind of in the area where the pool was?

9    A.    Yes, just not behind the house.  I was, I was

10  using the, coming around the corner towards the side of

11  the house.

12    Q.    Were you moving during your shots in your second

13  volley?

14    A.    I don't recall.

15    Q.    Did you have cover during your second volley?

16    A.    No.

17    Q.    Did you attempt to achieve cover prior to firing

18  your second volley of shots?

19    A.    Yes.  I was trying to.

20    Q.    Where?

21    A.    Just we call it slicing the pie, around the

22  corner of the house, but the house is more concealment

23  than cover.  So I was hoping that there would be something

24  in the wall of the corner to help stop a bullet come my

25  direction, but --

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 90

1      Q.    Sorry.  Go ahead.

2      A.    -- but I eventually had to move away from the

3  house to keep visual on Solis because there was furniture

4  on the side of the house.

5      Q.    **What do you mean the house is more concealment**

6  **than cover?**

7      A.    Bullets go straight through houses of walls.

8  It's common.

9      Q.    **You'd describe them as paper thin, right?**

10      A.    Well it depends what type of wall, but these

11  houses, these mobile homes have thin walls.

12      Q.    **Is it your understanding that shots you fired**

13  **went through walls of houses?**

14            MR. KLEHM:  Objection.  Incomplete hypothetical.

15  Lacks foundation.  Calls for speculation.

16            THE WITNESS:  I'm not aware of that.

17      Q.    **BY MR. SINCICH:  Prior to firing your second**

18  **volley of shots, what did you see Mr. Solis doing?**

19      A.    He was still holding the gun.  I don't recall

20  which hand it was in.

21      Q.    **What was he doing?**

22      A.    He was in a swinging motion turning towards my

23  direction with the gun again.

24      Q.    **Turning to his left or right?**

25      A.    I feel like it was his left, but I don't recall

EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.
Officer Michael Bell on 05/08/2024

Page 91

1    specifically.

2        Q.    During your first volley of shots, where were

3    you aiming?

4        A.    I would say that, I guess the center mass area.

5        Q.    Center mass of what?

6        A.    Solis.

7        Q.    What part of Mr. Solis' body?

8        A.    The center of his mass.  It's the center of him.

9        Q.    I see your hands moving around your chest and

10   stomach.  Is that what you just demonstrated?

11       A.    Oh, the part of the body?  Yes, it's typically

12   towards the chest area.

13       Q.    During your first volley of shots, was

14   Mr. Solis' chest area exposed to you during all of the

15   shots?

16       A.    I knew where, I knew where his chest was.  Yes,

17   I was aiming at his chest.

18       Q.    Was his shoulder square with you during each of

19   your three approximate shots in the first volley?

20       A.    He was moving.  I don't recall his specific

21   positions.

22       Q.    So when you fired your first shot, were you

23   aiming at his chest?

24       A.    Yes.

25       Q.    And when you fired your second shot, where were

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
*Officer Michael Bell on 05/08/2024*

Page 92

1  you aiming?

2      A.    The center mass area.

3      Q.    If that bullet impacted exactly where you were

4  aiming, what would it strike on his body?

5      A.    The chest.

6      Q.    And when you fired your third shot, what were

7  you aiming for?

8      A.    The same, the chest.

9      Q.    And during this time frame, Mr. Solis was still

10  fleeing from you around the north side of the house

11  towards the north side of the house?

12      A.    Yes.

13      Q.    And he was on the other side of the chain-link

14  fence with the privacy slats?

15      A.    At what time?

16      Q.    When you fired your first volley of shots.

17      A.    His feet were behind the fence, yes.

18      Q.    And portions of his body as well?

19      A.    Yes.

20      Q.    While you were firing, was he trying to keep a

21  lower profile as he moved away from you?

22      A.    Yes.

23      Q.    Was he essentially bent over at the waist?

24      A.    At times.

25      Q.    And I'm specifically referring to while you were

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 93

1    firing your first volley of shots.

2         A.    Yes.  So it's hard for me to continue explaining

3    this any differently, but he was moving so he was in

4    different positions while I was firing.

5         Q.    Okay.  Do you know where -- strike that.

6               Do you know if any of your shots in the first

7    volley struck Mr. Solis?

8         A.    No.

9         Q.    Do you know if any of your shots in the second

10   volley struck Mr. Solis?

11        A.    I just assumed, but no.

12        Q.    Where did you assume you struck Mr. Solis in the

13   second volley?

14        A.    I don't know where he was struck.  I assume that

15   he was hit.

16        Q.    Why did you assume that he was hit?

17        A.    Because he had a response where he dropped to

18   the ground.

19        Q.    While you were in the backyard prior to firing

20   your first shot all the way up to your last shot, did

21   Mr. Solis say anything to you?

22        A.    I don't recall him saying anything or hearing

23   anything.

24               MR. KLEHM:  Counsel, we've been going for an

25   hour.

---

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 94

1          MR. SINCICH:  I'm going to take a break in a

2     minute.  I'm going to take a break in just a minute.

3          Q.    BY MR. SINCICH:  After Mr. Solis went to the

4     ground, what did he do after that?

5          A.    I couldn't see him.  He was behind furniture at

6     the, at the door that leads into the house.

7          Q.    Did you see him actually hit the ground at all?

8          A.    I just saw him disappear from my field-of-view.

9          Q.    Did you see him crawl while he was on the ground

10    at all?

11         A.    No.

12         Q.    Okay.  During your second volley of shots, where

13    were you aiming?

14         A.    Same, center mass.

15         Q.    Center mass of what part of Mr. Solis' body?

16         A.    Center of him, his chest.

17         Q.    Were you able to see Mr. Solis' chest during the

18    second volley of shots?

19         A.    Yes.

20         Q.    Were you able to see his chest during all

21    approximately three of your second volley of shots?

22         A.    Yes.

23         Q.    And during your second volley of shots,

24    Mr. Solis was still running away from you?

25              MR. KLEHM:  Objection.  Misstates his testimony.

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
Officer Michael Bell on 05/08/2024

Page 98

1    that he turned towards me with it --

2        Q.    Okay.

3        A.    -- pointing at me.

4              You're talking about the first volley incident?

5        Q.    Yes.  Did you see Mr. Solis ever run towards any

6    officer?

7        A.    Run towards an officer?

8        Q.    Yes.

9        A.    He was going towards the same direction that

10   Deputy Waltermire was going towards.  They were going

11   towards each other at the time of the last volley.

12       Q.    Did you know where Deputy Waltermire was when

13   you were firing your second volley?

14       A.    I don't remember what time exactly, during that

15   volley or right after, but I noticed, I noticed Waltermire

16   was coming in my direction.  I think it was right after.

17       Q.    Okay.  So did you know that Deputy Waltermire

18   was going to come through that gate prior to firing your

19   second volley?

20       A.    I don't.  I don't believe so.

21       Q.    At that point in time, is it fair to say that

22   Mr. Solis wasn't trying to run towards Deputy Waltermire?

23       A.    That's fair.

24       Q.    And Mr. Solis never tried to run towards you,

25   right?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 99

```
 1      A.    Correct.

 2      Q.    Did you ever see Mr. Solis attempt to take a

 3   hostage?

 4      A.    No.

 5      Q.    Did you ever see Mr. Solis physically harm

 6   anyone during the incident?

 7      A.    No.

 8      Q.    Did you ever see Mr. Solis attempt to punch,

 9   kick or grab anybody during the incident?

10      A.    No.

11      Q.    Did you ever see Mr. Solis attempt to open a

12   window to any home?

13      A.    No.

14      Q.    Did you ever see him attempt to enter a home

15   through a window?

16      A.    No.

17      Q.    Did you ever see him attempt to open a door to

18   any home?

19      A.    No.

20      Q.    Did you ever see him try to go through the door

21   to any home during the incident?

22      A.    Not that I recall.

23      Q.    Is it fair to say that Mr. Solis was in the

24   vicinity of at least three homes during the incident?

25      A.    Yes, that's fair.
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 100

1    Q.    And out of all those three homes, he never tried

2    to go through any door or window?

3    A.    As far as I can recall.

4    Q.    Is it fair to say that Mr. Solis never had his

5    hand under the towel while he was in the green car?

6    A.    I can't, I can't say that.  I didn't see him put

7    his hand under the towel as far as I know.

8    Q.    Okay.  And prior to your second volley of shots,

9    is it fair to say that Mr. Solis did not point the gun at

10    you?

11    A.    The gun was not pointed at me before the second

12    volley, correct.  Actually if -- before the second volley,

13    but after the first volley.

14    Q.    Correct.

15          You received training on the concept of deadly

16    force?

17    A.    Yes.

18    Q.    Is it fair to say that deadly force should only

19    be used when necessary in defense of life?

20    A.    I'd say it's fair that deadly force be used when

21    there's fear, intent and ability.  That's what I'm trade

22    on.

23    Q.    Is that sometimes called the deadly force

24    triangle?

25    A.    I don't recall that statement.

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 101

```
 1     Q.    Is it your understanding that the fear that an

 2   officer has must be objectively reasonable?

 3           MR. KLEHM:  Objection.  Calls for a legal

 4   conclusion.

 5           THE WITNESS:  I'm not sure what it's classified

 6   as.

 7     Q.    BY MR. SINCICH:  When an officer has a fear that

 8   he's using to justify the use of deadly force, were you

 9   ever trained that that fear must be objectively

10   reasonable?

11     A.    I was trained that it must be reasonable, yes.

12     Q.    Were you ever trained on the concept of

13   objective reasonableness when it comes to using deadly

14   force?

15     A.    I know what objective reasonableness is, yes,

16   but outside objectively, that everybody is in agreement

17   that it's reasonable.

18     Q.    Is part of the training that officers should use

19   the least intrusive method if possible to take a person

20   into custody?

21           MR. KLEHM:  Objection.  Incomplete hypothetical.

22           You can still answer.

23           THE WITNESS:  To use the least amount of force

24   necessary to effect the arrest.

25     Q.    BY MR. SINCICH:  When using deadly force, are
```

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 120

1    A.    I don't recall.

2    Q.    What distance did he cover during your second

3  volley approximately?

4    A.    Approximately 8 feet.

5    Q.    Approximately where was he in this image if you

6  know approximately when you first started firing your

7  second volley?

8    A.    I believe he was close to that round table from

9  what I recall.

10    Q.    Okay.  And then he went down after your second

11  volley of shots?

12    A.    Yes.

13    Q.    Okay.  Let me just look at my notes really

14  quickly here.

15         I'm just going to do those four exhibits right

16  now.  I don't have any further questions at this time.

17         MR. SINCICH:  Counsel, do you have anything?

18         MR. KLEHM:  No, I do not.

19         MR. SINCICH:  Ms. Ledesma, do you have any

20  additional spellings or order that you want to take?

21         THE REPORTER:  No additional spellings.

22         But, Mr. Klehm, did you want a copy?

23         MR. KLEHM:  Yes, please, and expedited, please,

24  or rough.

25         THE REPORTER:  A rough or an expedite or both?

**EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.**
**Officer Michael Bell on 05/08/2024**

Page 121

1          MR. KLEHM:  How long would it take to get an

2    expedite?

3          THE REPORTER:  Can we go off the record?

4          MR. SINCICH:  Off the record.

5          (WHEREUPON THE DEPOSITION WAS CONCLUDED AT

6    4:08 P.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25