# "EXHIBIT C"

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                            --oOo--

 4    EDGAR SOLIS,                          )
                                            )
 5                  Plaintiff,              )
                                            )
 6           vs.                            ) No. 23-cv-00515-HDV
                                            )     JPR
 7    COUNTY OF RIVERSIDE; STATE OF         )
      CALIFORNIA; SALVADOR WALTERMIRE,      )
 8    MICHAEL BELL, AND DOES 1-10,          )
      INCLUSIVE,                            )
 9                                          )
                    Defendants.             )
10    _____)

11

12

13

14

15

16

17                    DEPOSITION BY ZOOM OF

18                    LIEUTENANT ARTHUR PAEZ

19                       MAY 15, 2024

20

21

22

23
      Remotely reported by:
24    Catherine Buenaventura
      CSR NO. 8724
25    No. 00073144
```

Page 30

```
 1   officer grabbing one of Mr. Solis' arms and maneuvering
 2   him into a different position.  You understand what I
 3   mean by going "hands on"?
 4        A.   Yes.
 5        Q.   Is there another phrase for that?  I'll use
 6   another phrase if there's a better one.
 7        A.   Well, the term "hands on" can be vague.  It
 8   could be a physical encounter as well during a use of
 9   force.
10        Q.   Okay.  Do you know which officer touched
11   Mr. Solis after the shots and prior to any medical aid?
12        A.   I believe I was one of them assisting.  And I
13   do not recall who the other officer was.
14        Q.   When you and another officer touched
15   Mr. Solis, what did you guys do?
16        A.   Placed him in handcuffs.
17        Q.   Did you put him chest down on the concrete?
18        A.   I believe he was chest down when we placed
19   handcuffs on him.
20        Q.   Do you recall Mr. Solis in response to a
21   command saying, "I can't"?
22        A.   I don't recall that response.
23        Q.   Did you hear Mr. Solis complaining of pain at
24   all during the medical aid?
25        A.   I do recall him --
```

Page 31

1  MR. KLEHM:  All right.  All right.  Hang on a
2  second.
3  Marcel, I've got to object to this line of
4  questioning because you're asking him things about what
5  Solis said and your client took the Fifth Amendment
6  about every question I asked.  He didn't even place
7  himself at the scene.  So I think it's very unfair for
8  you to ask witnesses what your client may have said
9  when your client in his deposition pled the Fifth
10 Amendment to every question relating him even being at
11 the scene.
12 MR. SINCICH:  Sure.  You know why he pled the
13 Fifth Amendment.  Because he has a constitutional
14 right.  If the objection is fairness, I get it.
15     **Q.   Sergeant, you can answer the question.**
16 MR. KLEHM:  I agree.
17 THE WITNESS:  I'm sorry.  What is the
18 question?
19 MR. KLEHM:  It's just unusual.  I'm getting
20 more information from your questions to the lieutenant
21 about what your client said.
22 MR. SINCICH:  I'm just trying to get through
23 the deposition.  These are permissible questions.  It
24 is what it is.
25     **Q.   Did you hear Mr. Solis complain of pain after**

```
 1   the incident -- sorry, after the shooting?
 2        A.   I don't recall him making a statement.
 3        Q.   Was he essentially making some kind of
 4   grunting or pain noises?
 5        A.   Based on my recollection, yes.
 6        Q.   After the medical aid was completed, did the
 7   officers remain on scene for some time?
 8        A.   Which officers?
 9        Q.   Your team.
10        A.   They remained on scene, yes, until leaving or
11   being driven away.
12        Q.   How long was your team on scene before they
13   left?
14        A.   I wouldn't have that exact time.
15        Q.   Can you give me an approximate time, please?
16        A.   I would estimate not more than 30 minutes.
17        Q.   Did you speak with any members of your team
18   within that 30-minute time frame?
19        A.   Yes.
20        Q.   Who did you speak with?
21        A.   All three of them.
22        Q.   What did Officer Bell tell you?
23        A.   I had inquired whether -- who my shooting
24   guys were.  Once I determined who they were, then I
25   asked public safety statement questions.
```

Page 33

1  Q. What public safety statement questions did
2  you ask?
3  A. Number of rounds fired, direction, any
4  suspects outstanding. I believe I had a card that I
5  read it from.
6  Q. Do you recall any other questions?
7  A. Direction, rounds and I believe I asked if
8  they were okay as well.
9  Q. Did you learn that all of the officers were
10 okay?
11 A. Yes.
12 Q. What did you learn with regard to the
13 subjects outstanding?
14 A. There were -- no additional suspects were
15 being chased, if you will.
16 Q. Okay. How many rounds did Deputy Waltermire
17 tell you that he fired?
18 A. I don't recall.
19 Q. Can you give me an approximate number based
20 on your recollection?
21 A. No.
22 Q. In what direction did he fire?
23 A. It would have been toward the residence.
24 Q. Would that generally be in a west direction?
25 A. Yes.

Page 34

```
 1      Q.   And did you see Deputy Waltermire fire any
 2   shots?
 3      A.   No.
 4      Q.   Did you know it was Deputy Waltermire
 5   shooting when he was shooting?
 6      A.   No.
 7      Q.   After Deputy Waltermire entered the gate, did
 8   you also open the gate?
 9      A.   Yes.
10      Q.   And is that a white vinyl fence gate?
11      A.   Yes.
12      Q.   Approximately how tall was it?
13      A.   7 foot, 6-and-a-half maybe.
14      Q.   When you first opened that gate, did you see
15   Mr. Solis?
16      A.   Yes.
17      Q.   Where was he?
18      A.   By a door on the step.
19      Q.   Was he sitting on the step?
20      A.   Yes.
21      Q.   Was his back against the door?
22      A.   Physically I don't recall.
23      Q.   The direction of his back was towards the
24   door?
25      A.   Yes.
```

1  Q. Were you able to see his hands?
2  A. From what I recall, yes.
3  Q. Did he have a gun in his hands?
4  A. In his right hand, no. But his left hand was
5  down near his side where the gun was at.
6  Q. Did you see the gun prior to Deputy
7  Waltermire shooting?
8  A. Based on my recollection, yes.
9  Q. Do you recall whether or not that's what you
10 told the investigators?
11 A. I believe that's what I said.
12 Q. Okay. When you gave your statement to the
13 investigators, were you trying to be thorough giving
14 them all the facts that you recall?
15 A. Yes.
16 Q. And you were being honest with the
17 investigators?
18 A. Yes.
19 Q. How many shots did Officer Bell tell you he
20 fired?
21      MR. KLEHM: Objection, asked and answered.
22 BY MR. SINCICH:
23 Q. You can answer.
24 A. I don't recall.
25 Q. Do you know approximately how many rounds he

Page 36

1  told you that he fired?
2          MR. KLEHM:  Objection, asked and answered.
3  BY MR. SINCICH:
4      Q.   It's okay if we make objections.  You can
5  still respond unless your attorney tells you not to
6  answer.
7      A.   I don't recall how many rounds he said he
8  fired.
9      Q.   Okay.  Did he say he fired in one volley or
10 two volleys?
11     A.   Based on my recollection, I believe there was
12 two volleys of gunshots.
13     Q.   Is that your recollection of what he told
14 you?
15     A.   Yes.
16     Q.   Did he tell you which direction he fired in
17 both of those volleys?
18     A.   Yes.
19     Q.   Is the purpose of that to ascertain whether
20 or not any innocent civilians could have been struck by
21 that gunfire?
22     A.   Yes.
23     Q.   Which direction -- well, when he was
24 describing the direction that he fired, did he also
25 tell you where he was and where Mr. Solis was during

1   each volley?

2       A.   I believe so.

3       Q.   Did Officer Bell ever tell you that Mr. Solis

4   tried to shoot him?

5       A.   I don't recall him making that statement to

6   me, no.

7       Q.   Did Officer Bell ever tell you that Mr. Solis

8   pointed a gun at him?

9       A.   I don't recall obtaining that statement from

10  him.

11          MR. SINCICH:  I'll mark as Exhibit 1 to this

12  deposition an area that purports to be a Google Maps

13  aerial view of the officer-involved shooting location.

14          (Photograph labeled "614 Hillmer Drive"

15  marked Exhibit No. 1.)

16  BY MR. SINCICH:

17      Q.   Can you see my screen?

18      A.   Yes.

19      Q.   Is this the location of the officer-involved

20  shooting?

21      A.   I believe so.  It's the layout from the top

22  view.

23      Q.   Right.  The gate that you went through, the

24  vinyl gate, is that over here on the north side?  It

25  would be the northeast side of the property.

```
 1      A.   Yes.
 2      Q.   Where my cursor is?
 3      A.   Yes.
 4      Q.   Okay.  Now, where was Officer Bell when he
 5   fired his volley of shots?
 6           MR. KLEHM:  Objection, calls for speculation,
 7   lacks foundation.
 8   BY MR. SINCICH:
 9      Q.   From what he told you.
10      A.   It was to my understanding he was at the rear
11   of the property during both volley of shots.
12      Q.   Okay.  Are you able to point out here
13   somewhere on this image where Officer Bell was when he
14   fired his first volley of shots?
15      A.   Based on my recollection, he was to the rear
16   of the property.  I don't see where your cursor is at,
17   but --
18      Q.   Yes, I moved my cursor off.  Can you identify
19   a spot?  And then I'll ask you if I'm in the right
20   spot.
21           MR. KLEHM:  Objection, lacks foundation,
22   calls for speculation.
23           THE WITNESS:  It appears there's an awning to
24   the rear of the property.
25
```