# "EXHIBIT F"

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

May 31, 2024

Dale K. Galipo, Esq.
Marcel F. Sincich, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

**Regarding:** **Edgar Solis v. County of Riverside; State of California (CHP), et al.
USCD Case No. 5:23−cv−00515−HDV−JPR.**

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the March 2, 2022, officer involved shooting of Mr. Edgar Solis (Mr. Solis) by California Highway Patrol (CHP) Officer Michael Bell (Officer Bell) and Riverside County Sheriff's Department (RCSD) Deputy Salvador Waltermire (Deputy Waltermire). Pursuant to the requirements of Rule 26, I have studied the reports, video recordings, policies and procedures, California POST training documents, photographs, deposition transcripts, and other materials (as listed below) provided to me thus far regarding this case. Please be advised that if any additional data is provided for my review, a supplemental report may be necessary.

My opinions rest on the training given to every POST certified California Law Enforcement Officer and the reasonable professional standard of care as expressed and required pursuant to the training provided to every California certified Law Enforcement Officer, including Officer Bell and Deputy Waltermire, by POST.

**Materials Reviewed Thus Far:**

    1.      Signed Protective Order.

    2.      Plaintiff's First Amended Complaint for Damages.

    3.      Video Recordings:
           a.      [AGO 504] 603 Hillmer, Video.
           b.      [AGO 505] 603 Hillmer, Video.

c.   [AGO 506] 2022-03-02_16-09-20, Deputy Waltermire BWC Video (002. Video from Waltmire BWC).

d.   [AGO 507] Axon_Body_3_Video_2022-03-02_1609_X6033338V, Sgt. Paez BWC Video (001. Video from Sgt. Paez BWC).

e.   [AGO 508] AYPV2506, 614 Hillmer Dr. Front Yard Video.

f.   [AGO 509] BKSJ2054, 614 Hillmer Dr. Back Yard Video.

g.   [AGO 510] DHCY0843, 614 Hillmer Dr. Front Yard Video.

h.   [AGO 511] FDDR7512, 614 Hillmer Dr. Front Yard Video.

i.   [AGO 512] HFPF8390, 614 Hillmer Dr. Front Yard Video.

j.   [AGO 513] HMKO9684, 614 Hillmer Dr. Front Yard Video.

k.   [AGO 514] KTKM2053, 614 Hillmer Dr. Front Yard Video.

l.   [AGO 515] LIGD2098, 614 Hillmer Dr. Front Yard Video.

m.   [AGO 516] LMQZ6399, 614 Hillmer Dr. Front Yard Video.

n.   [AGO 517] MCII8645, 614 Hillmer Dr. Front Yard Video.

o.   [AGO 518] MMXM3627, 614 Hillmer Dr. Front Yard Video.

p.   [AGO 519] MRAK2661, 614 Hillmer Dr. Back Yard Video.

q.   [AGO 520] NCWE2879, 614 Hillmer Dr. Back Yard Video.

r.   [AGO 521] NDBQ2555, 614 Hillmer Dr. Back Yard Video.

s.   [AGO 522] NNCY2467, 614 Hillmer Dr. Back Yard Video.

t.   [AGO 523] OJMQ5886, 614 Hillmer Dr. Back Yard Video.

u.   [AGO 524] UGGK1245, 614 Hillmer Dr. Back Yard Video.

v.   [AGO 525] VVPM1227, 614 Hillmer Dr. Back Yard Video.

w.   [AGO 526] WNRG1367, 614 Hillmer Dr. Front Yard Video.

x.   [AGO 527] WRLN1188, 614 Hillmer Dr. Front Yard Video.

y.   [AGO 528] XBDK3186, 614 Hillmer Dr. Front Yard Video.

z.   [AGO 529] XMDR0023, 614 Hillmer Dr. Back Yard Video.

4.   Audio Recordings:

a.   [AGO 497] CIIT Interview Officer Bell CONFIDENTIAL.

b.   [AGO 498] Hemet PD Dispatch CONFIDENTIAL (003. Audio Hemet Dispatch).

c.   [AGO 499] Int. Deputy Waltermire CONFIDENTIAL.

d.   [AGO 500] Int. Officer Bell CHP CONFIDENTIAL.

e.   [AGO 501] Int. Officer Sobaszek HPD CONFIDENTIAL.

f.   [AGO 502] Int. Sgt. Paez HPD CONFIDENTIAL.

g.   [AGO 503] OIS briefing - March 2 CONFIDENTIAL.

5.   Transcripts:

a.   October 19, 2024, Deposition of Deputy Salvador Waltermire.

b.   May 3, 2024, Deposition of Edgar Solis.

c.   May 8, 2024, Deposition of Officer Michael Bell with exhibits.

d.   May 15, 2024, Deposition of Lt. Arther Paez with exhibits.

e. May 15, 2024, Deposition of Corporal Patrick Sobaszek with exhibits.

f. [AGO 68-161] E.1.A – Michael T. Bell CONFIDENTIAL.

g. [AGO 162-192] E.1.B – Michael Bell CHP Interview CONFIDENTIAL.

h. [AGO 193-248] E.1.C – Salvador Waltermire Riverside DA Interview CONFIDENTIAL.

i. [AGO 249-300] E.1.D. – Patrick Sobaszek Riverside DA Interview CONFIDENTIAL.

j. [AGO 301-334] E.1.E – Arthur Paez Riverside DA Interview CONFIDENTIAL.

k. 018. RCSD Report by Inv. Moody re Transcript of Int of Edgar Solis; 041222.

l. 023. RCSD Report by Inv. Moody re Transcript of Int of Sgt. Paez; 041222.

m. 028. RCSD Report by Inv. Moody re Transcripts for Int of Officer Michael Bell; 041222.

6. CHP Investigative Records:

a. [AGO 1-7] 1. Critical Incident Investigation - C22-601-001_Redacted.

b. [AGO 8-9] A – Table of Contents.

c. [AGO 10-13] B.1 – Summary of Incident.

d. [AGO 14-18] B.2 – Scene Description.

e. [AGO 19-20] B.3 – Employee's Profile CONFIDENTIAL.

f. [AGO 43] B.6 – Crime Scene Evidence Collection &amp; Storage.

g. [AGO 44] B.7 – Injury Descriptions.

h. [AGO 46] B.9 – Critical Incident Debriefing.

i. [AGO 47-48] C.1 – Identification CONFIDENTIAL.

j. [AGO 49-52] C.2 – Witnesses CONFIDENTIAL.

k. [AGO 53-56] C.3 – Other Involved Personnel.

l. [AGO 57-64] D – Vehicles CONFIDENTIAL.

m. [AGO 65-67] E.1 – Officer Statements CONFIDENTIAL.

n. [AGO 335-336] E.1.F – Maps.

o. [AGO 337] E.2 – Obtaining a Pubic Statement - UOF Critical Incident.

p. [AGO 338-343] E.3 – Witness Statements CONFIDENTIAL.

q. [AGO 344-345] E.3.A – Witness Leslie Martinez CONFIDENTIAL.

r. [AGO 346-347] E.3.B – Witnesses Jorge Hdz Rocha Sandra Luz Gomez Bojorques Jose Manuel Hdz CONFIDENTIAL.

s. [AGO 348-349] E.3.C – Witness Marlene Sue Biggs CONFIDENTIAL.

t.     [AGO 350-351] E.3.D – Witness Maria Isabel Cruz Abel Robles and Jorge Gonzalez CONFIDENTIAL.

u.     [AGO 352-353] E.3.E – Witnesses Yolanda Martinez Elizabeth Alvarado Martinez and Cassandra Rodri CONFIDENTIAL.

v.     [AGO 354-355] E.3.F – Witnesses Jaden Schig Mary Clarksburg Tristan Neaveill Sebastian Neaveill CONFIDENTIAL.

w.     [AGO 356-357] E.3.G – Witnesses Jose Jesus Rodriquez Ana Rodriquez Liliana Rodriquez CONFIDENTIAL.

x.     [AGO 358-359] E.3.H – Witness Nidia Santana CONFIDENTIAL.

y.     [AGO 360-361] E.3.I – Witnesses Pearo Rodriquez Florina Mandujano Thomas Jordon CONFIDENTIAL.

z.     [AGO 362-363] E.3.J – Witness Richard Contla CONFIDENTIAL.

aa.    [AGO 364-365] E.3.K – Witnesses Kathy Cassel Kayla Cassel CONFIDENTIAL.

bb.    [AGO 367] F. – Diagrams.

cc.    [AGO 368-376] G. – Photography and Video CONFIDENTIAL.

dd.    [AGO 377-378] H.1 – Annexes - CHP 271.

ee.    [AGO 379-391] H.2 – CHP 36 CONFIDENTIAL.

ff.    [AGO 395-399] H.4 – Crime Scene logs.

gg.    [AGO 400-407] H.5 – CHP 125 CONFIDENTIAL.

hh.    [AGO 408-450] H.6 – Press Release.

ii.    [AGO 452-480] MB220610001 Admin Presentation CONFIDENTIAL.

jj.    [AGO 481-483] Officer Michael Bell - Memorandum of Findings CONFIDENTIAL.

kk.    [AGO 484-487] Officer Michael Bell ID 20350.

ll.    [AGO 488-496] Policy and Procedure Evaluation Report CONFIDENTIAL.

7.     RCSD Investigative Records:

a.     009. Dispatch Log. 03.02.22.

b.     010. Hemet PD CAD Log; 030222.

c.     011. RCSD Report by Dep. Carranza re Initial Report; 040122.

d.     012. RCSD Report by Dep. Cline re Notification & Response; 030222.

e.     013. RCSD Report by Inv. Mendoza re Legal Rep Walk-Through; 030322.

f.     014. RCSD Report by Inv. Manjarrez re Notification & Response; 030322.

g.     015. RCSD Report by Inv. Manjarrez re Int of Leslie Martinez; 030322.

h.     016. RCSD Report by Inv. Manjarrez re RUHS Scene Processing; 030322.

i.    019. RCSD Report by Inv. Moody re Int of Edgar Solis; 041222.

j.    021. RCSD Report by Inv. Moody re Int of Officer Bell; 041222.

k.    022. RCSD Report by Inv. Moody re Int of Sgt. Paez; 041222.

l.    027. RCSD Report by Inv. Moody re Response to Scene; 031522.

m.    029. RCSD Report by Dep. Ditfurth re Response; 050222.

n.    030. RCSD Report by Dep. Ditfurth re BWC Review of Dep. Waltermire; 050222.

o.    030. RCSD Report by Dep. Gonzalez re Response.; 051322.

p.    031. RCSD Report by Dep. Ditfurth re BWC Review of Sgt. Paez; 050222.

q.    031. RCSD Report by Dep. Gonzalez re Charting of Dep. Waltermire.; 051322.

r.    032. RCSD Report by Dep. Ditfurth re Duty Weapons to Armory; 050222.

s.    032. RCSD Report by Dep. Gonzalez re Charting of CHP Bell.; 051322.

t.    033. RCSD Report by Dep. Gonzalez re Charting of Witness Officers; 051322.

u.    034. RCSD Report by Dep. Ditfurth re Suspect Gun to Forensics; 030322.

v.    035. RCSD Report by Dep. Ditfurth re 642 Taschner Dr. Surveillance; 050222.

w.    035. RCSD Report by Inv. Moody re Summary Report for Edgar Solis; 041322.

x.    036. RCSD Report by Inv. Moody re Evidence to Perris Forensic Lab & Armory; 051922.

y.    037. RCSD Report by Inv. Moody re Suspect Gun Function Test; 051922.

z.    038. RCSD Report by Dep. Kroll re Forensic Tech for Aerial Photos; 051922.

aa.    038. RCSD Report by Inv. Sandoval re Area Canvass; 042722.

bb.    039. RCSD Report by Dep. Cary re Charting of Involved Officers; 051922.

cc.    039. RCSD Report by Dep. Cline re 614 N. Hillmer Dr.; 030222.

dd.    040. RCSD Report by Dep. Cary re Forensic Report for Hospital, Scene w-Suspect; 051922.

ee.    041. RCSD Report by Dep. Vanderfeer re Forensic Report for Scene 632 Taschner Dr.; 051922.

ff.    042. RCSD Report by Dep. Kroll re Forensic Report Processing the Suspect Mustang.; 051922.

gg.    043. RCSD Report by Dep. Torres re Latent Print Search & DNA Swab.; 051922.

hh.    044. RCSD Report by Dep. Cline re Digital Media.; 051922.

    ii.    045. RCSD Report by Dep. Cline re Torres Report; 051922.

    jj.    046. RCSD Report by Dep. Torres re DNA Collection; 062122.

    kk.    047. RCSD Report by Dep. Kopitzke re Rapid DNA Testing; 062122.

    ll.    048. RCSD Report by Dep. Anderson re Briefing; 110222.

    mm.    049. RCSD Report by Dep. Anderson re Canvass Interviews; 110222.

8.    Photographs:

    a.    [AGO 530-546] OIS-655-03022022 Combined Photos 1 Subset CONFIDENTIAL.

    b.    [AGO 547-603] OIS-655-03022022 Combined Photos 1.

    c.    [AGO 604-629] OIS-655-03022022 Combine Photos 2 Subset CONFIDENTIAL.

    d.    [AGO 630-678] OIS-655-03022022 Combined Photos 2.

    e.    [AGO 679-687] OIS-655-03022022 Combined Photos 3 Subset CONFIDENTIAL.

    f.    [AGO 688-753] OIS-655-03022022 Combined Photos 3.

    g.    [AGO 754-764] OIS-655-03022022 Combine Photos 4 Subset CONFIDENTIAL.

    h.    [AGO 765-828] OIS-655-03022022 Combined Photos 4.

    i.    [AGO 829-848] OIS-655-03022022 Combined Photos 5 Subset CONFIDENTIAL.

    j.    [AGO 849-881] OIS-655-03022022 Combined Photos 5.

    k.    [AGO 882-886] OIS-655-03022022 Combined Photos 6 Subset CONFIDENTIAL.

    l.    [AGO 887-956] OIS-655-03022022 Combined Photos 6.

    m.    [AGO 957-1006] OIS-655-03022022 Combined Photos 7.

    n.    [AGO 1007-1010] OIS-655-03022022 Combined Photos 8 Subset CONFIDENTIAL.

    o.    [AGO 1011-1070] OIS-655-03022022 Combined Photos 8.

    p.    [AGO 1071-1145] OIS-655-03022022 Combined Photos 9.

    q.    [AGO 1146-1219] OIS-655-03022022 Combined Photos 10.

    r.    [AGO 1220-1236] OIS-655-03022022 Combined Photos 11 CONFIDENTIAL.

    s.    004. Photo Charting of Deputies Paez, Bell, Waltermire, Sobaszek & Weapons.

    t.    005. Photos re Solis At Hospital by Tech Cary; 030222.

    u.    006. Photos re Solis's Clothing & Property by Tech Cary; 030222.

    v.    007. Photos re Scene by Tech Vanderfeer; 03.02.22.

    w.    008. Photos re Scene by Tech Alvarado; 03.02.22.

    x.    Photographs of Edgar Solis Gunshot Wounds from Medical Records.

9.    Discovery Responses:
    a.    August 4, 2023, County's Responses to Plaintiff's Interrogatories.
    b.    August 4, 2023, County's Responses to Plaintiff's Requests for Admission.
    c.    August 30, 2023, CHP Responses to Plaintiff's Requests for Admission.
    d.    September 11, 2023, CHP Responses to Plaintiff's Interrogatories.
    e.    September 18, 2023, County's First Supplemental Disclosures.
    f.    September 22, 2022, CHP Joinder in County's First Supplemental Disclosures.
    g.    January 4, 2023, Plaintiff's Responses to Officer Bell Interrogatories.
    h.    April 30, 2024, Plaintiff's First Supplemental Disclosures.

10.    Policies and Training:
    a.    [AGO 1237-1273] Michael Bell Training Records.
    b.    [AGO 1274-1295] CH1 HPM 70.6, Chapter 1.
    c.    [AGO 1468-1499] CHP Training Materials, A&C 2022 Docs.
    d.    [AGO 1457-1467] LD20 ECO - (CTC I-20), CHP Training Materials, Expanded Course Outline.
    e.    [AGO 1335-1456] LD_20_V-5.3, CHP Training Materials, Leaning Domain Workbook.
    f.    [AGO 1312-1334] CHP Training Materials, Media.
    g.    [AGO 1310-1311] CHP Training Materials, Post Testing Guidelines.
    h.    [AGO 1305-1309] CHP Training Materials, Presentation Modules.
    i.    [AGO 1296-1304] LD20 TTS, CHP Training Materials, Training and Testing.

11.    POST Basic Learning Domains:
    a.    #1. "Leadership, Professionalism and Ethics." Version 5.6
    b.    #2: "Criminal Justice System." Version 6.4
    c.    #3: "Principled Policing in the Community." Version 5.1
    d.    #5: "Introduction to Criminal Law." Version 5.6
    e.    #15: "Laws of Arrest." Version 4.14
    f.    #16: "Search and Seizure." Version 4.8
    g.    #20: "Use of Force/Deescalation." Version 5.4
    h.    #21: "Patrol Techniques." Version 5.0
    i.    #23: "Crimes in Progress." Version 4.1
    j.    #33: "Arrest Methods/Defensive Tactics." Version 5.0
    k.    #34: "First Aid, CPR and AED." Version 6.1
    l.    #35: "Firearms/Chemical Agents." Version 2.5
    m.    #36: "Information Systems." Version 3.6

12.    Scene Assessment Photographs from GLA Investigations, LLC.

13.    Overview of the incident scene via the internet.

**Brief Overview of Events According to the Riverside County Sheriff's Department and California Highway Patrol Investigative Records and Commentary:**

On March 2, 2022, Edgar Solis, a male, Hispanic, age 35, was in a green Ford Mustang, stopped on the west side of North Taschner Drive, facing north, approximately two houses south of West Menlo Avenue, in Hemet, California. Members of a Gang Task Force (GTF) led by Hemet Police Department Sergeant Arthur Paez and including Hemet Detective Patrick Sobaszek, County of Riverside Sheriff's Department Deputy Salvador Waltermire, and California Highway Patrol (CHP) Officer Michael Bell, received a Be On the Look Out (BOLO) communication regarding a green Mustang driven by Mr. Solis. Within approximately two minutes of the Officers encountering Mr. Solis, Officer Bell fired two volleys of shots at Mr. Solis followed by Deputy Waltermire shooting at Mr. Solis. Mr. Solis was struck multiple times by the Officers' rounds. In this set of facts (including as supported by video, physical, and forensic evidence) Mr. Solis (as recorded) never threatened to harm any Officer and was not an immediate threat of death or serious bodily injury to any person at the time of the uses of deadly force. The following pages are a brief overview of the incident, commentary, and opinions focusing primarily on Officer Bell's conduct and use of deadly force against Mr. Solis.

**Incident:**

On March 2, 2022, Sgt. Paez received a Hemet Station Crime Analysis Unit BOLO for Mr. Solis (who was possibly armed with a rifle and had three felony warrants), and for his vehicle (a 2005 Ford Mustang, green in color). Sergeant Paez entered the Mustang's license plate information into the Safety License Plate Reader Camera System (Flock). Shortly thereafter, Sergeant Paez received information that the Mustang was last seen traveling westbound on West Menlo Avenue at North State Street, in the City of Hemet. Sergeant Paez forwarded this information to Officer Bell, Detective Sobaszek, and Deputy Waltermire.

Officer Bell received the BOLO regarding Mr. Solis, however, he and his partner, Detective Sobaszek, first responded to an unrelated call. While en route Officer Bell learned that there were enough units responding to the unrelated call. So, Detective Sobaszek and Officer Bell went to the area identified by the Flock alert in search of Mr. Solis and the green Mustang.

Detective Sobaszek drove an unmarked Hemet Police Department Police Interceptor Utility Vehicle, a Ford Explorer, referred to as a "Stealth Explorer" by Officer Bell, with Officer Bell as the passenger in the vehicle.

At approximately 4:07 p.m., Detective Sobaszek drove westbound on Menlo Avenue from State Street. As the officers passed North Taschner Drive, Officer Bell observed a green Mustang matching the description of the vehicle on the BOLO. The Mustang was stopped, facing north, on the west side of Taschner Drive, approximately at the border of the second and third house south of Menlo Avenue. On the instruction of Officer Bell, Detective Sobaszek made a U-turn on Menlo Avenue and turned south onto Taschner Drive to investigate. As Detective Sobaszek drove closer to the Mustang, within approximately one vehicle length, Officer Bell reported recognizing the driver as Mr. Solis, the subject depicted on the BOLO flier. Detective Sobaszek stated that he activated the patrol vehicle's emergency lights and stopped facing the front of the Mustang. Officer Bell stated that Detective Sobaszek turned on the emergency lights when Officer Bell was exiting the Stealth Explorer and that Detective Sobaszek parked nose-to-nose with the Mustang.

Officer Bell exited the patrol vehicle and immediately drew his primary duty weapon as he approached the Mustang on the driver's side and ordered Mr. Solis to show his hands. Detective Sobaszek exited the patrol vehicle and approached the passenger side of the Mustang. After Officer Bell gave Mr. Solis the command to show his hands, Officer Bell stated that Mr. Solis slightly raised his left hand only. Officer Bell, who was standing within arm's reach of Mr. Solis, stated that Mr. Solis' right hand was over a towel that was draped over the center consol, and did not move. According to Officer Bell, Mr. Solis' hand was not under the towel. (Officer Bell Statement 81:16-18.) Officer Bell also stated that the only shape he could identify under the towel was the gear shifter. Detective Sobaszek also drew his primary duty weapon and also began giving Mr. Solis commands.

As Officer Bell and Detective Sobaszek were approaching the Mustang, Deputy Waltermire arrived on scene and stopped behind and to the left of the Stealth Explorer. Deputy Waltermire drove an unmarked RCSD Ford Crown Victoria. Deputy Waltermire exited his patrol vehicle and approached the Mustang on the passenger side, stopping near the "A" pillar, near Detective Sobaszek. Deputy Waltermire saw Officer Bell reaching into the Mustang from the open driver's window. Deputy Waltermire, who had already drawn his baton, then struck the Mustang's windshield shattering it.

According to Mr. Solis, he "got rushed" and "got scared" so he fled in reverse. Mr. Solis slowly reversed the vehicle away from the officers to the end of the cul-de-sac, moving approximately 10 mph. After following the Mustang on foot for a short distance on the west side of the street, Officer Bell yelled for Detective Sobaszek and Deputy Waltermire to move their respective patrol vehicles closer to provide cover. Mr. Solis stopped the Mustang momentarily before accelerating to the east. Mr. Solis drove through the driveway on the south side of 632 Taschner Drive and continued east to the backyard where he stopped. Officer Bell crossed the street and pursued along the north side of the same residence into the back yard. Detective Sobaszek parked the Stealth Explorer in front of the house and continued on foot. After Mr. Solis drove into the backyard,

Deputy Waltermire reentered his vehicle, drove north on Taschner Drive, east on Menlo Avenue, and then south on the next parallel street, North Hillmer Drive.  Sergeant Paez dove in a separate vehicle, also a Stealth Explorer, west on Menlo Avenue then followed Deputy Waltermire's route south on Hillmer Drive.

As Officer Bell entered the backyard of 632 Taschner Drive, he observed Mr. Solis running in an easterly direction.  Mr. Solis climbed over a short block wall at the rear of 632 Taschner Drive and entered the backyard of 633 Hillmer Drive.

According to Officer Bell, as he pursued Mr. Solis over the block wall, he observed what appeared to be a firearm in Mr. Solis' hand, though he did not know which hand it was supposedly in.  Officer Bell reported that Mr. Solis had a gun on the Hemet radio.

In his initial statement to investigators, Officer Bell stated that he saw the firearm after he jumped over the wall into the next property.  (Officer Bell Statement 52:14-17.)  Officer Bell described that he saw something shiny as Mr. Solis' arms were moving as he ran.  (Officer Bell Statement 53:15-54:3.)  It is unclear from Officer Bell's initial statement to investigators if he positively identified a firearm in Mr. Solis' hand.  It appears that Officer Bell saw something shiny, but he was not sure what color it was and was not sure what hand it was in.  However, by the time of his deposition, Officer Bell appeared clear that he saw a firearm in Mr. Solis' hand at the time.  (Officer Bell Deposition 70:9-12.)

Mr. Solis continued east through the side yard of 643 Hillmer Drive onto Hillmer Drive with Officer Bell closing the distance in pursuit.

Witness, Richard Contla, at 622 Taschner Drive, heard a noise coming from the residence to his north (632 Taschner Drive), and stepped out of his house to see what occurred.  Mr. Contla looked east into the backyard of 623 Taschner Drive and saw a male (Mr. Solis) jumping over the wall.  Mr. Contla also saw Detective Sobaszek park the Stealth Explorer in front of 632 Taschner Drive and run to the east.  Mr. Contla did not appear to report seeing a gun in Mr. Solis' hand to canvassing officers.  (AGO 362-363.)

Witness, Jaden Schlig, at 633 Hillmer Drive, heard someone running through the yard on the south side of the residence.  Mr. Schlig looked out the window and saw a man (Mr. Solis) running on the south side of the residence and break through a lattice fencing with two officers in pursuit.  Mr. did not appear to report seeing a gun in Mr. Solis' hand to canvassing officers.  (AGO 354-355.)

Witness, Marlene Biggs, at 634 Hillmer Drive, was in her front yard when she saw a man (Mr. Solis) break through her neighbors' (across the street) lattice fencing with two officers in pursuit.  Ms. Biggs reported to investigators that she did not see anything in Mr. Solis' hands.  (AGO 348.)

Based on the unclear identification of a firearm by Officer Bell as stated in his initial statement, the statements of the civilian witnesses, and the lack of video evidence

showing a gun in Mr. Solis' hand, for the purposes of this report, I cannot assume that there was a gun in Mr. Solis' hand. Whether there was a gun in Mr. Solis' hand or in his possession is important to my analysis. However, assuming Mr. Solis had a gun in his possession or hand, more important to the analysis is what Mr. Solis did with the gun.

Mr. Solis continued south toward the cul-de-sac of Hillmer Drive and entered the driveway of 614 Hillmer Drive. Mr. Solis' path of travel thereafter generally circled counterclockwise around the house back towards the front yard of the property.

In his initial statement to investigators, Officer Bell stated that Mr. Solis went through a swinging gate into the backyard of that residence as Officer Bell closed the distance on Mr. Solis. (Officer Bell Statement 26:8-10, 26:14-16.) Just beyond the swinging gate, there was a chain-link fence with privacy slats that shielded the view of what is behind it and obscured Officer Bell's vision of Mr. Solis. (Officer Bell Statement 26:18-22, 26:25.) Officer Bell described Mr. Solis going through that swinging gate, making a quick turn, and slouching down behind the concealment fence then facing Officer Bell. (Officer Bell Statement 26:25-27:4.) In his deposition, Officer Bell described Mr. Solis turning all the way around facing Officer Bell and then ducking down behind the fence after facing Officer Bell. (Officer Bell Deposition 82:24-83:4.) This is an important distinction. On the one hand, Officer Bell described Mr. Solis slouching behind concealment then facing him. On the other hand, Officer Bell described Mr. Solis facing him, pointing the gun at him, and then crouching down. In the former, Officer Bell would not be able to see a firearm in Mr. Solis' hands because his vision would be obscured. In the latter, Officer Bell may have seen a firearm prior to his vision being obscured.

It is also important to note that Officer Bell did not tell investigators that Mr. Solis pointed a gun at him. In his narrative statement to investigators describing what occurred in his own words, Officer Bell stated:

> "It's going to be this -- this residence right here. He was approaching this residence and it -- it occurred to me, within an instant, that he was going to reach cover and concealment before me which was going to put me in a huge disadvantage. And that fear level went through the roof for me. I also realized that there could be somebody in this backyard that could potentially be a victim and whose life could be in danger at this point. And I proceeded on foot, and he went through a gate -- a swinging gate into the backyard of that residence. I was with -- from the time we were both arriving at this residence, I felt like I was within lethal range of him firing at me and -- and being able to accurately harm me. But now, I had gained enough on him to where it was very -- seemed very close at this time. And I was -- I was fearful. He went through the fence -- I mean not the fence. The gate. And just beyond the gate, there was a a shorter there was a short fence that I believe was chain link. It had slats in it like for to sort of shield

what's behind it. But it's not – wasn't fully covered. To where I can see what was on the other side of it. Although, it was obscured. And as soon as he went through that gate, he made a quick turn and slouched -- he slouched down, facing -- facing me, behind that concealment fence. With a firearm in front of him that I can't -- I can't make – couldn't make out. So, I can't make out everything. But, I could make out portions of everything. And as he moved, I can see his outline of where his hands were and the firearm. And I knew he was hunkered down just in front of me, facing me, with the firearm in front of him. And like he -- he -- he wanted to -- he was waiting for me to go through where he had just gone through. And I thought my -- I thought I would die right then if I didn't shoot him. And I shot at that time. I shot through the fence at him. Approximately three times." (Officer Bell Statement 25:22-27:18.)

Later in his statement to investigators, Officer Bell stated:

"It just -- it -- it 100 percent looks like he made a decision to hide and lie in wait for me to come through -- that that's the only term I can think of. He had the weapon with him. He was facing me. And looking -- looking at me. He -- he wasn't continuing to flee or hide or surrender." (Officer Bell Statement 60:7-13.)

Investigator Moody sought clarity later in the interview:

**Moody**: "Okay. So, he's hunkered down. His body is facing you as you're coming through the gate. Can you see the gun? Can you see his hands?"

**Bell**: "So, like I said, I can -- I -- it's -- it's hard to say. I never get a clear view of anything because everything's partially obscured. But because things are moving, it's like a flip book. I don't know how to say. I'm seeing parts of it and my brain's putting it all together or what's -- what's there. So, I know the big picture of what's happening. But I can't see details. So, I can't tell you which hand the gun was in. But I know there was a gun there. And I know which direction it was facing because I could see -- I could see it, the shining." (Officer Bell Statement 61:7-23.)

Additionally, the investigative findings do not describe Mr. Solis pointing a gun at Officer Bell. On February 27, 2023, the California Highway Patrol Memorandum of Findings – Employee Involved Shooting Incident, authored by Captain G.D. Campa, Commander of San Gorgonio Pass Area, stated to Officer Bell, "As Solis reached a third residence, he quickly turned toward a position of concealment and took up a posture to lie in wait, while holding the firearm in front of him. Fearing for your life, you discharged your primary duty weapon at Solis." (AGO 482.) The concluded investigation did not include discovery or analysis of Mr. Solis "pointing" a gun at Officer Bell. Officer Bell signed the said Memorandum of Findings.

In the California Highway Patrol Critical Incident Police/Procedures Evaluation Report, CHP determined that "Solis stopped near a low chain-link fence, which was covered with privacy lats, and crouched down as Officer Bell approached.  The privacy slats partially obstructed Officer Bell' view of Solis, however, Officer Bell was able to see Solis facing him while holding the firearm.  Because Solis was crouched down, appearing to be lying in wait, and armed with a firearm, Officer Bell feared for the safety of nearby residents and his own life, and at 16:10:03 hours, fired several successive shots from his primary duty weapon at Solis."  (AGO 491.)  Any reasonable investigation into an officer-involved shooting would have indicated and analyzed a stated fact as important as whether the subject pointed a gun at an officer.  Since this was not found in the reports, it is more probable that Officer Bell never told anyone during the investigation that Mr. Solis turned all the way around facing him and did not tell investigators that Mr. Solis pointed a gun at him before slouching down.  (Officer Bell Deposition 103:5-105:5.) Officer Bell's May 8, 2024 deposition appears to be the first time in the record that Officer Bell stated that Mr. Solis pointed a gun in his direction.  (Officer Bell Deposition 80:11-16.)

It is my opinion from Officer Bell's initial statement and review of the scene photographs that Officer Bell did not and was not able to see Mr. Solis pointing a gun at him.  When Officer Bell fired at Mr. Solis, he could not see Mr. Solis because his vision was obscured.  Officer Bell also testified that he would not even be able to see something as bright and obvious as the muzzle flash of a gun being discharged in his direction because of the lack of visibility behind the chain-link fence.  (Officer Bell Deposition 82:1-5.)

> Q.    Prior to firing your first volley, was your view of Mr. Solis obscured?  A.  Yes.  (Officer Bell Deposition 102:16-18.)

> Q.    Is it fair to say that you could not see details of his person behind the chain-link fence?  A.  Yes.  (Officer Bell Deposition 102:19-21.)

> Q.    Okay.  So is it fair to say that he went through the gate and then immediately turned and slouched behind the fence before the shots were fired?  A.  Yes, …  (Officer Bell Deposition 104:2-5.)

> Q.    As you were explaining it, after he slouched down, he was behind concealment, correct?  A.  Yes.  (Officer Bell Deposition 104:8-10.)

> Q.    And you couldn't make out everything, correct?  A.  Correct. (Officer Bell Deposition 105:4-5.)

Another important detail is that Officer Bell states several times that Mr. Solis was moving away from him prior to and at the time of his first volley of shots.  To explain how Mr. Solis was bending down as he was running away, Officer Bell stated that he was only able to see Mr. Solis' silhouette through the concealment fence.  Officer Bell stated that he never got a clear picture of Mr. Solis all the time.  This is also consistent with

Officer Bell's statement that what he saw was like a "flip book" of the light appearing through the small gaps in the privacy slats as Mr. Solis continued away from Officer Bell.

Officer Bell stated that he could not make out the firearm and that he could only see Mr. Solis' outline.  (Officer Bell Statement 27:4-9.)  After Mr. Solis ducked down behind the fence, Officer Bell could only see his general shape through the slats.  (Officer Bell Deposition 82:24-83:4.)  When asked if he saw the gun, Officer Bell stated, "it's hard to say.  I never get a clear view of anything because everything's partially obscured." (Officer Bell Statement 61:7-14.)  Officer Bell elaborated, "I can't see details.  So, I can't tell you which hand the gun was in."  (Officer Bell Statement 61:19-20.)  Officer Bell also clarified that he fired at Mr. Solis when Mr. Solis was concealed from his view behind the chain-linked fence.  (Officer Bell Deposition 105:20-106:1.)  Therefore, without being able to see Mr. Solis clearly and without being able to identify a gun in Mr. Solis' hand, Officer Bell shot approximately three times through the fence at Mr. Solis in a northerly direction.  (Officer Bell Statement 27:16-18; Officer Bell Deposition 107:22-108:4.)

When Officer Bell fired his first shot, Officer Bell testified that he was "just inside the gate going from the front yard to the backyard" and that Mr. Solis was approximately 12 feet away from him.  (Officer Bell Deposition 85:10-15, 116:11-23.)  Officer Bell testified that when he fired his first volley, Mr. Solis remained low and moved away from Officer Bell in a northeast direction.  (Officer Bell Deposition 8:4-19, 88:4-8, 92:9-22.)

The forensic evidence (bullet strikes and casings) shows that Officer Bell was standing near the southwest corner of the house, while Mr. Solis was between the chain-link fence housing pool equipment and the metal fence surrounding the pool.  From these approximate positions, Officer Bell fired 3-4 rounds at Mr. Solis in a northeast direction.

After Officer Bell's first volley of shots, Detective Sobaszek put out over the radio, "Shots fired."  Immediately following Officer Bell's first volley of shots, Mr. Solis continued north toward the front yard of the property away from Officer Bell.  Officer Bell lost sight of Mr. Solis but continued in pursuit before stopping behind cover on the southeast corner of the house.  According to Officer Bell, Mr. Solis was still trying to say low after being shot at in the first volley and moving towards the front of the trailer on the opposite side of the property.  (Officer Bell Statement 28:13-16, 63:20-24.)  Based on Officer Bell's statements, Mr. Solis was not attempting to go inside the house.

Officer Bell stated that he saw Mr. Solis "with the firearm still in his hand.  And he's turning and the firearm's swinging, even as he's turning to look back at me.  And I take my focus off of the firearm."  (Officer Bell Statement 29:1-5.)  According to Officer Bell, Mr. Solis was turning to look at him, not to fire a weapon at him.

Officer Bell knew that his partner Detective Sobaszek was coming towards him from the rear of the house and knew that other GTF team members were at the front of the house.

**Moody**: "… At -- when he's at the door right before the gate, did the gun ever come around? Did he ever turn around the body? Do you remember him pointing it at you?"

**Bell**: "No. I don't remember. I remember the gun swinging so he's, I guess, leading with the gun with his - - with - - with his body. So, I can see the gun and my - - all my focus goes off the gun to my sights and his upper torso. And I don't see what he - - how he continues to turn, manipulate then. I just see my sights and the - - and his upper torso." (Officer Bell Statement 89:5-17.)

Mr. Solis did not turn around to face Officer Bell and did not point a gun at Officer Bell. Yet, Officer Bell then opened fire with his second volley of shots aiming at Mr. Solis' upper torso. (Officer Bell Statement 29:2-5, 30:2-7.)

It was approximately 3-5 seconds between Officer Bell's first and second volley of shots. (Officer Bell Deposition 12:17-19, 13:22-23, 88:19-23.) Officer Bell also fired approximately 3 rounds within a couple of seconds in his second volley of shots. (Officer Bell Deposition 22:11-18.) When Officer Bell opened fire for the second time, Mr. Solis was on the northeast side of the home heading towards the front area, approximately 15-20 feet away from Officer Bell who was at the back corner of the house. (Officer Bell Deposition 88:24-89:11.)

Prior to firing his second volley of shots, Officer Bell stated that Mr. Solis was still holding the gun but again did not know which hand it was in. (Officer Bell Deposition 90:17-20, 96:16-19.) Officer Bell stated that Mr. Solis arms were in a swinging motion but did not know which direction Mr. Solis was turning. (Officer Bell Deposition 90:21-91:1.) Officer Bell again testified that he was aiming center mass at Mr. Solis' chest and was able to see his chest when he fired his second volley of shots. (Officer Bell Deposition 94:12-22.) However, Mr. Solis was fleeing from Officer Bell at the time, moving towards the front of the house. (Officer Bell Deposition 94:23-95:9.)

Mr. Solis did not point a gun at Officer Bell immediately prior to or during the second volley of shots. (Officer Bell Deposition 96:25-97:6, 100:8-13.) Again, during the second volley of shots, Officer Bell was unable to see Mr. Solis' entire body. (Officer Bell Deposition 110:13-16.) Mr. Solis was moving away from Officer Bell during his second volley of shots and covered approximately eight feet in the process. (Officer Bell Deposition 119:21-23, 120:2-4.)

Detective Sobaszek only heard the first two shots from Officer Bell's second volley of shots as he was arriving in support. At the time of the first two shots, Detective Sobaszek could not see Officer Bell as he was running toward the area where Officer Bell was standing. At the time, Detective Sobaszek was in the area where Officer Bell fired his first volley of shots, and Officer Bell was in the same area that Mr. Solis was during the first volley of shots. In these positions, given the privacy slats on the chain-link fence, no

reasonable officer would be able to positively identify a subject or a weapon in the subject's hand during Officer Bell's first volley of shots.

According to Mr. Solis, prior to and at the time that Officer Bell used deadly force against him, Mr. Solis was not pointing and had not pointed a weapon at Officer Bell or any other person; Mr. Solis was not and had not shot at Officer Bell or any other person; Mr. Solis did not verbally threaten to harm Officer Bell or any other person; Mr. Solis was not attempting to harm or threaten Officer Bell or any other person; and no person or officer was about to be injured or harmed based on Mr. Solis' conduct.  (Plaintiff's Responses to Officer Bell Interrogatories, No. 1.)

Officer Bell assumed Mr. Solis was struck by his gunfire seeing Mr. Solis drop to the ground.  (Officer Bell Deposition 93:9-18, 120:10-12.)  After Officer Bell's second volley of shots, Mr. Solis fell to the ground and Officer Bell lost the visual of his entire body.  Mr. Solis fell to the ground near a step to a door of the residence.  Mr. Solis then sat on a step with his back facing the house and put his right hand up in submission (Mr. Solis' left hand is not visible on the video).  Officer Bell was unable to see Mr. Solis due to home furnishings blocking his view.

Deputy Waltermire then "Exploded through the gate" and passed Mr. Solis.  Officer Bell and Detective Sobaszek were pointing their weapons in the direction of Deputy Waltermire and Sergeant Paez who followed behind Deputy Waltermire.  After entering the gate, Deputy Waltermire swung his weapon up pointing it at Officer Bell and Detective Sobaszek.  During that time, Officer Bell began yelling at Deputy Waltermire to stop and to watch out, referencing Mr. Solis who was down in a submissive position, being right there on the ground.

Without any attempt to communicate, coordinate, or plan, Deputy Waltermire burst through the gate with such haste that he entered the yard from the north in a careless stride past Mr. Solis.  Knowing there were just "shots fired" and the sight of two officer's weapons pointed right at Deputy Waltermire followed by their yelling caused Deputy Waltermire to unreasonably panic.  Deputy Waltermire turned left toward a group of trash cans (away from Mr. Solis) and dove to the ground to face Mr. Solis.  Without warning, and without any justification, Deputy Waltermire proceeded to fire his entire magazine at Mr. Solis, firing eleven times from approximately ten feet of Mr. Solis.

A body worn camera recording of the incident shows Deputy Waltermire firing eleven times, indiscriminately in the direction of Mr. Solis.  Deputy Waltermire admitted he did not give any commands before he fired, nor did he give Mr. Solis a warning he would fire.  Mr. Solis was in a seated position with his hands up in submission prior to and when Deputy Waltermire used deadly force.  Deputy Waltermire testified Mr. Solis' right hand was in the air when he first encountered him and remained visible throughout the incident.  Deputy Waltermire did not perceive a threat from Mr. Solis' right hand.

According to Deputy Waltermire, during the eleven shots Mr. Solis never touched the gun and from Deputy Waltermire's perspective, Mr. Solis was not reaching for the gun.

Deputy Waltermire claimed to have assessed the situation after each of the eleven shots yet failed to accurately determine that Mr. Solis did not present a danger at the time. Further, Deputy Waltermire's rapid rate of fire belies the claim that he assessed between shots. Mr. Solis' empty hands were up prior to and at the time of the shots. Illuminating is the body-worn camera video of Sergeant Paez, who followed Deputy Waltermire towards the front gate. Unlike Deputy Waltermire, Sergeant Paez appeared to keep his composure, saw Mr. Solis with his hands up, and stopped at the entrance of the gate. Sergeant Paez immediately instructed Deputy Waltermire, "I got him." With a lack of situational awareness, after Sergeant Paez's statement, Deputy Waltermire opened fire, contagious to Officer Bell's shots. When Deputy Waltermire opened fire, it put Sergeant Paez in danger as he was standing only a few feet from Mr. Solis. Backing away from the gunfire in fear of being shot by officers, Sergeant Paez yelled at Deputy Waltermire, "I got it, stop, stop, stop!" Deputy Waltermire finally stopped shooting when he ran dry.

In total, nineteen (19) rounds were fired at Mr. Solis. Officer Bell fired a total of eight (8) rounds between his two volleys, and Deputy Waltermire fired a total of eleven (11) rounds.

Throughout the incident, Officer Bell displayed an irrational set of subjective fears which appear to have led to his inappropriate use of deadly force. First, after the green Mustang reversed into the cul-de-sac, Officer Bell thought "100 percent" it was going to accelerate directly towards officers (Officer Bell Statement 49:21-4) despite there being no indication that the vehicle would do so and no other in the path of the vehicle or near the vehicle. In fact, the car was driven in the opposite direction of Officer Bell. Officer Bell was incorrect in his assumption and his subjective belief was unreasonable. Second, as Mr. Solis was running away from Officer Bell in the open road of Hillmer Drive, Officer Bell was terrified again "100 percent" and formed the subjective belief that Mr. Solis was an imminent danger to the public and officers because he did not stop and surrender. (Officer Bell Statement 56:5-15.) Again, Officer Bell was incorrect in his subjective belief was unreasonable as Mr. Solis did not harm any person but was merely attempting to get away. Third, even after shooting Mr. Solis in two volleys of shots, causing him to fall to the ground, and witnessing Deputy Waltermire unload his entire magazine at Mr. Solis, and while Mr. Solis had obvious femoral bleeding and was bleeding out quickly, Officer Bell stated that he still feared for his life, even when Mr. Solis was laying unarmed on the ground bleeding. (Officer Bell Statement 33:9-11.) Further, in addressing Officer Bell's unreasonable subjective fear that Mr. Solis may take a hostage, Investigator Moody asked: "Do you remember seeing anybody outside their house when you were running." To which Officer Bell responded, "No." (Officer Bell Statement 55:22-25.)

Mr. Solis was admitted to the Riverside University Health System Medical Center intensive care unit to receive medical intervention. His injuries included (1) one gunshot wound to the right hand; (2) one gunshot wound to the right wrist; (3) one gunshot wound to the mid-upper back; (4) two gunshot wounds to the right leg; and (5) a fractured right leg. Miraculously, no vital organs were struck, and Mr. Solis survived. (COR 744.)

Given the position of Mr. Solis when Deputy Waltermire opened fire (as recorded on video), any shots to Mr. Solis' back side appear to be associated with Officer Bell's shots.

Key known facts that should have determined Officer Bell's actions includes:
- Mr. Solis was alone.
- Mr. Solis was not particularly athletic or capable.
- Mr. Solis was moving away from the Officers.
- Mr. Solis was shot in the back.
- Mr. Solis was shot while on the ground.
- Mr. Solis was shot without a weapon in his possession.
- Mr. Solis did not physically harm anyone.
- Mr. Solis did not attempt to punch, kick, or grab anyone.
- Mr. Solis did not verbally threaten anyone.
- Mr. Solis did not say anything to Officer Bell or any other officer or person.
- Mr. Solis did not run towards any officer or person.
- Mr. Solis did not attempt to run over any of the officers or person while in the green Mustang.
- Mr. Solis did not initiate a high-speed chase.
- Mr. Solis reversed slowly at only 10 mph.
- Mr. Solis did not attempt to take a hostage.
- Mr. Solis did not attempt to open a window or door to any home.
- Mr. Solis did not attempt to enter a window or door to any home.
- Mr. Solis was moving away from Officer Bell during both volleys of shots.
- Mr. Solis was seated on the ground, having already been shot, unarmed, during Deputy Waltermire's shots.
- Mr. Solis had a gun in his possession.
- Officer Bell had information that Mr. Solis had three (3) active felony warrants.
- Officer Bell had information that Mr. Solis may be armed.
- Officer Bell had information that Mr. Solis was accused of carjacking, robbery, drug possession, and firearm possession.
- Officer Bell had no information that Mr. Solis ever harmed anyone.
- Officer Bell had several less lethal and less intrusive alternative options available to him.
- Officer Bell was armed with a Taser and pepper spray.

- Officer Bell was wearing a ballistic vest.
- Officer Bell had approximately ten (10) years of training and experience.
- Officer Bell had the support of at least three additional GTF officers with additional officers en route.
- Officer Bell had the support of a K9 unit and air unit.
- Officer Bell was behind or had the opportunity to remain behind cover and/or concealment prior to firing each volley of shots.
- Officer Bell failed to have a tactical plan.
- Officer Bell failed to coordinate and communicate with other officers.
- Officer Bell failed to avoid a crossfire situation.
- Officer Bell testified that he gave Mr. Solis a verbal warning.
- There were no civilians in the backyard of 614 Hillmer Dr.
- Officer Bell knew when firing his weapon that the walls of the mobile homes were "paper thin."

**Standards and Training Regarding the Use of Deadly Force:**

From the outset, during POST Basic Academy, the seriousness of the unique powers imbued on Law Enforcement Officers is stressed with the required responsibility they have to use them with great care. It is clear that there is no room for unprofessional, careless and/or hot-headed individuals in the law enforcement profession. This is best expressed in Learning Domain # 2: "Criminal Justice System:"

"The criminal justice system gives law enforcement two extraordinary powers:
- the power of arrest
- the power to use deadly force

The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint*. This is why it is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, POST specifies that there are several key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."

Officers are trained that they are not allowed to inflict excessive force on persons that they arrest and that they must calculate their use of force based on the credible threat(s) evident in the totality of the circumstances.

**Force Options:**

Law enforcement officers are trained by POST that a subjects' resistance/actions to an arrest will determine the type of force used by peace officers.  The following illustrates how a subject's resistance/actions can correlate to the force applied by an officer:

*Compliant* - Subject offers no resistance:
- Mere professional appearance
- Nonverbal actions
- Verbal requests and commands
- Handcuffing and control holds

*Passive non-compliant* - Does not respond to verbal commands but also offers no physical form of resistance:
- Officer's strength to take physical control, including lifting/carrying
- Pain compliance control holds, takedowns and techniques to direct movement or immobilize a subject

*Active resistance* - Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody:
- Control holds and techniques to control the subject and situation
- Use of personal body weapons to gain advantage over the subject

*Assaultive* - Aggressive or combative; attempting to assault the officer or another person, verbally or physically displays an intention to assault the officer or another person:
- Use of devices and/or techniques to secure compliance and ultimately gain control of the situation
- Use of personal body weapons in self-defense and to gain advantage over the subject

*Life-threatening* - Any action likely to result in serious bodily injury or death of the officer or others:
- Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat

**POST Constant Re-evaluation of Force Requirement:**

"Peace officers must use the force option(s) appropriate for the situation as conditions may change rapidly.  Officers must continually reevaluate the subject's actions and the practical considerations involved in the situation and must be prepared to transition as needed to the appropriate force

options (deescalate or escalate), so as to always remain within the bounds
of conduct which is objectively reasonable under the circumstances."
(POST Learning Domain 20, page 3-7.)

Under the facts cited above, Mr. Solis never harmed any person, never verbally
threatened to harm any person, and Mr. Solis's conduct was not life-threatening to any
person or officer at the time of the deadly force. Accordingly, methods to deal with Mr.
Solis given the totality of the circumstances of this incident (a single, non-life-threatening
man) includes containment, verbal de-escalation (as trained), and the application of less-
lethal force if necessary. Instead, Officer Bell overreacted in the use of deadly force by
shooting a fleeing subject including to the back.

Officers in California (including Officer Bell) and throughout the nation are trained that
the right to life is a constitutional right. Accordingly, Officers are to use lethal force
always with a reverence for life and only in the direst of circumstances and only absent
an obvious reasonable alternative. In the case of deadly force, an officer may not use
deadly force if there is not an imminent threat of great bodily harm or death against him
or someone else.

**Considerations Regarding the Use of Deadly Force:**

The use of deadly force is the most serious decision a peace officer may ever have to
make. Such a decision should be guided by the reverence for all human life (including
the officer's life and others that may be in imminent danger) and used only when other
means of control are unreasonable or have been exhausted (i.e., only when necessary).
Because reverence for all life is the foundation on which the use of deadly force rests, the
authority to use deadly force is an awesome responsibility given to peace officers by the
people who require peace officers to exercise that authority judiciously. In the law
enforcement/community partnership, peace officers are expected to be self-disciplined,
and accountable. Firing a firearm at a human being is different from all other peace
officer use of force option and requires a specific set of facts before lethal force is
justified.

*Deadly force* applied by a peace officer is force that creates a substantial risk of causing
death or serious bodily injury.

An officer may use deadly force to protect oneself or others only when the officer has the
objective and reasonable belief that deadly force is necessary, and only when the officer
has the objective and reasonable belief that his/her life, or the life of another, is in
immediate threat of death or serious physical injury *based upon the totality of the facts
known to the officer at the time*. (LD 20: Chapter 3 – Use of Deadly Force, pages 4-3 &
4-4.)

An officer may also use deadly force to prevent the escape of a fleeing person only if the
officer objectively and reasonably has probable cause to believe that the suspect poses a

significant threat of death or serious physical injury to the officer or others, only if the
subject threatens the officer with a weapon or there is probable cause to believe that he
has committed a crime involving the infliction or threatened infliction of serious physical
injury or death, only when the officer objectively and reasonably believes that the use of
deadly force is necessary, and only after some warning were feasible.  (LD 20: Chapter 3
– Use of Deadly Force, pages 4-5 & 4-6.)

Officers are trained that in order to understand the aspects of the use of deadly force,
peace officers need to become familiar with the following terms:

> Reasonable necessity means: Delay in apprehension would create
> substantial and unreasonable risk to officers or others possibly resulting in
> serious physical injury or death.

> Imminent threat means: A threat of death or serious bodily injury is
> "imminent" when, based on the totality of the circumstances, a reasonable
> officer in the same situation would believe that a person has the present
> ability, opportunity, and apparent intent to immediately cause death or
> serious bodily injury to the peace officer or another person.  An imminent
> harm is not merely a fear of future harm, no matter how great the fear and
> no matter how great the likelihood of the harm, but is on that, from
> appearances, must be instantly confronted and addressed.

> Panic means: The total loss of emotional and physical self-control.  A
> sudden, unreasoning, hysterical fear of events that led up to the encounter
> with the subject.

> Self-control means: Maintaining composure to make sound judgments and
> decisions.

> Unreasonable force means: An officer will be found to have used
> unreasonable force when the type, degree or duration of the force which
> was used is found to have been greater than that which was objectively
> reasonable under the totality of the circumstances confronting the officer at
> the time that the force was used.

*Sufficiency of fear* - According to Penal Code Section 835a, **fear** alone does not justify
the use of deadly force.  An imminent harm is not merely a fear of future harm, no matter
how great the fear and no matter how great the likelihood of the harm, but is one that
from appearances, must be instantly confronted and addressed.
- A simply statement of fear for your safety is not enough; there must be
  objective factors to justify your concern.
- It must be objectively reasonable.
- It must be based on the facts and circumstances known to the officer at the
  time.

*Considerations when deciding to use deadly force* - The decision of whether or not to use deadly force may be influenced by the officer's:
- training and experience
- judgment
- mental alertness
- existing facts and circumstances
- understanding of state law, case law, and agency policy

(LD 20: Chapter 3 – Use of Deadly Force, page 4-8.)

The standard for using the deadly force is that the deadly force can be used when necessary in defense of life.  Also, peace officers are trained not to overreact when using force, including deadly force, and an overreaction in the use of force is excessive force.

While there are other law enforcement tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the law enforcement officer's firearm.  Accordingly, law enforcement officers are trained that they can only use firearms under the most extreme circumstances.  These situations are very rare and law enforcement officers are trained that the use of force must meet an *objectively reasonable* standard.  Law enforcement officers are trained that "Unreasonable Fear" is defined as: *Generated in the officers' mind with no direct correlation to facts and situations.* Unreasonable fear includes overreactions to true potential threats as well as reactions to unreal threats based on prejudice or poor application of past experience.  As stated above, law enforcement officers are taught that any use of deadly force must be based on an *objective* rather than a *subjective reasonable necessity of action to counter imminent danger.*

**California Highway Patrol Training Regarding the Use of Force:**

"The Department recognizes that use of force is a serious responsibility that shall be exercised judiciously with respect for human rights and dignity, and for the sanctity of every human life.  This policy recognizes the use of force by law enforcement requires constant evaluation.  Even at its lowest level, the use of force is a serious responsibility." (CH1 HPM 70.6 at 1-3.)

"Each officer is expected to utilize the following principles to make decisions to use force in a professional, fair, unbiased, and objectively reasonable manner, based on the facts and totality of the circumstances perceived by the officer at the time of the event."  (CH1 HPM 70.6 at 1-3.)

California Penal Code Section 835a(e)(2) states: "A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person.  An imminent harm is not merely a fear of future

harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed." (CH1 HPM 70.6 at 1-4.)

"An officer may only use a level of force that they reasonably believe is proportional to the seriousness of the suspected offense or the reasonably perceived level of actual or threatened resistance." (CH1 HPM 70.6 at 1-5.)

"An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life." (CH1 HPM 70.6 at 1-7.)

"If reasonably safe and feasible to do so, officers shall use other available resources and techniques." (CH1 HPM 70.6 at 1-7.)

The use of deadly force is only permissible in if it is: (A) "To defend against an imminent threat of death or serious bodily injury to the officer or to another person"; or (B) "To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended."

However, "Deadly force for apprehension of a person shall be used only when all other reasonable means of apprehension have been exhausted and, if under the totality of the circumstances perceived by the officer, the use of a firearm is not likely to endanger innocent persons." (CH1 HPM 70.6 at 1-7 to 1-8.)

835a (a)(2): "It is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer."

**Duty to Intercede:**
- 7286 a(2) "Excessive force" means a level of force that is found to have violated Section 835a of the Penal Code, the requirements on the use of force required by this section, or any other law or statute.
- 7286 a(4) "Intercede" includes, but is not limited to, physically stopping the excessive use of force, recording the excessive force, if equipped with a body-worn camera, and documenting efforts to intervene, efforts to deescalate the offending officer's excessive use of force, and confronting the offending officer about the excessive force during the use of force and, if the officer continues, reporting to dispatch or the watch commander on duty and stating the offending officer's name, unit, location, time, and situation, in order to establish a duty for that officer to intervene.

When officers are involved in or witness an incident in which they believe excessive force is currently or may have been used by any peace officer, they shall take immediate action to stop the excessive force. (CH1 HPM 70.6 at 1-7 to 1-12.)

The community expects that peace officers will not use unreasonable force and will intervene to stop any excessive force by another officer. (LD 20: Chapter 3 – Use of Deadly Force, page 7-8.)

### Tactical Concepts:

- **Tactical Approach** – Don't rush in. Where COULD the threat be?
  - Our "3 Friends" – Time, Distance, & Cover. Utilizing the radio.
  - Have you obtained all pertinent information regarding the call?
  - Is a secondary officer reasonable?
  - Are you making your approach with the understanding that the threat can be anywhere? Is this an AMBUSH?
  - Are you utilizing time, distance and cover in a manner to better assess the situation and make better decisions?
  - Have you considered all available resources? Air support, K9, additional units, perimeter?
  - Can you SLOW THINGS DOWN?
- **Have a PLAN!**
- **Situational Awareness**
- **O.O.D.A. Loop**
  - Observe: Gather Information.
  - Orient: Consider Options.
  - Decide: Select Appropriate Action(s).
  - Act: Take Action(s).
- The "**6 R's**" – Return fire – Relocate to cover – Reload – Radio – Remain – Render aid
- **Tactical Breathing** – Oxygen!
- **Control the Scene**

When other officers are present, law enforcement officers must work as a team, as trained. "The first officer on scene must take a leadership role for the initial assessment, making contact with the involved parties, and determining if law enforcement action is required. To accomplish these tasks safely, this officer may need to rely on additional support from one or more officers."

The **contact officer** is the officer initiating an action who becomes responsible for conducting the contact.

The **cover officer** is the officer responsible for surveillance and control of a suspect in order to free the contact officer to perform a thorough investigation."

"Cover" is a term often associated with combat tactics. Under such conditions, **cover** refers to anything that may stop or deflect an opponent's weapon (e.g., brick walls, buildings, portion of the vehicle with the engine block, etc.).

**Concealment** refers to anything that prevents an opponent from observing the officer (e.g., bushes, small trees, tall grass, dark shadows, large crowds, lines of moving vehicles, etc.). Concealment alone does not stop or deflect bullets.

(LD 21: Chapter 1 – Basic Concepts of Law Enforcement Patrol, page 1-14.)

Officers are trained that there are several tactical errors that if not followed could be detrimental to the appropriate decision-making process in a tactical situation, including:
- Inappropriate attitude including being careless or complacent, overconfident, or too aggressive.
- "Tombstone courage" includes being overly anxious to show one's own courage or attempting to handle dangerous situations beyond one's ability.
- Poor or no planning includes rushing into the situation without any plan of action, failure to establish a plan of action prior to engaging the suspect, or not considering alternative actions.
- Inadequate communication includes not establishing roles (cover, contact, etc.), failure to work with other officers as a team, or failure to notify dispatch of actions.
- Physical and mental fatigue includes not enough rest, attention and reflexes are compromised, or not staying in good physical condition.
- Poor positioning includes abandoning a safe location or being too close or in front of the suspect.

(LD 21: Chapter 1 – Basic Concepts of Law Enforcement Patrol, page 1-21 & 1-22.)

To avoid these tactical errors, officer should follow the following guidelines:
- Be aware of and use available cover.
  - In every situation, identify items that would provide adequate cover if needed
  - Use, be ready to use, and/or move to cover when necessary
- Ask for backup when necessary.
  - Seek backup in high risk situations (e.g., building searches)
  - If assistance is requested, wait for that assistance to arrive before abandoning cover or taking action
- Use available communication systems.
  - Use available communication systems to transmit appropriate and accurate safety and tactical information
  - Understand the limitations of your communications equipment

- Be aware of distance and positioning
  - Identify, plan, then move to positions of advantage
  - Avoid abandoning a safe location or rushing into a potentially dangerous area

(LD 21: Chapter 1 – Basic Concepts of Law Enforcement Patrol, page 1-25 & 1-26.)

**Guidelines for Foot Pursuits:**

| | General Guidelines |
|---|---|
| **Plan of Action** | • Officers should discuss safety factors as well as possible plans for taking action in situations involving fleeing subjects<br>• Plans may include, but are not limited to:<br>  - actions they would take if a fellow officer is wounded and a subject flees on foot<br>  - coordination of who will transmit radio traffic<br>  - appropriate use of or escalation of force |
| **Working with a Partner** | • If partner officers stay together during a foot pursuit, there is a greater likelihood that a safe and successful outcome will occur<br>• If partners become separated, officers should reevaluate the level of risk before continuing the pursuit |
| **Vehicle Pullovers** | • If a foot pursuit begins with the subject fleeing from a vehicle the officer has just stopped, officers should generally remain with the vehicle rather than pursue the subject on foot<br>• The remaining vehicle may contain:<br>  - additional suspects<br>  - items that would identify the fleeing suspect<br>  - other evidence of criminal activity |
| **Pursuits Around Blind Corners** | • Officers should pursue subjects around blind corners as widely as possible in order to better see what they may be approaching (This tactic may also be referred to as "cutting the pie," "slicing the pie," or "fanning.")<br>• If conditions prevent such action, officers may choose to, when possible:<br>  - use a hand-held mirror to see around the corner first<br>  - peer around the corner at a level lower than where a subject would expect to encounter the officer<br>  - call off the pursuit |
| **Pursuits in Unfamiliar Areas** | • If officers become disoriented or in an unfamiliar area they should provide dispatch with:<br>  - house numbers<br>  - easily recognizable landmarks<br>  - building descriptions |

| High Obstacles (e.g., fences, walls, etc.) | • High obstacles may prevent officers from seeing:<br>  - a subject who is lying in wait<br>  - a vicious dog or other animal<br>  - dangerous drops or hazardous terrain, or<br>  - other hazardous obstacles on the other side<br>• Before pursuing a suspect over a high fence or wall, officers should:<br>  - stop<br>  - listen<br>  - attempt to peer though, over, or around the obstacle near the point where the subject went over |
|---|---|
| Draw Firearms | • Whether or not officers should pursue a subject with their firearms drawn is generally based on specific agency policy and may depend on the:<br>  - seriousness of the offense<br>  - officer's perception of risk<br>  - potential for an accidental discharge<br>  - risk of creating a weapon retention problem |
| Poor Visibility | • Officer safety hazards are greatly increased when a pursuit is initiated in bad weather, low light or nighttime conditions<br>• Officers may be inhibited from:<br>  - keeping sight of the suspect<br>  - staying with a partner<br>  - identifying hazardous obstacles (e.g., ditches, rocks, barbed wire, etc.) |
| Pursuits into Buildings or Structures | • Officers should avoid continuing the pursuit if the subject flees into a building or other structure.<br>• Following the subject could lead to:<br>  - an ambush situation with "suspect-friendly" supporters<br>  - a possible hostage situation<br>  - the likelihood that the subject may have access to weapons within the building/structure<br>• Under such conditions, officers should:<br>  - establish a perimeter around the building/structure<br>  - call for additional support or backup<br>  - if conditions allow, coordinate with other officers to conduct a systematic tactical search of the building/structure |
| Losing Sight of the Suspect | • If officers should lose sight of the fleeing subject at any time during the pursuit, they should:<br>  - stop, look, and listen for possible locations where the subject could be hiding or the direction the subject may be moving |

| | - consider establishing a perimeter in the area |
| | - call for additional support or backup |
| | - if a K-9 is available, ensure that the area is not contaminated |
| | - if conditions allow, coordinate with other officers to conduct a systematic tactical search of the area |

(LD 21: Chapter 1 – Basic Concepts of Law Enforcement Patrol, page 2-45 to 2-48.)

## **The Required (and Trained) Tactical Response to this Incident:**

A seminal aspect of this incident was the gross departure from required tactics, which resulted in the inappropriate use of deadly force on Mr. Solis causing him serious bodily injury. These tactics are so fundamental that absent highly unusual and rare instances, failures to adhere to them are not excused or forgiven. In this regard, it is helpful to compare what occurred during this incident in view of the basic tactical steps expected from trained law enforcement officers. However, trained and expressed, the basic tactical steps understood and required are briefly stated as follows:

*Containment:*

This phase includes getting the subject (Mr. Solis) under control by restricting any opportunity to flee or change position so that a safe apprehension can occur. Initially, this can be a difficult problem if the subject is in flight. The professional wisdom (as taught by POST) is to create a containment zone, remain at a safe distance to relieve the emotional pressure on the target, and await sufficient assisting units and coordinate them into a team effort.

The training is that once the subject is located and/or contained, the objective is to keep the subject contained - preferably within an isolated area away from the public (or to evacuate bystanders from the containment area) - while they are dealt with by law enforcement officers who remain in positions of safety. POST training in this regard is extensive and precise. Further, during containment, law enforcement officers are taught that leaving the safety of cover and exposing themselves is a forbidden tactic. Officer Bell's conduct was counter to training and the proper tactical plan of action.

In this incident, there were four GTF Officers on scene with several more units en route. All that was necessary at this point in the incident was to contain and re-enforce the containment of Mr. Solis by positioning officers at strategic locations behind cover to maintain and implement the remaining proper tactical steps (as outlined below). This did not occur in this case. Instead, Officer Bell took it upon himself to override appropriate tactics and handle the situation by himself, and ultimately used inappropriate deadly force against Mr. Solis.

A primary purpose of establishing a containment includes providing the apprehending law enforcement officers with a safe and realistic assessment of the credible risks to be tactically resolved. Sound tactics accommodate the opportunity for such a safe assessment. In this case, Officer Bell squandered the ability for a tactical advantage by reacting too quickly and independently and not giving sufficient time for Mr. Solis to comply with instructions. It cannot be overstated that according to the POST standards (and training and policies), the law enforcement officers involved in this incident were required to take a position of safety - "cover" - and take sufficient time as events unfolded for the next expected step in the process - "decompression."

*Decompression:*

All living creatures, including human beings, have instinctive protective reflexes that will take control of the body during extreme stress, especially without any training to overcome or override these reflexes. If exposed to extreme stress without any training in how to handle such stress, people may invariably flee or, when there is no other option, they will fight to either ward off danger or to create an avenue of escape. Trained and experienced law enforcement officers have both seen and experienced this human response. It is a basic fact of life in the business of law enforcement work, and something every experienced law enforcement officer is trained to cope with.

Law enforcement officers are trained that there is always a point during any sudden demand upon a subject when it becomes counterproductive and can only be expected to drive the subject into a state of incoherent dread and terror rather than compliance. As stress and/or anxiety increase, the ability for the contained subject to comply decreases. Thus, a decompression pause is necessary, at which time, a rational activity (such as meaningful communication), can take place. This did not occur in this case. Officer Bell did not follow the basic tactical training and did not attempt to decompress/de-escalate the situation. In my opinion, Mr. Solis was not given ample opportunity to understand and comply. Thus, the actions of the involved officers and Officer Bell logically unnecessarily escalated and exacerbated the situation.

*Communication:*

In this phase, a law enforcement officer establishes contact with the subject (in this case Mr. Solis) from a position of advantage/safety. During this time, unknown issues such as language problems, impairments caused by intoxication, mental illness, emotional anxieties, and other issues that may interfere with safe apprehension become known and are dealt with. Had Officer Bell maintained a position of safety, and/or attempted containment or decompression, he would have had the time to give instructions to Mr. Solis and take him into custody.

Ignoring this key phase of contact often leads to a situation that deteriorates into confusion, and in which law enforcement officers take their own independent actions (as occurred in this incident), rather than working together in a coordinated plan. The

necessity for a calm and skilled law enforcement officer-subject communication cannot be overstated. When this does not occur, law enforcement officers and civilians alike can be needlessly and avoidably injured or killed.

*Instruction:*

Once the communication link has been established, a clear set of instructions, which contains enough detail to avoid surprises and assures understanding, is conveyed to the subject. In this incident, a contact officer on scene would have explained to Mr. Solis how to assume a position that would have facilitated a safe apprehension, and what he was not to do.

*Compliance:*

In this phase, the subject (in this case Mr. Solis) states/expresses his understanding of the instructions that were given to him by the communicating officer/negotiator. Mr. Solis would have had an opportunity to ask questions for clarification and would have demonstrated his understanding of the instructions to the arrest team.

*Surrender:*

This phase requires the subject (in this case Mr. Solis) to physically perform the acts that were communicated to him by the communicating officer. Mr. Solis would have been instructed, and then taken the steps to move into a place and position for officers to approach and take him into custody without the use of any force. This would have included Mr. Solis voluntarily placing himself in an apprehension position with his hands empty and at his back for handcuffing.

*Detention/ Apprehension:*

This final phase includes the actual proper reasonable physical restraint of the subject (if necessary), a search for any weapons, and his safe transport to a facility for booking.

**Opinions Thus Far:**

1.  Physical/objective evidence takes no side, does not lose its memory, and documents the true facts. It is my opinion, based on the review of the materials in his case, that the location of Officer Bell and Mr. Solis during the two volleys of shots are as follows:

    Officer Bell fired his first volley of shots from the area of the checkered concrete where it meets with the gray concrete; in a northeastern direction; and Mr. Solis was moving away from Officer Bell and in the area between the chain-link fence and the white pool safety fence (opposite Officer Bell).

Officer Bell fired his second volley of shots from the southeast corner of
the house; in a north northwestern direction; and Mr. Solis was moving
away from Officer Bell and in the area of the east side of the house
approximately ten feet prior to the white vinal gate/fence.

Officer Bell's firearm was loaded with .40 caliber S&W bullets.  There
were five .40 caliber S&W bullet casings discovered indicating the area
where Officer Bell fired his first volley of shots.  There were three bullet
strike marks through the privacy slats in the chain-link fence opposite
Officer Bell's first volley shooting location.  There was a projectile located
on the north side of the pool equipment area to the east side of the home in
alignment with Officer Bell's first volley shooting location and the strike
marks to the white pool safety fence.  There were two bullet strike marks
on the white pool safety fence in direct alignment with Officer Bell's first
volley shooting location and the strike marks to the privacy slats on the
chain-link fence.  Mr. Solis' shoe was found next to the white pool safety
fence near the bullet strike marks.  The bullet strike marks on the white
pool fence are consistent the with height of the shots to Mr. Solis' leg.

There were three .40 caliber S&W bullet casings discovered in the area
where Officer Bell fired his second volley of shots.  There were several
bullet strike marks in alignment with Officer Bell's second volley shooting
location and Mr. Solis' location when being shot, to the while vinal fence,
the neighboring fence, the neighbors' car, and the neighbor's house.

2.    It is my opinion, based on my review of the materials, that no reasonable
officer under these circumstances could have perceived Mr. Solis pointing
a gun at Officer Bell during or immediately prior to Officer Bell's first volley
of shots because a concealment fence divided Officer Bell and Mr. Solis.

The privacy slats shielded Officer Bell's view of Mr. Solis, and likewise,
shielded Mr. Solis' view of Officer Bell.  From Officer Bell's perspective
and testimony, the privacy slats obscured his vision, concealed Mr. Solis,
Officer Bell could not make out the gun, and it was hard for Officer Bell to
say whether he could see Mr. Solis' hands.  Officer Bell saw what looked
like a flip book, Mr. Solis' silhouette and/or outline, and Officer Bell never
saw a clear picture of Mr. Solis who was behind the privacy slats.  It is
therefore my opinion, that Officer Bell did not see Mr. Solis point a gun at
him at any point in time where Mr. Solis was concealed by the privacy slats
prior to and during Officer Bell's first volley of shots.

According to Mr. Solis, prior to and at the time that Officer Bell used
deadly force against him, Mr. Solis was not pointing and had not pointed a
weapon at Officer Bell or any other person.  Mr. Solis' statements are
consistent with the physical evidence.  Assuming Mr. Solis' statements to

be true, Mr. Solis did not point a gun at Officer Bell and no reasonable officer would have mistakenly believed under these conditions and circumstances that Mr. Solis pointed a gun at an officer.

No gun can be identified in Mr. Solis's hand at any time in any video. No latent prints were observed or developed on the subject weapon after being dusted with black print powder. The DNA sample did not meet the minimum requirement to be entered and searched in the FAIRS database. Further, two witnesses who saw Mr. Solis running did not report seeing a gun in his hand. Witness Ms. Biggs specifically told canvassing officers that she did not see a gun in Mr. Solis' hand. This evidence suggests that and is consistent with Mr. Solis not having a gun in his hand at the time.

3. It is my opinion, based on the review of the materials in his case, that Mr. Solis did not fire a shot at Officer Bell. The subject weapon was a Colt Detective Special, .38SPCL, revolver. (COR 932.)

The subject weapon was tested for DNA and fingerprints. (COR 932.) "The revolver was treated with cyanoacrylate fumes, dusted using fluorescent powder and examined under variable wavelength light. No latent prints were observed. The revolver was then dusted using black print powder. No latent prints were developed." (COR 1042.) From a swab of the handgun: "DNA ID Result: Low. Does not meet minimum requirements to be entered and searched in the FAIRS database." (COR 1051.) From a swab of Mr. Solis: "DNA ID Result: Low. Does not meet minimum requirements to be entered and searched in the FAIRS database." (COR 1051.) This evidence suggests that Mr. Solis did not fire the gun during the incident and did not have the gun in his hand. During investigations with suspects who have a firearm who are not wearing gloves, it is very common for either DNA and/or fingerprints to be discovered on the weapon. I saw no indication in the records that a gunshot residue test was performed on Mr. Solis. This is an indication that there was no investigatory reason to perform the test (meaning no statement that or concern as to whether Mr. Solis fired a weapon during the incident).

When a revolver is fired, the expended shell casing remains in the cylinder of the gun as opposed to being ejected from the gun in magazine-loaded pistols. On revolvers, there is a teardrop on the cylinder indicating the direction in which the cylinder turns when the hammer is cocked to the rear (which is necessary for firing the weapon). The Colt Detective Special turns clockwise (from the perspective of the shooter) when the hammer is cocked to the rear. If this revolver is loaded and a shot is fired, the expended shell casing with remain in the top position in line with the barrel. If after a shot is fired the hammer is cocked, the cylinder will rotate

clockwise aligning a new round (from the left) with the firing pin while the expended casing would be to the immediate right of the barrel.

The Riverside Sheriff Armory inspected, conducted a function test on, and test fired the subject weapon.  It was functional and working.  (COR 991.)  The subject weapon was recovered with one fired casing.  (COR 1010.)  "At 2138 hours, FT Alvarado and I removed a loaded revolver (items DC02 and DC02A) from Hemet PD unit 24 #2910 as it was parked in the cul-de-sac.  Prior to moving the firearm, FT Alvarado photographed the placement of it inside the vehicle.  During the briefing I learned the firearm was removed from the scene after the officer involved shooting and secured in the unit by Hemet PD Off. Gordon.  Shortly after being secured, Hemet PD Off. Reynoso removed the revolver and opened the cylinder to check if a round had been fired.  For further information regarding the initial securing of the revolver, see their supplemental reports."  (COR 1020.)  "Prior to opening the revolver, I marked the cylinder on both sides of the frame at the upper position that would note which round was located in the barrel position.  Once the cylinder was opened, I noted the fired casing appeared at one position to the left the barrel.  This cylinder rotates in a clockwise direction when fired.  FT Alvarado photographed and packaged the revolver and the ammunition found inside of it for evidence.  Inv. Mendoza later entered the revolver into CLETS."  (COR 1020.)

Q.  Prior to firing your first shot, did you hear any other shots being fired?  A.  No.  (Officer Bell Deposition 14:12-14.)

Q.  Okay.  Did you ever see him pull the trigger of a gun?  A.  No.  (Officer Bell Deposition 14:23-25.)

Q.  Did you ever hear the sound of a gunshot coming from his direction?  THE WITNESS:  No.  (Officer Bell Deposition 15:1-5.)

Q.  BY MR. SINICICH: Did you hear or see the impact of a round anywhere near your body?  A.  No.  (Officer Bell Deposition 15:6-8.)

Q.  Were you injured at all during the incident?  A.  No.  (Officer Bell Deposition 15:9-10.)

"Carranza: Okay.  Did you ever hear if the suspect fired any rounds?  Bell: I did not hear anything."  (Officer Bell Statement 86:24-87:1.)

Q.  When you say that you wouldn't be able to see a muzzle flash of his gun, why is that?  A.  I'm saying it's possible that I would not be able to see a flash if it was, if his gun was behind cover when he fired at me.  (Officer Bell Deposition 82:1-5.)

Q.  So wouldn't you be able to see the muzzle flash if he fired at that time?
A.  Yes.  If he fired while he was above the fence, yes.  (Officer Bell
Deposition 84:20-23.)

Q.  Okay.  And did he fire the weapon at you at that time?  A.  I didn't see
him fire the weapon.  (Officer Bell Deposition 84:24-85:1.)

Q.  Did you hear him fire the weapon?  A.  I didn't hear my weapon or his
weapon.  (Officer Bell Deposition 85:2-3.)

According to Mr. Solis, prior to and at the time that Officer Bell used
deadly force against him, Mr. Solis was not and had not shot at Officer Bell
or any other person.

From the physical and forensic evidence, as well as the statements of both
Officer Bell and Mr. Solis, Mr. Solis did not fire a weapon at Officer Bell
or any person during the incident.  Officer Bell's testimony that it is
probable that Mr. Solis shot at Officer Bell evident of his unreasonable
subjective fears during the incident generated in the Officer Bell's mind
with no direct correlation to facts and circumstances he was presented with.
Officer Bell's unreasonable fear (as trained) is an overreaction to true
merely *potential* threats as well as reactions to unreal threats which could
be based on either his prejudice or poor application of past experience.

4.     Officer Bell's use of deadly force was inappropriate and unnecessary under
the totality of the circumstances, was inconsistent with basic law
enforcement training and violated basic POST standards and the standard of
care pursuant to POST and officer training.  Officer Bell's use of deadly
force was not necessary in defense of life.  Mr. Solis was not an immediate
threat of death or serious bodily injury to Officer Bell, or any other officer
or person at the time of Officer Bell's uses of deadly force.

According to Mr. Solis, prior to and at the time that Officer Bell used
deadly force against him, Mr. Solis was not pointing and had not pointed a
weapon at Officer Bell or any other person; Mr. Solis was not and had not
shot at Officer Bell or any other person; Mr. Solis did not verbally threaten
to harm Officer Bell or any other person; Mr. Solis was not attempting to
harm or threaten Officer Bell or any other person; and no person or officer
was about to be injured or harmed based on Mr. Solis' conduct.  Assuming
this to be true, it is obvious to any law enforcement officer that the use of
deadly force against Mr. Solis would be inappropriate and unjustifiable.

There must be a reasonably perceived threat in order to justify the use of
deadly force, here there was not.  The evidence shows that Mr. Solis was
moving away from Officer Bell while behind the concealment of a chain-

link fence covered with privacy slats.  Officer Bell's vision of Mr. Solis was obscured.  Importantly, at one point, Officer Bell shot Mr. Solis in the back, not while Mr. Solis was facing Officer Bell.  Additionally, Officer Bell did not use deadly force when he claimed Mr. Solis pointed the gun at him.  Instead, he fired at Mr. Solis as he moved away from Officer Bell, a substantial distance away and with sufficient time and opportunity for Officer Bell to assess that Mr. Solis was not attempting to harm him and determine that deadly force was inappropriate.

Mr. Solis was merely running away.  He was not and had not attempted to assault or harm any officer or person.  A person moving away from Officers, regardless of whether the person has a gun in their hands, who makes no movement or gesture to suggest to a reasonable officer that he is going to immediately cause serious bodily harm or death to another, (here Mr. Solis) is not an immediate threat of death or serious bodily injury.

Officers, including Officer Bell, are trained and know that they cannot shoot a person merely for fleeing and they cannot shoot a person merely for having a gun in their hand.  To do so would constitute inappropriate, unnecessary, and unjustifiable force, which is what we have here.  Considering the absence of concrete evidence to validate Officer Bell's assertion that he fired at Mr. Solis due to a credible threat to himself in the form of Mr. Solis pointing a gun at him, it is more likely that this incident is a result of Officer Bell overreacting and using unnecessary force than reacting to an actual perceived threat.

Mr. Solis was not actively resisting arrest in any manner that would justify the use of deadly force.  As trained by POST, resistance is generally divided into three categories, active resistance, assaultive resistance, or life-threatening resistance.  Deadly force is only authorized if the subject's conduct is life-threatening resistance.  Mere flight, at most, is active resistance, for which the appropriate use of force options consists of control holds and body weapons – not the use of deadly force.  Important to my review is that Mr. Solis was not being aggressive or combative with any person at the time of the use of deadly force, Mr. Solis did not verbally threaten to harm any person, and Mr. Solis did not verbally or physically display and intention to assault any officer or person.

Officer Bell was not responding to a serious or violent crime at the initiation of his contact with Mr. Solis.  This incident started as a BOLO call for three felony warrants related to past alleged crimes that had not been proven in a court of law.  The officers were not called to the scene to investigate an ongoing serious or violent crime.  Due to the nature of the initiation of this incident, the law enforcement officers' interest in stopping

and detaining Mr. Solis at all costs is greatly diminished and doing so with the use of deadly force is not justified.

This was not a situation that constituted requiring split-second judgments by Officer Bell. My review of the objective facts of this case (as shown in the video evidence) are that Officer Bell had time and opportunity to utilize cover but failed to do so, had time and opportunity to utilize space and distance to create even more time but failed to do so, had time and opportunity to communicate with Mr. Solis to de-escalate the situation but failed to do so, and had time and opportunity to communicate with partner officers to create a safe apprehension and containment plan for Mr. Solis but failed to do so. For a reasonable officer to be in a situation to make a split-second judgment (as it relates to the use of deadly force) there must be a triggering event that is reasonably perceived by the officer which the officer is reacting to and reasonably believes requires an immediate response in the use of deadly force. Based on my review of the materials, no reasonable officer would have perceived Mr. Solis making any type of furtive movement that would suggest that he was an immediate threat of death or serious bodily injury. There was no event under the circumstances that required an immediate response in the form of deadly force. One of the reasons that Officer Bell's use of deadly force was inappropriate is because it was an overreaction to the situation, and he fired too quickly without a proper assessment of the need to do so.

Circumstances are often if not always tense, uncertain, and rapidly evolving for law enforcement officers on patrol – this does not provide an excuse for law enforcement officers to use deadly force. However, in my analysis I allow for the fact that Officer Bell was in foot pursuit of a subject (tense), cannot predict the future (uncertain), and that this matter evolved from a vehicle stop to a short vehicle pursuit to a foot pursuit within a matter of a minute (rapidly evolving). I also took into consideration that Mr. Solis appears to be attempting to flee the officers, first by vehicle, then on foot, and had a firearm in his possession. Yet, none of these circumstances justify the use of deadly force here.

Officer Bell appears to have deliberately ignored basic training, and tactics, leading to the unnecessary shooting of Mr. Solis. As such, Officer Bell's decisions and actions fell below the expected and required professional standard of care and reflected deliberate indifference (as trained) to the life and safety of Mr. Solis.

5.    Officer Bell's use of deadly force was inappropriate and not necessary to defend human life, was inconsistent with basic law enforcement training and violated basic POST standards and the standard of care pursuant to

POST and officer training.  Officer Bell's use of deadly force was not in apprehension of a fleeing person for any felony that threatened or resulted in death or serious bodily injury, where a reasonable officer would believe that the person will cause death or serious bodily injury to another unless immediately apprehended.

Under what is commonly referred to as the "Fleeing Felon Rule," an officer may be justified in using deadly force only if the subject., if permitted to get away, the officer reasonably believes the will cause death or serious bodily injury to another sometime in the future.  The Fleeing Felon Rule is not a self-defense use of deadly force.  According to his own statements and testimony, Officer Bell's inappropriate use of deadly force was in the defense of self.  Therefore, the Fleeing Felone Rule is inapplicable.

Nevertheless, Officer Bell was not apprehending a person fleeing from a felony that threatened or resulted in the death or serious bodily injury of a person.  Officer Bell did not learn any information about Mr. Solis from his partner.  Officer Bell did not have any details about the incidents in which crimes were alleged against Mr. Solis subject to the warrants.  Therefore, Officer Bell never formed, and could not reasonably form, the belief that Mr. Solis was a person suspected of a felony that threatened or resulted in death or serious bodily injury.

Nevertheless, based on my review of the available materials, there are no credible threat for any reasonable officer to believe that Mr. Solis will cause death or serious bodily injury to another sometime in the future if he is not immediately apprehended.

Mr. Solis did not attempt to take a hostage during the incident.  (Bell Deposition 99:2-4.)  Mr. Solis did not attempt to open a window to any home during the incident.  (Bell Deposition 99:11-13.)  Mr. Solis did not attempt to enter a home through a window during the incident.  (Bell Deposition 99:14-16.)  Mr. Solis did not attempt to open a door to any home during the incident.  (Bell Deposition 99:17-19.)  Mr. Solis did not attempt to enter through the door to any home during the incident.  (Bell Deposition 99:20-22.)  Despite Mr. Solis being in the vicinity of at least three homes during the incident, Mr. Solis never tried to enter any home. (Bell Deposition 99:23-100:3.)  Mr. Solis never verbally threatened Officer Bell or any other person during the incident.  (Bell Deposition 102:8-11.)  Officer Bell did not see any civilians in the area and did not know if any civilians were in the area to be threatened by Mr. Solis.  (Bell Deposition 78:20-79:19.)

It is my opinion that Mr. Solis was not a threat of death or serious bodily injury to any person if not immediately apprehended by Officer Bell.

6.    Officer Bell fired eight (8) rounds during the incident at Mr. Solis and recklessly endangered the lives of civilians in the area.

Officer Bell's weapon was loaded with 16 rounds, one bullet chambered and a fully loaded magazine of 15 rounds.  At the conclusion of the incident, during Officer Bell's charting, it was determined that he was missing 8 rounds.  (COR 909).  Eight "FEDERAL .40 S&W" casings were located in the backyard of the incident location in the approximate locations of where Officer Bell fired his two volleys of shots.

With letters designating separate evidence items consistent with and related to Officer Bell's uses of deadly force: B. Strike mark entry – located at 614 N. Hillmer Drive on an aluminum ladder hanging on the interior side of the north fence of the pool equipment area; Bl. Strike mark exit – located at 614 N. Hillmer Drive on a fence slat directly behind the ladder inside the pool equipment area; C. Strike mark – located at 614 N. Hillmer Drive on a fence slat behind the ladder inside the pool equipment area; D. Strike mark – located at 614 N. Hillmer Drive on a fence slat behind the ladder inside the pool equipment area; E. Strike mark – located at 614 N. Hillmer Drive on the pool fence to the right side of the pool entry gate; F. Strike mark-located at 614 N. Hillmer Drive on the pool fence gate; G. Strike mark - located at 614 N. Hillmer Drive on the east cinder block wall at the north east corner of the property; K. Strike mark - located at 614 N. Hillmer Drive on the east side of the south PVC fence post to the north side of the home. The hole was in the upper portion of the post; K1. Strike mark exit - located at 614 N. Hillmer Drive on the west side of the south PVC fence post to the north side of the home.  The hole was in the upper portion of the post; K2. Strike mark - located at 614 N. Hillmer Drive on the north west window shutter and window frame; L. Strike mark entry - located at 614 N. Hillmer Drive on the lower portion of the PVC fence, south of the gate; L1. Strike mark exit - located at 614 N. Hillmer Drive on the lower portion of the PVC fence, south of the gate; M. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the upper portion of the PVC gate near the metal latch; M1. Strike mark exit - located at 614 N. Hillmer Drive on the south side of the upper portion of the PVC gate; N. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the middle portion of the PVC gate, below the door handle; N1. Strike mark exit - located at 614 N. Hillmer Drive on the south side of the middle portion of the PVC gate; O. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the PVC gate, slightly above the diagonal support brace; O1. Strike mark exit - located at 614 N. Hillmer Drive on the south side of the PVC gate, slightly above the lower horizontal support brace; P. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the PVC gate, slightly below the horizontal support brace; PI. Strike mark exit - located at 614 N.

Hillmer Drive on the south side of the PVC gate, slightly below the horizontal support brace; Q. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the north west PVC fence. This entry hole was located on the lower area of the middle portion of the fence panel; R. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the north west PVC fence. This entry hole was located on the upper portion of the fence panel; R1. Strike mark exit - located at 614 N. Hillmer Drive on the north side of the north west PVC fence. This exit hole was located on the upper portion of the fence panel; S. Strike mark entry - located at 614 N. Hillmer Drive on the south side of the north west PVC fence. This entry hole was located on the upper portion of the fence panel, west of Point 'R'; S1. Strike mark exit - located at 614 N. Hillmer Drive on the north side of the north west PVC fence. This entry hole was located on the upper portion of the fence panel, west of Point 'R'; W. Strike mark on the right front passenger door of the grey Toyota Avalon parked in the driveway at 624 N. Hillmer Drive. This hole is where item DCS3 was located; X. Strike mark entry located on the south side of the southwest corner of the home at 624 N. Hillmer Drive; and X1. Strike mark exit located on the west side of the southwest corner of the home at 624 N. Hillmer Drive.

Deputy D. Cline "noted there were several bullet strike marks on the PVC gate and fence (photographic points K through P). It appeared several of the bullet strike marks on this fence continued toward the front portion of the PVC fence that is on the north border of the property and into the property at 624 N. Hillmer Drive." (COR 1021.) Deputy D. Cline also stated, "In the front yard on the PVC fence that separates the properties at 614 N. Hillmer Drive and 624 N. Hillmer Drive, located three additional possible bullet holes, marked as photographic points Q, R, R1, S, and SI." (COR 1022.) Deputy D. Cline also stated, "At 624 N. Hillmer Drive, located a projectile in the door frame of a vehicle parked in the driveway (item 33). The strike mark for this item was photographed as point W. I located one additional strike mark to the southwest corner of the structure (photographic points X and X1). I did not locate any other strikes, holes, or items of evidence at this location." (COR 1014-1022.)

Officer Bell's testimony that he fired all of his shots center mass aiming at Mr. Solis' chest is not helpful in determining whether any of his shots stuck Mr. Solis. Mr. Solis was not shot center mass in the chest during the incident. However, we have video evidence showing the positions and locations of Deputy Waltermire and Mr. Solis during Deputy Waltermire's use of deadly force (Deputy Waltermire in a prone shooting platform firing west at Mr. Solis who was seated on a step facing Deputy Waltermire). It is not possible for the shot to Mr. Solis' back to have been fired by Deputy Waltermire. The shot to Mr. Solis' back therefore must have been fired by

Officer Bell, which is consistent with his testimony that Mr. Solis was moving away from him during his shots. The angle of fire in Officer Bell's first volley of shots, as indicated by the physical and forensic evidence, is consistent with the approximate height of the shots that struck Mr. Solis' lower body.

Of Officer Bell's shots, several bullets struck homes, recklessly endangering civilian lives. Officer Bell, believing the walls of these homes were paper thin, should not have used deadly force under these circumstances considering the innocent lives he endangered in the process.

7.    It is my opinion, based on the review of the materials in his case, that there were reasonable alternatives to the use of deadly force by Officer Bell on Mr. Solis.

Officer Bell had reasonable, less-intrusive, alternatives to the use of deadly force. Reasonable alternatives to the use of deadly force, including as described above, that were available to Officer Bell include but are not limited to achieving cover, communicating and planning with other officers, coordinating resources such as a helicopter, K9, or other support, communicating with the subject (here Mr. Solis), attempting to apprehend on foot, attempting to contain, tactical repositioning, and less-lethal force options if necessary including the use of the Taser or pepper spray. Further, based on my review of the video evidence it was feasible for Officer Bell to utilize any one or combination of the reasonable available less-intrusive alternatives to the use of deadly force. An officer's (here Officer Bell) failure to take the time available to him and instead use deadly force instead of attempting reasonable alternatives does not mean that the officer did not have time, or it was not feasible. It is my opinion that Officer Bell had time (it was feasible) to use less-intrusive means and intentionally and recklessly chose not to.

8.    It is my opinion, based on the review of the materials in his case, that Officer Bell overreacted in his use of deadly force on Mr. Solis and that such overreaction was a result of Officer Bell's unreasonable subjective fears.

As stated above, and what I observed throughout Officer Bell's statement to investigators and testimony under oath, Officer Bell suffered from an irrational and unreasonable fear (as trained) prior to entering the officer-involved shooting location and remained even after Mr. Solis was shot, unarmed, and bleeding profusely on the ground.

9.    Officer Bell's tactics were inappropriate under the totality of the circumstances, were inconsistent with basic law enforcement training and

violated basic POST standards and the standard of care pursuant to POST and officer training.

In my opinion, there were fundamental tactical errors in this incident. In my experience, a significant number of civilian deaths and serious injuries involving police result from a series of cascading departures from expected and required tactics and deliberate departures from training. This appears as a key factor in the downward spiral of events resulting in the shooting of Mr. Solis.

Officer Bell failed to establish an incident specific tactical plan and failed to follow the trained default tactical plan for containing and communicating with a subject. Instead, Officer Bell ineffectively decided to handle the situation alone without the support and coordination of his partner officers. Officer Bell failed to de-escalate the situation, and instead inappropriately escalated the situation leading to his use of inappropriate and unnecessary force as defined by POST.

Pursuant to basic officer training, tactical de-escalation involves the use of techniques to reduce the intensity of an encounter with a subject and enable an officer to have additional options to gain voluntary compliance or mitigate the need to use a higher level of force while maintaining control of the situation. Officer Bell failed to de-escalate and failed to attempt to de-escalate the situation. De-escalation techniques require planning, assessment, time, containment, use of resources, and communication. Officers should coordinate their approach to a subject – this did not occur here. Officers should assess the situation and gather information – this did not occur here. Officers should use (as trained) the equation *Distance + Cover = Time*, which allows officers to communicate with the subject, refine tactical plans, and call for additional resources – this did not occur here. Officers should make an effort to contain the subject to create more time and opportunity to de-escalate the situation – this did not occur here. Officers should call for and utilize additional resources with specialized expertise and tools to assist in control and containment of the situation – this did not occur here. Officers should maintain communication between officers and communicate effectively with the subject (critically important as trained) including giving verbal commands and warnings, use of persuasion, defusing, empathy, redirecting, and building a rapport – this did not occur here.

10.   It is my opinion, based on the review of the materials in his case, that Officer Bell's wrongful conduct (as described above) was integral to Deputy Waltermire's inappropriate and unjustifiable use of deadly force

and that Officer Bell failed to intervene (as trained) in Deputy Waltermire's inappropriate use of deadly force.

Officer Bell was not a mere bystander to Deputy Waltermire's inappropriate use of deadly force.  Officer Bell first used inappropriate force against Mr. Solis, failed to communicate to his partners that it was he who was firing at Mr. Solis and not vis-a-versa, failed to coordinate and communicate with Deputy Waltermire so that he could approached the scene safety without creating a crossfire situation (as here), which resulted in Deputy Waltermire's contagious shooting of Mr. Solis.  Contagious fire (as seen here) is when one officer (Officer Bell) firing his weapon on a subject wrongfully induces another officer(s) (Deputy Waltermire) to begin shooting at the subject without independently assessing the need to use deadly force.  Further, Officer Bell yelled to Deputy Waltermire from a position of cover with weapons pointed at Mr. Solis and Deputy Waltermire's direction, alerting Deputy Waltermire of Mr. Solis' location.  Only after and because Officer Bell yelled to Deputy Waltermire, Deputy Waltermire jumped to the floor and fired eleven shots at Mr. Solis who was already shot and in a position of submission.


## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education.  I am a twenty-seven-year veteran of the Los Angeles County Sheriff's Department (LASD).  I was hired on December 1, 1965, and I retired from active service on March 31, 1993.  My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988).  The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During my service with the department, I had a wide range of duties.  Those duties included an 18-month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units.  I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five- and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.),

which was created to investigate, locate, observe and arrest major (career) criminals.  I
held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with
homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police
corruption.  The majority of our cases were homicide cases, including the murder of
police officers.  Arrests frequently occurred in dynamic circumstances including crimes
in progress.

My unit also conducted major narcotics investigations including undercover narcotics
buys, buy busts, and reverse stings.  We frequently deployed at the request of
investigative units, such as Narcotics, which provided the initial investigative leads for
our operations.  These narcotics cases usually involved multiple kilogram quantities of
drugs and amounts of money ranging from one hundred thousand to more than one
million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide
investigations.  In that regard, the unit processed, under my command and supervision,
various aspects (depending on the complexity of the cases involved) of approximately
1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a
consultant (since 1993) have involved injuries or deaths connected with some aspect of
force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three
justifiable shooting incidents.  From that time, and over the next five years of my
command, N.O.R.S.A.T. established a remarkable record of more than two thousand
arrests of career criminals without a single shot fired – either by my officers or by the
suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were
apprehended during the course of their crimes and were very prone to use firearms to
escape apprehension.  This record of excellence was accomplished through the use of
proper tactics, management and supervision of personnel, training in correct
apprehension methods, and adherence to the moral and ethical standards endorsed by
California POST and my Department.  These methods and principles are also embraced
by every state training commission of which I am aware, as well as the national standards
established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was
assigned to author Field Operations Directive 89-3, "Tactical Operations Involving
Detective Personnel."  This order remained in force 20 years (until September 30, 2009),

and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.  I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District

Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication).  My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication).  My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches.  My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al,* No. 14-16585 (not for publication), regarding the use of lethal force.  My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force.  My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons.  My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit.  My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity.  My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.  I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths.  My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness.  My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.,* No. 18-55035 (for publication) regarding the use of lethal force and custom and practice.  My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity.  My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity.  My opinions supported argument in the Ninth Circuit

opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) *Tan Lam, v. City of Los Banos*, et al. D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), *Tiffany Tabares, et al v. City of Huntington Beach, et al*, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness. I was retained as consultant regarding the October 15, 2019 Law Enforcement Activity Related Death (including positional asphyxia) of Mr. Angel Zapata-Hernandez by San Diego Metropolitan Transit System (MTS) Code Compliance Officers. My consultations included recommendations and resulted in significant changes in policy and training by the MTS. I was a retained expert in the Temporary Restraining Order restricting the use of kinetic weapons during demonstrations issued April 19, 2021 in *Black Lives Matter v. City of Los Angeles, et al*, Case No.: CV 20-5027 CBM (Asx). My opinions supported argument in the Ninth Circuit opinion, Case No. 20-16351 (not for publication), *Terrance Amons, et al., v. Dillon Tindall et al.* D.C. No. 4:19-cv-00301 KAW regarding use of lethal force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children," pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016. I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that

included requested training opinions.  I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.  On June 16, 2021, I was selected by the Los Angeles County District Attorney as a member of FACCT - an independent team assigned to re-examine fatal use of force incidents by law enforcement officers and recommend further action when appropriate. On November 7, 2021, I was an Honoree of the 2021 National Lawyers Guild of Los Angeles at their annual Awards Gala as a recognized defender of Constitutional Rights.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in *Alma Rosa Godinez, v. San Diego County, et al.* Case No. 3:16-cv-00236 BAS-NLS.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

I declare under penalty of perjury that the foregoing is true and correct.  Executed May 31, 2024, at Santee, CA.

Roger A. Clark