# "EXHIBIT K"

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                    ---oOo---

4   EDGAR SOLIS,
                                Case No.
5              Plaintiff,       5:23-cv-00515-HDV-JPR

6   vs.

7   STATE OF CALIFORNIA; MICHAEL
    BELL, and DOES 1-10, inclusive,
8              Defendants.
    _____/

9

10

11            REMOTE DEPOSITION OF

12                GREG MEYER

13            Monday, July 15, 2024

14

15

16  Reported by:  Susan D. Yip
                  CSR #5038
17  No.  86902

18

19

20

21

22

23

24

25

EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 07/15/2024

Page 19

1    a case where a subject was shot in the back while running

2    away?

3        A    It's hard to be specific because it's been so

4    many years.  I'd say out of all of them, there is

5    probably a couple of them.  Maybe two.  Maybe three.

6        Q    Do you know if out of those two or three if any

7    of them were unarmed?

8        A    No, I think I would recall that.

9        Q    Is it fair to say that those two or three

10   individuals shot in the back while running away were

11   armed?

12       A    Yes.

13       Q    Did you make a recommendation --

14       A    That's my best recall is that they were.  I

15   don't recall any that were not.

16       Q    Okay.  Thank you.

17            Do you recall if you recommended that any of

18   those two or three incidents where the person was shot

19   in the back running away armed were outside of policy

20   or inappropriate?

21       A    No, I think I would recall that specific and

22   the answer would be no, I would not have found those out

23   of policy if a suspect is running while armed.

24       Q    Is it fair to say that based on your training

25   and experience, an officer's subjective perception of the

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 20

1    incident could be objectively incorrect?

2             MR. KLEHM:  Objection:  Incomplete

3    hypothetical.

4             THE WITNESS:  Right.  Well, if I understand the

5    question correctly, yes, sure, the subjective impressions

6    or perceptions can be incorrect but officers are not held

7    to what their subjective impressions are, there have to

8    be facts and circumstances to lead to whether their

9    perception was reasonable or not.

10   BY MR. SINCICH:

11        Q    Okay.  And you wrote a report in this case?

12        A    I did.

13        Q    How much do you charge for the work up of your

14   report?

15        A    450 dollars per hour, same as for this

16   deposition.

17        Q    What about for trial?

18        A    I'm sorry, I didn't hear the word.

19        Q    What about for trial testimony?

20        A    Trial testimony is a $3,000 per day flat rate.

21        Q    And how many hours approximately did you work

22   on the report up to the time that you turned it in?

23        A    I'd have to look at my notes if I may.

24        Q    Yes, please go ahead.

25        A    So the question is more complicated than it

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 21

1    might seem.  I'll do my best here.

2            I started working on my report, well, that

3    doesn't help.  All right.  By the time I worked, I'm

4    sorry, by the time I turned in my report, signed and sent

5    it, I had worked on this case for 16.5 hours.

6            Your question was how long did I work on the

7    report.  Probably four or five, six hours of that was

8    actually the report writing, the rest was review and note

9    taking regarding the documents I was provided.  That's

10   probably the best I can do with that.

11       **Q    Thank you.  I appreciate the clarity.**

12           **Does your report contain all of your opinions**

13   **in this case?**

14       A    Yes.  So far, unless I get asked something in

15   this deposition or on the witness stand that's outside

16   the scope of my report.

17       **Q    Does your report contain all of the documents**

18   **that you reviewed that you considered in rendering your**

19   **opinions?**

20       A    Yes.

21       **Q    Were there any documents that you reviewed**

22   **since turning in your report?**

23       A    Yes.

24       **Q    What have you reviewed?**

25       A    I reviewed the document, it's listed on my

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 25

1  are trained in de-escalation.

2       Q    I think you understood the question correctly.

3  I didn't say policy but specific CHP training outside

4  of --

5       A    You mean outside of POST training?

6       Q    Right.  So outside of POST, is there any CHP

7  training to your knowledge regarding de-escalation?

8       A    No, not without looking it up.  Again, I would

9  imagine there is but it's not fresh in my mind.

10      Q    To your knowledge are officers trained that in

11  determining the objective reasonableness of their use of

12  force, there must be facts specific based on the totality

13  of circumstances that the officer knew at the time of the

14  force?

15      A    Yes.

16      Q    And are officers trained that the

17  reasonableness of a particular use of force is not judged

18  from the perspective of 20/20 hindsight but instead of

19  the reasonable officer on scene?

20      A    That's basically correct, yes.

21      Q    Would you agree that deadly force is the most

22  significant force an officer can use?

23      A    Yes.

24      Q    And that deadly force can only be used in

25  limited circumstances?

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 26

1          MR. KLEHM:  Objection:  Incomplete

2    hypothetical.

3          THE WITNESS:  Yes.  I mean the policies and the

4    training spell out those circumstances.

5    BY MR. SINCICH:

6          Q    Is it fair to say that officers can only use

7    deadly force if there is an imminent threat of death or

8    serious bodily injury?

9          A    Yes.

10         Q    Based on the training, and I believe you

11   mentioned something to this effect earlier, are officers

12   trained that their subjective fear alone is insufficient

13   to use deadly force?

14               MR. KLEHM:  Incomplete hypothetical.

15               THE WITNESS:  Yes.

16               And I started to say -- now I lost the

17   question.  Could you just re-ask it?  I'm sorry.

18               MR. SINCICH:  Could you read back please,

19   Susan?

20               (Record read as follows:

21                    Q.   "Based on the training, and I

22                    believe you mentioned something to that

23                    effect earlier, are officers trained

24                    that their subjective fear alone is

25                    insufficient to use deadly force? ")

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 27

1           THE WITNESS:  Yes.  They have to have

2    objectively reasonable perceptions or beliefs that would

3    have them believe that there is an imminent threat of

4    death or serious bodily injury in order for them to use

5    deadly force.

6    BY MR. SINCICH:

7        Q    And a little bit ago, you said that the law

8    recently actually changed with regard to the use of

9    deadly force.  Do you recall making a statement like

10   that?

11       A    It's not exactly what I said.  I said the law

12   changed with respect to incorporating de-escalation

13   efforts into the law.

14       Q    Were you referring to Penal Code 835-A?

15       A    Yes, for when it came in four and a half years

16   ago it was modified or effective, the effective date was

17   four and a half years ago for that modification.

18       Q    According to 835-A, is it true that fear alone

19   does not justify the use of deadly force?

20           MR. KLEHM:  Objection:  Calls for legal

21   opinion.

22           THE WITNESS:  As I say, I don't recall that

23   language from 835-A but it may be in there.

24           But as a training matter, as a practical

25   matter, as a policy matter, that statement is correct.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

1  Fear alone does not justify, there has to be objectively

2  reasonable perceptions and beliefs based on the facts and

3  circumstances the incident that leads to the deadly force

4  decision.

5  BY MR. SINCICH:

6      Q    Based on your recollection is 835-A quoted in

7  the POST learning domain?

8      A    It is.

9          MR. KLEHM:  Objection:  Vague as to time.

10         THE WITNESS:  Oh, okay.

11         If we can understand unless you tell me

12  different, we're talking about the current version of

13  Section 835-A of the California Penal Code which took

14  effect on January 1, of 2020, then that's the answer,

15  yes.  If I would imagine you would tell me if we're going

16  to talk about the old version.

17  BY MR. SINCICH:

18     Q    Right, the current version or at least the one

19  that was in effect at the time of this incident, right?

20     A    Yes.

21     Q    Okay.  According to the training, imminent harm

22  is not merely fear of future harm, no matter how great

23  the fear and no matter how great the likelihood of the

24  harm, right?

25     A    That language sounds familiar.  I'm not looking

EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 07/15/2024

Page 29

1    at it and I don't have it memorized but it does sound

2    familiar.  And that's part of the definition of

3    imminence.

4         Q    Right.

5              Are officers trained through POST that

6    uncontrolled fear tends to increase unreasonable force?

7         A    Yes.

8         Q    Because of that, are officers trained to help

9    control their fear?

10        A    Yes.

11        Q    And trained to react in stressful circumstances

12   according to their training?

13        A    Yes.

14        Q    Are officers trained that unreasonable fear

15   could include an over-reaction to a potential threat?

16        A    Yes.

17        Q    Is it fair to say, and I think this goes to

18   what you said earlier as well, that deadly force whether

19   or not it's appropriate, it depends on the facts?

20        A    The facts and the totality of the circumstances

21   that are known to the officer at the time he or she makes

22   the decision to use deadly force.

23        Q    Would you agree in your experience in

24   evaluating deadly force cases that sometimes the facts

25   are in dispute?

EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 07/15/2024

Page 30

1      A    Yes.

2      Q    Would you agree that in this case the facts are

3   disputed?

4           MR. KLEHM:  Objection:  Vague and ambiguous.

5           THE WITNESS:  They must be or we wouldn't be

6   here.

7           That means yes.

8   BY MR. SINCICH:

9      Q    Is it fair to say that if the case goes to

10   trial, the jury is going to determine the facts?

11           MR. KLEHM:  Objection:  Calls for legal

12   conclusions.

13           THE WITNESS:  The jury is going to determine

14   the fact, yes, I believe correct but, right, as a legal

15   conclusion but that's on my experience that seems right.

16   BY MR. SINCICH:

17      Q    Based on your experience and understanding if

18   the case is going to trial, ultimately, the jury will

19   determine whether or not the use of force was appropriate

20   for the training and policy?

21           MR. KLEHM:  Objection:  Calls for legal

22   conclusion.

23           THE WITNESS:  Yes.

24   BY MR. SINCICH:

25      Q    Would you agree that if there was no

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 31

1   objectively reasonable perception, that Mr. Solis was in

2   immediate threat of death or serious bodily injury --

3          MR. KLEHM:  Incomplete -- I'm sorry, go ahead.

4          MR. SINCICH:  -- that deadly force would not

5   conform to contemporary law enforcement training and

6   procedures?

7          MR. KLEHM:  Incomplete hypothetical, lacks

8   foundation, calls for speculation.

9          THE WITNESS:  I'd say yes with the qualifier

10  that the law and the training often mixes up the words

11  immediate and imminent when they really should be talking

12  about either /or.

13         MR. SINCICH:  Okay.

14     Q   Do you know if officers are trained in the

15  difference between imminent and immediate?

16     A   Well, you see both words in the POST training,

17  you see both words in the law, and since officers are

18  taught the law and they receive their POST training, I

19  would say yes, they are taught both of those words but

20  I'm not sure that they're specifically taught the

21  difference between the two.

22     Q   Okay.  There is at least some Supreme Court use

23  in the use of force training.  Supreme Court opinions

24  quoted in the Supreme Court -- strike that.

25         There is some use of Supreme Court opinion in

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 32

1    the POST training, right?

2        A    United States Supreme Court, yes.

3        Q    And do you know which term United States

4    Supreme Court uses?

5             MR. KLEHM:  Objection:  Incomplete

6    hypothetical.

7             THE WITNESS:  I know they use immediate.  I'm

8    not sure if they have got imminent in any other use of

9    force decisions without looking.

10   BY MR. SINCICH:

11       Q    Do you know if officers are trained that there

12   might be training, there might be local policy, and there

13   might be POST, but if the Supreme Court says something,

14   then that's what you have to follow?

15            MR. KLEHM:  Objection:  Vague and ambiguous.

16   Incomplete hypothetical.

17            THE WITNESS:  Yes.  It's an interesting

18   question.

19            You know, you see cases all the time where

20   officers are arguably following their policy and training

21   or not, and then when you apply an U.S. Supreme Court

22   decision like Graham versus Connor or any of its

23   subsequent related cases, can there be a conflict between

24   what the law says, the case law says and what the policy

25   and training says.

1  situations, they're too fast breaking to do that, you

2  have to end the situation as quickly as you can.

3  BY MR. SINCICH:

4      **Q    Okay.  What would be the importance of creating**

5  **distance if you can?**

6          MR. KLEHM:  Objection:  Incomplete

7  hypothetical.

8          THE WITNESS:  Well, creating distance buys you

9  time and sometimes gives you the opportunity to get other

10  resources but, again, it's all very fact-specific and

11  it's different in a stand-off situation than it is for an

12  immediate breaking situation that needs to be addressed

13  very quickly.

14  BY MR. SINCICH:

15      **Q    What do you mean by an immediate breaking**

16  **situation?**

17      A    Something that's happening right now in front

18  of your eyes that's a deadly threat or could be a deadly

19  threat to others, you need to resolve that right now.

20  You don't just sit there and watch the person run away

21  with a gun in their hand for the purpose of creating

22  distance.  That would be stupid.

23      **Q    Are officers trained on how to cordon off an**

24  **area to prevent a person from escaping?**

25      A    They are.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 38

1        MR. KLEHM:  Objection:  Incomplete

2   hypothetical.

3   BY MR. SINCICH:

4        Q    Are officers trained on the concept of cover?

5        A    They are.

6        Q    To your knowledge are officers trained on the

7   equation distance plus cover equals time?

8        A    Yes.

9        Q    And I think there is a follow-up to the

10  equation that time equals options?

11       A    I didn't hear the last word.

12       Q    That time equals options?

13       A    That's generally true if you have the time,

14  yes.

15       Q    Okay.  Do you plan on providing any opinions as

16  to Mr. Solis's subjective state of mind?

17            MR. KLEHM:  Objection:  Incomplete

18  hypothetical.  Vague and ambiguous.

19            THE WITNESS:  I'm sorry, maybe I don't

20  understand.  I don't really know anything about

21  Mr. Solis's subjective state of mind.  He's running away

22  with a gun in his hand but I don't know what he's

23  thinking.

24            MR. SINCICH:  Right.

25       Q    Is it fair to say that any officer and any

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 39

1    reviewer of this incident would not know what was going

2    on in Mr. Solis's mind during the incident?

3         A    Would not know --

4              MR. KLEHM:  Vague and ambiguous.

5              THE WITNESS:  Not only would they not know,

6    they wouldn't care.

7    BY MR. SINCICH:

8         Q    It's generally his actions or conduct that's

9    important, right?

10        A    Right.  Behavior is everything in these

11   situations.  Not what his psychology is or wherever we're

12   going with subjective state of mind.

13        Q    And you were really good about answering these

14   questions earlier but just as a matter of a question, do

15   you plan on giving any opinion related to the law?

16        A    Just if it comes up in the context of what I

17   wrote in my report, mainly the law as it's taught to

18   police officers, if I'm asked a question in that context,

19   yes, but as far as interpreting law and providing legal

20   opinions, no, I don't do that.

21        Q    Okay.

22             When you were gathering facts about this

23   case, did you speak to anybody?

24        A    Well, I'm sure I spoke with Mr. Klehm and his

25   secretary about a number of things.  Maybe I don't

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 44

```
1   in wait?

2         A    I don't know.

3         Q    What is your understanding of what lying in

4   wait means then?

5         A    It means that in the case like this, during a

6   foot pursuit, that the suspect finds someplace where they

7   decide to stop and wait for the officer to approach or

8   come around a corner or from some other obstacle and

9   potentially shoot at them.

10        Q    Does it necessarily mean that the subject is

11  going to shoot at the officer?

12        A    No, not necessarily, but the implication is

13  that that's what they're doing and that's why they're

14  doing it.

15        Q    Generally speaking, when a person is lying in

16  wait, they're hiding, right?

17             MR. KLEHM:  Vague and ambiguous.  Incomplete

18  hypothetical.

19             THE WITNESS:  I don't know if hiding is the

20  right word.

21             They're just taking what they think is a

22  position of advantage for themselves so that they can

23  attack the approaching officer or maybe it's hiding also,

24  it could be either, I suppose.  But lying in wait implies

25  they intend to attack the officer.
```

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 45

1             MR. SINCICH:  Okay.

2        Q    And we don't know what Mr. Solis's intent was

3   in this case, right?

4        A    I do not.

5        Q    If Mr. Solis was, for instance, ducking behind

6   a gate in this hypothetical, could it be that he was

7   trying to hide so that he was not detected by the

8   officer?

9        A    It's possible.

10       Q    And is it also possible that he was doing that

11  without any intent to harm anybody?

12            MR. KLEHM:  Incomplete hypothetical, lacks

13  foundation, calls for speculation.

14            THE WITNESS:  Sure, that's possible.

15            I think what's important is the officer's

16  perception, belief, about the situation.

17  BY MR. SINCICH:

18       Q    And what's important is whether or not that

19  officer's perception and belief is reasonable, right?

20       A    Correct.

21       Q    Based on the objective facts of the case?

22       A    Yes.

23       Q    You mentioned in your summary that it's unknown

24  if Officer Bell's rounds struck Mr. Solis.  Do you see

25  that?

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 46

1    A    I'm not sure where it is but I remember writing

2    it.  Let me --

3        **Q    It's the second to the last sentence, sir.**

4    A    Oh.  Yes, it was unknown to me at the time of

5    this report and it's still unknown to me.

6        **Q    You reviewed information related to Deputy**

7    **Waltermire's shooting, right?**

8    A    A little bit.  I wasn't retained to deal with

9    Waltermire's shooting.

10        My recollection is that he approached from a

11   different angle and he fired 11 shots.  I wrote that

12   down, but I didn't spend any time analyzing his

13   positioning or justification for his shooting or anything

14   like that.

15       **Q    Did you see the video of Deputy Waltermire's**

16   **shooting?**

17   A    I don't recall.  I could look at my notes.

18   Would you like me to?

19       **Q    Yes.**

20   A    Would you like me to look at my notes with

21   respect to that question?

22       **Q    Yes, please, sir.**

23   A    Thank you.

24       **Q    In your report there is three videos listed but**

25   **they're not titled in a way that I can easily identify**

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 51

1    perceived Mr. Solis as an imminent threat of death or

2    serious bodily injury, then Officer Bell's deadly force

3    would conform with contemporary law enforcement training,

4    right?

5        A    Pending procedures and any reasonable officer

6    could have done the same thing.  Yes, you definitely

7    paraphrased it.

8        Q    Okay, and then you finished the remainder?

9        A    No, not in total but it's all right.  The

10    opinion is what it is on paper.

11        Q    Right.

12            Do you only have two opinions, primary

13    opinions, in this case?

14        A    I'll have to look.

15            MR. KLEHM:  Vague and ambiguous.

16            THE WITNESS:  I wonder if something is wrong

17    about my opinion numbering.

18    BY MR. SINCICH:

19        Q    I just wanted to make sure that we have it

20    correct.

21            Do you see that your second opinion is listed

22    as opinion 3?  On page --

23        A    Yes, I think I got a typographical error there,

24    that's what I was just checking.  Let me just scroll down

25    and make sure.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

1    All right.  So opinion Number 3 is really

2    Number 2.  And the answer is yes, I have only documented

3    two opinions in this case.  I apologize for the clerical

4    error.

5         Q    No problem.  I just wanted to make sure I

6    wasn't missing anything in understanding.

7         A    Got it.

8         Q    Based on your training and experience in this

9    case, would it be appropriate and within the training

10   policies and procedures to use deadly force on Mr. Solis

11   if he had a gun in his hand and he was running away while

12   he was in the backyard?

13             MR. KLEHM:  Objection:  Incomplete

14   hypothetical.

15             THE WITNESS:  If Officer Bell reasonably

16   assessed that Mr. Solis was constituting an imminent

17   threat while running with a gun in his hand, either to

18   himself or to people potentially downrange, yes,

19   basically what the opinion is talking about throughout

20   its many pages.

21   BY MR. SINCICH:

22        Q    Okay.  And if a person is running away, all the

23   facts in this case being the same in the backyard,

24   running away with a gun in their hand and nothing else,

25   would that constitute a reasonable perception of an

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 53

1    imminent of death or serious bodily injury?

2                 MR. KLEHM:  Objection:  Incomplete

3    hypothetical.

4                 THE WITNESS:  Yes.

5                 MR. KLEHM:  Vague.

6    BY MR. SINCICH:

7        Q    Whose life is imminently threatened in that

8    hypothetical by a person running away with a gun in their

9    hand?

10                MR. KLEHM:  Objection:  Incomplete

11   hypothetical, vague and ambiguous.

12                THE WITNESS:  First and foremost, Officer Bell

13   himself, and secondarily as the foot pursuit continues

14   and as he is approaching a residence, officers coming

15   from the other side and any residents inside the house if

16   he managed to get inside the house, take a hostage, hurt

17   somebody, et cetera.

18                Primarily, at the outset, certainly Officer

19   Bell from the first time he started chasing him and,

20   yelling at him, drop the gun or I'll shoot, or whatever

21   the exact words were.

22   BY MR. SINCICH:

23       Q    By running away with a gun in your hand, how

24   does that constitute an imminent threat with nothing more

25   to Officer Bell?

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 54

1      A    Because --

2              MR. KLEHM:  Objection:  Sorry, Captain Meyer.

3   Objection:  Vague and ambiguous as to the phrase with

4   nothing more.  Argumentative.

5              You can answer.

6              THE WITNESS:  Because a suspect with a semi --

7   sorry, a suspect with a hand gun in their hand can point

8   the gun and shoot at the officer in a quarter second or

9   less, even while they're running and that's proven by

10  empirical research over and over again, and that's faster

11  than any officer can react to the deadly threat,

12  therefore, it's an imminent deadly threat presented by

13  the suspect that needs to be countered immediately.

14  BY MR. SINCICH:

15      Q    **Even if the suspect doesn't make any movement**

16  **that threatens the shooting of an officer?**

17              MR. KLEHM:  Objection:  Argumentative.

18  Incomplete hypothetical.

19              THE WITNESS:  Yes.  The officer cannot wait for

20  the suspect with the gun in the hand to turn on him or

21  make some kind of another furtive movement that indicates

22  that the suspect might shoot the officer because so far

23  as of this morning, there is 29 dead, murdered by gunfire

24  police officers in this country, most of whom did not

25  have time to react and overcome the threat before getting

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

1   shot, and there are thousands of similarly situated

2   officers in the history of this country whose names are

3   inscribed on the wall in Washington, D.C.

4   BY MR. SINCICH:

5      Q   **Do you plan on testifying as to any other use**

6   **of force incidents where officers were shot?**

7      A   If I'm asked about them, I sure will.

8      Q   **Well, I didn't ask them about this situation**

9   **but you brought it up so I'm just wondering if that's**

10  **something that you plan on doing at trial.**

11     A   Well, if that's part of my answer like it just

12  was in this question because you asked, then I would, or

13  if defense counsel asked me about what I know about other

14  officers getting shot, and the chapters and books that

15  I've written about officers being shot and how it happens

16  and how to prevent it and all those tactical and life

17  saving issues, of course I will answer it.  But I don't

18  have some big game plan to do that.  I'll answer the

19  questions that come to me.

20     Q   **Do you know the statistics on how many times**

21  **officers shoot people in this country who are unarmed?**

22     A   It's --

23     MR. KLEHM:  Unarmed, counsel?

24     MR. SINCICH:  That was the question, yes.

25     MR. KLEHM:  Yes.  How is that reasonably

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 59

1    completely incoherently worded and incomplete

2    hypothetical.

3              You can answer.

4              THE WITNESS:  Again, it's dependent on the

5    totality of the circumstances, the officer's reasonable

6    perceptions about the threat level of that person

7    standing there or running with the gun.

8    BY MR. SINCICH:

9        **Q    So the fact of having the gun alone is not**

10   **enough, you have to have something else, right?**

11       A    You have to have a reasonable belief that there

12   is an immediate or imminent threat of death or great

13   bodily harm to yourself or another person in order to

14   qualify to use deadly force.

15       **Q    And what facts did Officer Bell testify to that**

16   **led him to believe that Mr. Solis was in imminent threat**

17   **of death or serious bodily injury prior to his volley of**

18   **shots?**

19       A    Just from memory without looking at the

20   quotations of the deposition of Officer Bell and my

21   report, I think he articulated very clearly that he knew

22   that Mr. Solis was a violent, dangerous person, who now

23   has a gun in his hand, who's now running away, who is now

24   refusing to drop the gun and surrender, and all of that

25   adds up to more than a sufficient imminent or immediate

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 60

1   threat of death or serious bodily injury to Officer Bell

2   and others.

3       **Q    Even if Mr. Solis isn't doing anything**

4   **threatening with the gun?**

5           MR. KLEHM:  Objection:  Argumentative.

6           THE WITNESS:  He is doing something threatening

7   with the gun.  He has it in his hand, he is resisting

8   arrest, and in a split second, he can launch bullets at

9   Officer Bell if he chooses to do so.  And I also still

10  wonder where that extra, where that missing bullet is.

11  BY MR. SINCICH:

12      **Q    Is it fair to say you don't know based on your**

13  **review of all the evidence?**

14      A    Right.  I documented in my report that there is

15  an expended round in Mr. Solis's handgun that's not

16  accounted for, and I don't know factually if, and it

17  doesn't sound like Officer Bell knows factually if

18  officer, I'm sorry, if Mr. Solis fired a round during the

19  incident or not.

20          But it doesn't really matter for the purposes

21  of my opinion.  It's just something that I noted during

22  the review process.

23      **Q    For the purposes of your opinion, do you**

24  **believe that Mr. Solis attempted to shoot Officer Bell?**

25      A    I do not know.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 61

1     Q   Does that matter to your analysis at all?

2     A   No.

3     Q   For the purposes of your opinions, do you

4  believe, based on your review of the facts, that

5  Mr. Solis pointed a gun at Officer Bell?

6     A   That's a question of fact that has to do with

7  Officer Bell's credibility that the jury will have to

8  decide if Officer Bell in various formats articulated

9  threat in different ways.

10       And I am going to need that very brief break if

11  we could.  Sorry, I couldn't make it to 15 minutes.

12       (Recess 11:32 to 11:42.)

13  BY MR. SINCICH:

14     Q   Captain Meyer, is your methodology in analyzing

15  these cases essentially to apply the objective

16  reasonableness standard as it's outlined in POST?

17     A   Yeah, I mean when I -- that's two questions.

18       I mean my report, I rely on the objective

19  reasonable standards Graham versus Connor, POST training,

20  et cetera, the things that are laid out in my rationale

21  for opinion Number 1 in this case, but my process for

22  analyzing a case is look at the documents to provide it

23  and then apply what I believe are the professional

24  standards and practices of law enforcement when I am

25  finally reaching conclusions and opinions.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 62

```
 1      Q     Okay.

 2            Regarding the first volley of shots, if

 3   Officer Bell could not see whether or not Mr. Solis had

 4   a gun in his hand, would it be appropriate to use

 5   deadly force against Mr. Solis?

 6            MR. KLEHM:  Objection:  Incomplete

 7   hypothetical, lacks foundation, calls for speculation,

 8   argumentative.

 9            THE WITNESS:  If Officer Bell reasonably

10   believed that Mr. Solis had the handgun in his hand,

11   whether he could see it or not, yes, it would be

12   reasonable for him to use deadly force because of the

13   perception reaction response time issue we spoke about

14   earlier.

15   BY MR. SINCICH:

16      Q     Right.  I wanted to ask you about perception

17   reaction.  You do mention that in your report as well,

18   right?

19      A     I did.

20      Q     Do you hold yourself out to be an expert in

21   perception reaction?

22      A     Yes.

23      Q     Do you have any formal training in perception

24   reaction time?

25      A     Yes.
```

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 63

```
 1        Q     What's your formal training?

 2        A     I'm a certified force analyst by the Force

 3   Science Institute.  Have been for 14 years, at least I

 4   think.

 5        Q     Have you ever run any tests on officers'

 6   perception reaction time?

 7        A     Run like scientific tests like Core Science

 8   does, have I run them?  No.

 9        Q     Is it fair to say that you have simply read

10   about those tests?

11             MR. KLEHM:  Objection:  Argumentative.  How do

12   you think most professors -- sorry.  Go ahead.  You can

13   answer.

14             THE WITNESS:  No, that's not fair to say.

15             I attended a week long training certification

16   course on the subject out of town some years ago, and I

17   have attended before that and since that quite a number

18   of other classes that deal with that subject as well.

19             Have I stood there with a stop watch and a high

20   speed camera and done those scientific tests myself?  No,

21   I have not.  I have watched other people do them and

22   present on them.

23   BY MR. SINCICH:

24        Q     Have you been subject to any of those tests,

25   for instance, to find out your perception reaction time?
```

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 64

1        A      That's a good question.  Let's see.  No, I was

2     not involved in any of those scientific tests.  I kind of

3     do it myself.  It's kind of easy to do.

4        Q      **Do you know if Officer Bell has ever been**

5     **subject to a perception reaction time test?**

6        A      I do not know.

7        Q      **What's your perception reaction time if you**

8     **know?**

9        A      Well, again, I'm sure it's within about the

10    quarter second of the norm for, well, I'm sorry, I'm

11    misstating it.

12            I'm talking about how fast somebody can point a

13    gun from any position and shoot a round.

14            Perception reaction time is situation-dependent

15    but it's typically about six to eight-tenths of a second.

16    Some people are a little faster, some people take a

17    little longer to perceive and begin to react and

18    ultimately respond to the perceived threat.

19       Q      **Is it fair to say that everybody's perception**

20    **reaction time is going to be different?**

21       A      Right.  I mean there is a range of them.  Some

22    people are faster, some people are slower.  That's why we

23    have professional athletes and then the rest of us.

24       Q      **Right.  So is it fair to say that the person**

25    **who's trained for a specific encounter is going to have a**

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 65

1   faster time than the untrained individual?

2              MR. KLEHM:  Objection:  Incomplete

3   hypothetical, argumentative, lacks foundation.

4              THE WITNESS:  Yes.  As a general proposition, I

5   would agree with that.  Sure.

6   BY MR. SINCICH:

7       Q    And you said that there is a time for a person

8   to be able to use a weapon if a weapon is in their hand,

9   in this case, in the hypothetical being the subject, do

10  you recall saying that that's about a quarter of a

11  second?

12      A    Right.  There is plenty of research that

13  verifies that a person can, with a handgun in their hand,

14  in any position, or if even if it's still in their waist

15  band, if their hand is on it, ready to pull it, that they

16  can point it and fire it in a quarter second is kind of

17  an average time by actual testing.

18      Q    Is that testing cited in your report anywhere?

19      A    Yes.

20      Q    Is it the Lewinsky Hudson report?

21      A    I'm sorry, is it what?

22      Q    Lewinsky Hudson report?

23      A    I think I cited one of their reports.  Above

24  that, I just cited my own training and experience on that

25  subject, and then I used their peer-reviewed citation.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 66

1    Q    So when you get the quarter of a second time

2    frame, where are you getting it from?

3    A    From my training and my experience.  I can do

4    it.  I can do it right now.

5    Q    Okay.  And so that quarter of a second, were

6    any of the subjects police officers?

7    A    You mean in the testing?

8         MR. KLEHM:  Objection:  Vague and ambiguous.

9    BY MR. SINCICH:

10   Q    Yes, in the testing.

11   A    Could you just ask it again?  I want to make

12   sure I'm clear on what you're asking.

13   Q    In the testing where you got the quarter of a

14   second time frame, did they use police officers to run

15   the test?

16        MR. KLEHM:  Objection:  Vague and ambiguous.

17        Do you mean the person firing the gun or what?

18   What part of the test do you mean?

19   BY MR. SINCICH:

20   Q    This is a test of how fast the person with a

21   gun in their hand can fire it.  This is what Captain

22   Meyer has explained.

23        I'm asking, the people who are doing these

24   tests, the subjects of the test, were they police

25   officers?

EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 07/15/2024

Page 67

1    A    Not all of them.  Some yes, some no.

2    Q    **The ones who were not police officers, what**

3    **generally were their demographic, if you know?**

4    A    Yes.  That's what we call a naive shooter, in

5    other words, an untrained shooter, and I recall a

6    particular civilian female who had never touched a

7    handgun before in her life, and she was able to draw it

8    and shoot it in less than a quarter second.

9    Q    **And the time that people can have a gun, draw**

10   **it and shoot it, that time also varies, correct?**

11   A    It does.

12   Q    **And what is the variance in that time?**

13        MR. KLEHM:  Objection:  Lacks foundation, calls

14   for speculation.

15        THE WITNESS:  I don't know without -- sorry.

16        I don't know without looking up the studies but

17   you know, when you're dealing with variables that have an

18   average of a quarter second, then it's a split second

19   before a quarter second, a split second after a quarter

20   second would be the intuitive answer but I haven't looked

21   at the research per se in quite a while.  I could look it

22   up.

23   BY MR. SINCICH:

24   Q    **Do you know if in any of the research that**

25   **someone got a shot off accurately in a quarter of a**

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 68

1   second?

2          MR. KLEHM:  Objection:  Argumentative.  Vague

3   and ambiguous.

4          THE WITNESS:  Well, they shot the target.  I

5   mean that was the whole point so I'm not sure what you're

6   asking, I guess.

7   BY MR. SINCICH:

8      Q    As part of the test, if the shot missed the

9   target, it wouldn't be counted?

10     A    I don't know.  And it doesn't matter if it

11  misses in real life.

12     Q    Okay.

13          You also made mention of methamphetamine and

14  PCP in your report; do you recall that?

15     A    Yes.  I recall noting that the autopsy or the

16  toxicology test on Mr. Solis, from memory, the test

17  revealed the presence of amphetamine, methamphetamine and

18  PCP.

19     Q    If all the facts in this case were exactly the

20  same, except Mr. Solis was not under the influence of

21  methamphetamine, amphetamine and PCP, would it change

22  your opinion at all?

23     A    No.

24     Q    Based on your review of all the evidence, did

25  Officer Bell have any specific information about whether

EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 07/15/2024

Page 69

1    or not Mr. Solis was under the influence of amphetamine,

2    methamphetamine or PCP?

3         A    I don't recall if he had --

4              MR. KLEHM:  Objection:  Vague and ambiguous.

5    Lacks foundation.

6              THE WITNESS:  I don't recall if he had that

7    knowledge and I don't recall if he was interviewed or

8    testified in his deposition about his perceptions of

9    whether Mr. Solis was under the influence of something.

10   That's something not in my memory.  It would be in the

11   record.

12             MR. SINCICH:  Okay.

13        Q    Based on your review of the record, did

14   Mr. Solis ever attempt to enter a house?

15        A    I don't have a recall.  No, I don't have a

16   recall that he had attempted to.  I just have that

17   picture in my mind as he runs to this residence, I think

18   it was in the back porch area where this terminated, so I

19   don't know what his intentions were and I don't know if

20   it's documented any different than that in the record.

21        Q    Is it fair to say that at the time of Officer

22   Bell's use of deadly force, he did not know if there was

23   any civilians in the area including in the house?

24        A    Well, I think that's really two questions.  One

25   is yes, did he know or did he not know if there was

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 81

1    A   It would have been .40 caliber.  I don't

2  remember the brand control expansion rounds.  Standard.

**3    Q   All right.  And do you know why controlled**

**4  expansion rounds are used by law enforcement?**

5    A   Because if you hit the suspect, there is less,

6  two reasons, one is they have greater stopping power than

7  regular round nose rounds and the problem with regular

8  round nose rounds is they will often go through the

9  suspect and go downrange, potentially hit someone else so

10  they're safer in that regard.  They are not safer for the

11  suspect but they are safer for anyone who is downrange.

12  That's been the case for decades.

**13    Q   All right.**

**14       And in this particular residential setting**

**15  which consisted of mobile homes, would a jacketed round**

**16  as opposed to a controlled expansion round have a**

**17  better probability of going not just through the**

**18  suspect but through the walls of the mobile-home**

**19  trailers that were in this neighborhood?**

20       MR. SINCICH:  Vague and ambiguous.  Outside of

21  expertise.

22       THE WITNESS:  Yes, and I have seen that happen

23  during my career and in my expert work, the rounds can

24  penetrate that way.  Controlled expansion rounds are less

25  likely to penetrate that way.

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 82

1          MR. KLEHM:  Okay.

2      Q    Thank you, Captain Meyer.  I do not have any

3  further questions.

4          MR. SINCICH:  A couple quick follow-ups.

5          FURTHER EXAMINATION BY MR. SINCICH:

6      Q    Do you hold yourself out to be a toxicology

7  expert?

8      A    No.

9      Q    Is it fair to say that everybody reacts to

10  being under the influence of either amphetamine,

11  methamphetamine or PCP differently?

12      A    Well, there are some general ways that they act

13  out based on my own training and experience but, sure, I

14  mean human beings tend to do everything a little bit

15  differently, nobody does something identical to you and

16  me.

17      Q    And based on your training and experience, how

18  a person reacts, generally speaking, depends on how much

19  the person took of any substance?

20      A    You're getting past my expertise there.  You

21  need a pharmacologist or somebody like that to talk about

22  the physiology of how somebody reacts when they're under

23  the influence.

24      Q    Is it fair to say that you don't know whether

25  or not Mr. Solis was actually feeling the effects of the

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 07/15/2024**

Page 83

1    **drugs at the time?**

2         **A    I do not.**

3         Q    Okay.  I have no further questions at this

4    time.

5              It looks like we went two hours and 15

6    minutes, is that right, from your assessment?

7         A    Yes.

8         Q    Okay.  I'm going to get a check.  I got an

9    email with your W-9 right there so I'll open it up and

10   make sure it's attached and I'm going to get the check

11   out to you really soon.

12             Ms. Yip, do you have any spellings or

13   anything?

14             THE REPORTER:  Mr. Klehm, would you like to

15   order a copy?

16             MR. KLEHM:  Yes, ma'am.  Thank you.

17             THE REPORTER:  And I can ask the spellings off

18   the record.

19             I have 12:16 going off the record.

20             THE WITNESS:  Just mention that the math for my

21   payment for the deposition looks like 1012.50, it looks

22   like it to be 1,012.50.  Two and a quarter hours times

23   450 dollars.

24             (Off the record at 12:16 o'clock p.m.)

25

**EDGAR SOLIS vs STATE OF CALIFORNIA, ET AL.**
Greg Meyer on 07/15/2024

Page 84

1                    CERTIFICATE OF WITNESS

2

3

4          I, CAPTAIN GREG MEYER , hereby declare that I

5    have read the foregoing testimony, and the same is true

6    and a correct transcription of my said testimony except

7    as I have corrected.

8

9

10                               Signature

11

12

13                               Date

14

15

16

17

18

19

20

21

22

23

24

25