# "EXHIBIT L"

Case 5:23-cv-00515-HDV-JPR     Document 62-12     Filed 09/10/24     Page 1 of 19     Page ID #:786

# EDGAR SOLIS

## v.

## COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, *et al.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## Case No.: 5:23-cv-00515-HDV-JPR

### EXPERT WITNESS REPORT

### BY

### GREG MEYER

### May 31, 2024

## INTRODUCTION and QUALIFICATIONS

As requested by defense counsel for the State of California and California Highway Patrol (CHP) Officer Michael Bell, I have reviewed and analyzed case documentation for this incident by applying my combined 48 years of knowledge, skills, education, training, and experience as a law enforcement officer and my continuing involvement as a police procedures expert.

My opinions are based on my analysis of the documentation and evidence in this case, then applying my knowledge and understanding of generally accepted professional standards and practices in law enforcement. My opinions are offered with a reasonable degree of professional certainty and are based on:

1. My 48 years of law enforcement experience including 36 years as a sworn police officer, detective, sergeant, lieutenant, captain, reserve officer, and specialist volunteer at the Los Angeles Police Department (LAPD) combined with more than 34 years as a police tactics and procedures consultant; particularly including my experience as captain at the LAPD Academy in charge of training, including tactical training to include lethal and nonlethal Use of Force.

2. I chaired LAPD's Use of Force Best Practices Work Group and LAPD's Tactics Training Review Committee, and I continued to serve on both committees for several years after I retired.

3. My personal experience with respect to the investigation, administrative review, and adjudication at the supervisory and command levels at the LAPD for police Use of Force incidents including officer-involved shootings. For example, I conducted reviews of dozens of police shootings for the LAPD Deputy Chief in charge of the LAPD Use of Force Review Board; and as a captain, I reviewed and presented such cases for adjudication by the LAPD Use of Force Review Board.

4. For two years (2015-2017) I was the designated independent law enforcement expert for the United States Department of Homeland Security's Division of Civil Rights and Civil Liberties where I conducted special investigations involving Use of Force by such agencies as the Border Patrol, ICE, and the Federal Protective Service.

5. On 20 occasions (including 12 police shootings) I have conducted outside reviews of police Use of Force cases as requested by four District Attorney offices that were considering whether to file criminal charges against police officers; and on one occasion for a federal prosecutor after the officer was charged. In addition, I have conducted outside reviews of seven incidents (including three police shootings) as requested by chiefs of police of local agencies.

6. I wrote the tactical "Lessons Learned" sections of a series of books authored by a former Los Angeles County District Attorney detailing the murders of two dozen peace officers in Los Angeles County.

7. I hold the Force Science Analyst certification from the Force Science Institute (FSI) and have held the Certified Litigation Specialist credential from Americans for Effective Law Enforcement (AELE).

8. I have taught law enforcement and other professionals (including lawyers and judges) about police Use of Force on more than 50 occasions throughout the United States.

9. I am a member of and receive frequent professional education updates from the International Association of Chiefs of Police (IACP, life member), the Police Executive Research Forum (PERF, life member), the Peace Officers Association of Los Angeles County (POALAC, life member), the International Law Enforcement Educators and Training Association (ILEETA), the California Force Investigators Association (CALFIA), and the Association of Force Investigators (AFI).

10. Each year (except 2020-2022 because of COVID) I produce and instruct at Use of Force and Police Video Evidence and other seminars for POALAC, where I have been a board member for 20 years and chaired the Training Committee for 10 years.

11. I was a member of the design committee and taught classes for the revised California Peace Officer Standards and Training (POST) course on the investigation of officer-involved shootings and arrest-related deaths.

12. I have prior and ongoing work as an expert witness on police procedures, training, equipment, tactics, supervision and review processes, in federal, state, and local courts, both civil and criminal, as well as at arbitrations.

13. I have been an expert witness or consultant for more than 450 cases in the past 34 years, mostly involving police officers making arrests and mostly involving lethal and nonlethal Use of Force. More than 100 of my cases have involved officer-involved shootings.

14. I have testified in court on police procedures matters more than 70 times, and I have been deposed in such matters more than 80 times.

15. While the majority of my work involves the defense of police officers, I have worked on cases adverse to police officers (criminal, civil, arbitrations/hearings) on more than 40 occasions.

**LIMITATIONS**
1. If, after submission of this report, I am asked to consider other relevant materials and/or documents, I may either modify my stated conclusions or offer additional opinions via a supplemental report, as deemed appropriate.

2. I reserve the right to review and to respond if I deem it appropriate to any Plaintiff's police procedures expert report that I might receive in the future.

3. I do not offer legal conclusions. To the extent that my report may refer to statutes or case law, it is in the context of law enforcement training that refers to such matters.

4. When there are factual disputes among the parties and witnesses regarding their memories of specific events during the incident, I do not make determinations of the credibility of parties and witnesses, for that is the purview of the trier of fact.

5. When my report documents quotations and timings from audio/video evidence, I made my best effort to document those things accurately.

**LIST OF DOCUMENTS PROVIDED TO ME BY DEFENSE COUNSEL**

1. First Amended Complaint
2. Answer to First Amended Complaint
3. Bates AGO 1-1499
4. Videos
   a. KTKM2053
   b. VVPM1227
   c. UGGK1245
5. Hemet PD Dispatch Audio
6. Combined Documents
7. Scene Depiction
8. Combined Photos (10 segments)
9. DA Findings re CHP Officer Bell
10. CHP's Responses to RFPD (Set
11. Policy and Training Documents
    a. CHP Officer Bell training record
    b. A&C 2022 Docs
    c. EXPANDED COURSE OUTLINE
    d. HPM 70.6 CH. 1
    e. LEARNING DOMAIN WORKBOOK
    f. POST TESTING GUIDELINES
    g. PRESENTAITON MODULES
    h. TRAINING AND TESTING
12. Other Pleadings
    a. CHP Responses Solis Interrogs – Set One
    b. CHP's Responses to RFPD (Set 1) & POS
    c. Signed CHP Responses to Pl. Solis RFAs – Set One with POS
    d. Def. County of Riverside Responses to Plf. Solis RFA Set
    e. Def County of Riverside Responses to Plf. Solis RFP Set
    f. Def. County of Riverside Responses to Plf. Solis
    g. SOLIS Responses to Bell RFP, Set 1
    h. SOLIS Responses to Bell ROGS Set 1

13. Depositions
    a. CHP Officer Michael Bell
    b. Corporal Patrick Sobaszek
    c. Lieutenant Arthur Paez
    d. Salvador Waltermire

**PLAINTIFF'S FIRST AMENDED COMPLAINT REGARDING CHP OFFICER BELL**
- Excessive force
- Negligence

**INCIDENT SUMMARY**
On March 2, 2022 at approximately 1610 hours (4:10pm), California Highway Patrol (CHP) Officer Michael Bell was working with Hemet Police Department (HPD) Detective Patrick Sobaszek, in plainclothes, in an unmarked sheriff's vehicle, assigned to the Riverside County Regional Gang Task Force. The officers observed then confronted Plaintiff Solis who was the subject of a "BOLO" bulletin (be on the lookout for), who was driving a vehicle described on the bulletin, and who was wanted for three outstanding felony warrants. After CHP Officer Bell approached the driver side of Plaintiff's vehicle and tried to talk him into surrendering for the warrants, Plaintiff suddenly drove away. CHP Officer Bell chased on foot and observed Solis holding a handgun as they ran through a residential neighborhood. CHP Officer Bell reported that he gave verbal commands to drop the gun, but Plaintiff ignored them. After going over fences while chasing the Plaintiff, CHP Officer Bell reported that he observed Plaintiff going through a gate then apparently lying in wait on the other side, armed with a handgun, as Bell approached. CHP Officer Bell fired several rounds at Plaintiff, who then ran to the rear of a nearby residence. CHP Officer Bell fired several more rounds at Plaintiff as Detective Sobaszek arrived. Riverside County Sheriff's Department (RCSD) Deputy Salavadore Waltermire arrived from a different direction and fired 11 shots at the Plaintiff. CHP Officer Bell fired a total of eight shots during the incident. It is not known to me at the time of this report whether any of CHP Officer Bell's rounds struck the Plaintiff. The Plaintiff was treated for multiple gunshot wounds.

**TOXICOLOGY**
Testing of the Plaintiff found amphetamine, methamphetamine, and PCP.[1]

---

[1] Report of toxicology testing, AGO 392

**POTENTIAL LIMITATIONS OF VIDEO EVIDENCE**

This case involves video evidence. My training and experience are that video evidence of a police use of force incident is generally very valuable to an investigation, but it has several significant, potential limitations that investigators and adjudicators must be aware of:

- Videos are made with two-dimensional technology, but we live in a three-dimensional world.
- Videos do not always capture the involved officer's point of view.
- Videos may capture objects and events that the officer did not see.
- Videos do not always capture objects and events that the officer did see.
- Videos may capture more information than an officer's brain can process because of the psychological stress experienced in the moment.
- Video cameras do not capture objects and movements that are blocked from the camera lens.
- Videos may document lighting conditions, depth perception, and peripheral fields of view that are different than the human eye.
- Some videos have a low frame rate, thus they do not capture real time.
- Bystander cell phone videos tend not to capture the entire incident.
- Video devices are not always pointed at the action.
- Video devices often capture voices and other sounds that are more valuable to the investigation than what is seen on the video.
- Video cameras are neutral, inanimate objects; thus, videos do not experience the bio-mechanical, physiological and psychological aspects that the involved human being experiences under stress in terms of perception, fear, adrenalin-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.
- Videos of use-of-force incidents tend to cause emotion-based (not fact-based) reactions by viewers, because use of force is generally not pleasant to view.
- In some cases it is advisable to engage the services of a certified forensic video analyst.
- Officers experience events in real time, and only once. Officers do not have the luxury of repeated viewings of videos or manipulating videos (such viewing videos in slow motion or making freeze frame photographs of isolated events, for example) as investigators and adjudicators commonly do.
- Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances along with policy, training and the law to determine whether or not the officer's perceptions and actions were objectively reasonable.

## OPINIONS

### Opinion No. 1
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Officer Bell reasonably perceived that the actions of Plaintiff Solis created an imminent/immediate danger of death or serious bodily injury to Officer Bell or others, then Officer Bell's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

CHP Officer Bell fired his handgun during two shooting sequences.

During Officer Bell's first shooting sequence, he fired two shots in rapid succession, then a pause, then two more shots in rapid succession.[2]

Officer Bell is seen and heard on a surveillance video running from the street then through a driveway yelling, "I'm gonna shoot you!  Drop the gun! Drop the gun!" Then one shot is heard and this surveillance video ends.[3]

Officer Bell is seen and heard on another surveillance video walking quickly through a backyard yelling rapidly, "Drop it! Drop it! Drop it!" then he goes off camera and fires three shots, then yells, "Get on the ground! Get on the ground!"[4]

Officer Bell's post-incident round count and the case reports document that Officer Bell fired eight shots, but I heard only seven shots on the above audio/video segments.[5]  However, this may be a limitation of video technology that does not capture all data, and based upon my training and experience, this may require the services of a certified forensic video analyst.

At the time of this report, it is unknown to me whether any of CHP Officer Bell's rounds struck Plaintiff Solis.

CHP Officer Bell stated during his voluntary interview with Riverside County District Attorney investigators that he chased the Plaintiff on foot, observed Plaintiff holding a handgun, radioed that the Plaintiff had a handgun, gave multiple commands to drop the handgun and warned that he would shoot, he was 100 percent in fear for his life, was concerned about the safety of residents in the neighborhood, and the Plaintiff appeared to have the ability, opportunity and intent to shoot Bell.  Bell fired several rounds at the Plaintiff who appeared to be armed and lying in wait for Bell after going through a gate, and he fired several more rounds after Plaintiff ran next to a nearby house because Bell feared for the safety of other officers who were approaching from the other side, then the Plaintiff went out of Bell's view.[6]

---

[2] Audio recording from surveillance video labeled 603 Hillmer, AGO 504 at timer 0:00:03 – 0:00:06
[3] Surveillance video segment, AGO 514
[4] Surveillance video segment, AGO 524
[5] Photos, Set 3, #71; S&W .40 cal. semi-automatic handgun; full load = 15+1; post-incident = 7+1; and AGO 47-48
[6] CHP Officer Bell's transcribed interview statement, AGO 90-97, 122-123, 127-135, 154-155

CHP Officer Bell testified at deposition about the fears for his own safety and the safety of others that caused him to use deadly force:

> p. 76
> 12· · · ·A.· · I've experienced with criminals for years and
> 13· ·this type of, this type of person in this situation
> 14· ·committing this crime is one of the most dangerous because
> 15· ·he's wanted for violent crimes that have potential for
> 16· ·prison time and that gives, in my training and experience,
> 17· ·the person a reason to not want to be caught and willing
> 18· ·to do things that normally they wouldn't do, in my
> 19· ·training and experience.
> 20· · · · · · ·So the person had active felony warrants for
> 21· ·violent crimes.· The person was in possession of a firearm
> 22· ·illegally.· And in my training and experience with dealing
> 23· ·with several different people with firearms, the ones who
> 24· ·do not put it down have a reason to not put it down and
> 25· ·that reason usually involves them using the weapon.
> p. 77
> 1· · · · · · ·And I was fearing, number 1, that he would reach
> ·2· ·cover before me which is, which is, it's a really
> ·3· ·terrifying situation to be in.· He's making a conscious
> ·4· ·decision from the way that he fled with the car that he's
> ·5· ·willing to do and risk the public's life to get away.
> ·6· · · · · · ·And maintaining that gun, knowing he's being
> ·7· ·chased by the police let's me know that I'm getting ready
> ·8· ·to get in a very dangerous situation.· And I was in fear
> ·9· ·for my life and also the fear for the residents that,
> 10· ·people who lived in the home that he was approaching. …
> p. 80
> 11· · · ·Q.· · What did you see Mr. Solis do next?
> 12· · · ·A.· · He went through the gate.· There was another
> 13· ·fence inside of that gate.· It's like chain-link with
> 14· ·slats through the chain-link.· And he turned with the gun
> 15· ·pointing my direction facing me as he kneeled down behind
> 16· ·that, behind that second gate, that second fence.
> 17· · · ·Q.· · Is it your testimony that Mr. Solis pointed the
> 18· ·gun at you?
> 19· · · ·A.· · Yes.
> …
> 23· · · ·Q.· · BY MR. SINCICH:· Did Mr. Solis ever shoot the
> 24· ·gun at you?
> 25· · · · · · ·MR. KLEHM:· It calls for speculation.· Lacks
> p. 81
> 1· ·foundation.
> ·2· · · · · · ·THE WITNESS:· It's probable.

·3·  · · ·Q.· · BY MR. SINCICH:· What do you mean by that?
·4·  · · ·A.· · Well, I -- I wouldn't be able to see because --
·5·  ·it's hard.· It would be hard for me to know if he shot the
·6·  ·weapon for several reasons.
·7·  · · ·Q.· · What reasons?
·8·  · · ·A.· · One of which is when he's behind cover or
·9·  ·something's covering the weapon when he fires, I wouldn't
10·  ·see a flash.· I have something, I believe it's called
11·  ·auditory exclusion, so when I shoot or shooting's
12·  ·happening, I don't necessarily hear the sounds of my
13·  ·firearm going off let alone somebody else's.· So I
14·  ·wouldn't hear, hear the shot.· And then he, he had a
15·  ·revolver which doesn't eject spent cartridges.
16·  · · ·Q.· · Who told you that you have auditory exclusion?
17·  · · ·A.· · I know it.
18·  · · ·Q.· · You don't have auditory exclusion?
19·  · · ·A.· · I know that I have it.
20·  · · ·Q.· · How do you know that?
21·  · · ·A.· · Because I don't hear.· I didn't hear my
22·  ·gunshots.
23·  · · ·Q.· · You didn't hear your own gunshots?
24·  · · ·A.· · Yes.· I have no recollection of hearing my own
25·  ·gunshots. …
p. 83
1·  · · ·A.· · I saw him duck down after he turned and pointed
·2·  ·the weapon at me, he ducked down behind the fence and I
·3·  ·could still see his shape through the slats that he, where
·4·  ·he was at.
·5·  · · ·Q.· · Are you saying that he pointed the gun at you
·6·  ·before he went behind the fence?
·7·  · · ·A.· · No.
·8·  · · ·Q.· · So was he already behind the fence when he
·9·  ·pointed the gun at you?
10·  · · ·A.· · The fence isn't full height, so if I had to
11·  ·approximate, 3 to 4, 3 to 4 feet above the ground so he
12·  ·would be above the fence.· Then he ducked down underneath
13·  ·it.
14·  · · ·Q.· · So he went behind the fence.· And how much of
15·  ·his body were you able to see above the fence?
16·  · · ·A.· · I would say most of his upper body.
17·  · · ·Q.· · From his waist up?
18·  · · ·A.· · It would be approximate.· Yes, around there.
19·  · · ·Q.· · What hand was the gun in when he pointed it at
20·  ·you at that point?
21·  · · ·A.· · I don't recall.
22·  · · ·Q.· · Was his arm stretched out with the gun in his

> 23·  ·hand in a shooting position?
> 24· · · · · · ·MR. KLEHM:· Objection.· Argumentative.
> 25· · · · · · ·THE WITNESS:· A shooting position doesn't
> p. 84
> ·1·  ·necessarily mean your arm's stretched out, but the gun was
> ·2·  ·in his hands pointed towards me, both hands.
> …
> p. 85
> ·4· · · ·Q.· · How long after you saw Mr. Solis point the gun
> ·5·  ·at you did you fire your first shot?
> ·6· · · ·A.· · Immediately.
> ·7· · · ·Q.· · When you say immediately, do you mean one
> ·8·  ·second, half a second, 5 seconds?
> ·9· · · ·A.· · I would approximate within a second.
> 10· · · ·Q.· · Okay.· Where were you when you fired your first
> 11·  ·shot?
> 12· · · ·A.· · I believe I was just inside of the gate going
> 13·  ·from the front yard to the backyard.
> 14· · · ·Q.· · How far were you from Mr. Solis?
> 15· · · ·A.· · Maybe 12, 12 feet approximately.
> …
> p. 90
> 17· · · ·Q.· · BY MR. SINCICH:· Prior to firing your second
> 18·  ·volley of shots, what did you see Mr. Solis doing?
> 19· · · ·A.· · He was still holding the gun.· I don't recall
> 20·  ·which hand it was in.
> 21· · · ·Q.· · What was he doing?
> 22· · · ·A.· · He was in a swinging motion turning towards my
> 23·  ·direction with the gun again.

Plaintiff Solis's .38 caliber, six-shot handgun contained a single expended bullet casing along with five live rounds (see Photo AGO 764).

A moment prior to CHP Officer Bell beginning to shoot his first shot of the incident (when he reported that he observed Plaintiff Solis crouching behind a fence), an unusual metal-on-metal sound can be heard (per the audio from the surveillance video labeled 603 Hillmer, AGO 504 at timer 0:00:03).

Auditory exclusion is a well-documented hearing distortion, and I have experienced it myself:

> The most common hearing distortion is diminished sound, which can range from total loss to sounds seemingly muffled and distant.  This often happens with gunfire.  You may not hear the shots at all, or they may sound like a distant, muffled popping sound.[7]

---

[7] Dr. Alexis Artwohl, Loren W. Christensen, *Deadly Force Encounters*, Paladin Press (1997), p. 40; and I have seen Dr. Artwohl lecture on the subject on several occasions.

HPD Detective Sobsaszek stated during his interview with Riverside County District Attorney investigators, "I heard Officer Bell yelling like drop the gun … Drop the gun or I'm going to shoot you or something to that effect."[8]

Witness Marlene Sue Biggs told RCSD Investigator Anderson that she heard an officer say four or five times, "Put down your gun!" and "I'll have to shoot you!"[9]

Witness Liliana Rodriguez told RCSD Investigator Sandoval that she heard an officer yelling at someone to lower their firearm.[10]

I concur with RCSD Detective Sobsaszek's deposition testimony about why he believed that CHP Officer Bell's use of deadly force was justifiable:

> p. 70
> 12· · · · · · ·THE WITNESS:· Well, it's the totality of the
> 13· ·circumstances.· So obviously we're looking for this
> 14· ·guy.· We know he's a wanted felon for violent crimes,
> 15· ·you know, not just property crimes.· It's a crime
> 16· ·against persons.· It's carjackings.· It's a violent
> 17· ·crime.· It's weapons offenses.· That's all violent
> 18· ·stuff.
> 19· · · · · · ·From the initial contact the subject is
> 20· ·uncooperative.· He wouldn't listen to anything the
> 21· ·officers were saying.· He was hiding his hand
> 22· ·underneath that bandanna or towel or something that was
> 23· ·on the center console and then he ultimately fled from
> 24· ·officers.· During the foot pursuit, Officer Bell aired
> 25· ·that the subject had a firearm and he was running away
> p. 71
> 1· ·from him on foot.
> ·2· · · · · · ·Now, through my training and my own personal
> ·3· ·experience, someone with a firearm running away from
> ·4· ·you can turn and be facing you in a second or two.
> ·5· ·Obviously, we've been trained.· We know that our
> ·6· ·reaction is a lot slower than someone's action.· So
> ·7· ·potentially that suspect could be turning facing you
> ·8· ·getting rounds off before you've even processed what's
> ·9· ·going on in your mind.· So you know, in my professional
> 10· ·opinion and my experience, it is an imminent threat.
> 11· ·It's a deadly threat.· He's armed with a handgun and he
> 12· ·can use that at any time against Officer Bell if he's
> 13· ·chasing him.· And not only Officer Bell, but anyone in

---

[8] HPD Detective Sobsaszek's transcribed interview statement, AGO 281
[9] Report of interview of Marlene Sue Biggs, AGO 248-349
[10] Report of interview of Liliana Rodriguez, AGO 357

> 14· ·the public or the yard he's running into or, you know,
> 15· ·the house he's going to try to get into.· I mean, we're
> 16· ·not going to let someone get into a house and barricade
> 17· ·himself with an innocent victim either.· So there's
> 18· ·many factors that go into from my perspective why that
> 19· ·use of force was justified.

Significantly, then-Sergeant (now Lieutenant) Paez testified in his deposition about things CHP Officer Bell told him during the post-shooting scene walkthrough about Solis's tactical movements during the foot chase:

> p. 56
> 10· · · · Q.· ·Lieutenant, do you recall, as you were doing
> 11· ·this walk-through at the scene with Officer Bell and
> 12· ·him showing you where he was while he was pursuing the
> 13· ·suspect and where he was when he fired his two volleys,
> 14· ·that Officer Bell told you that he saw the suspect,
> 15· ·Mr. Solis, holding a gun?
> 16· · · · A.· ·I don't recall if he gave me that statement
> 17· ·specifically, that he saw him running with a gun.
> 18· · · · Q.· ·Okay.· Did you hear Officer Bell say that the
> 19· ·suspect was trying to conceal himself during this foot
> 20· ·pursuit, that is hiding behind things?
> 21· · · · · · ·MR. SINCICH:· Compound.
> 22· · · · · · ·THE WITNESS:· I actually do recall that.
> 23· ·BY MR. KLEHM:
> 24· · · · Q.· ·So was it your understanding based on what
> 25· ·Officer Bell told you at the scene of the shooting that
> p. 57
> 1· ·the suspect wasn't just running from him but was taking
> ·2· ·positions of cover or concealment during Officer Bell's
> ·3· ·pursuit of the suspect?
> ·4· · · · · · ·MR. SINCICH:· Misstates testimony, vague.
> ·5· · · · · · ·THE WITNESS:· I do recall him indicating that
> ·6· ·at some point Mr. Solis stopped.
> ·7· ·BY MR. KLEHM:
> ·8· · · · Q.· ·And do you recall that at the point Officer
> ·9· ·Bell said Mr. Solis stopped that Officer Bell told you
> 10· ·Mr. Solis had stopped to take a position of cover or
> 11· ·concealment?
> 12· · · · A.· ·Correct.· Based on my recollection, I believe
> 13· ·it was through the sliding fence by a -- there may have
> 14· ·been a pool pump right there.

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST). Following are excerpts from what California POST teaches peace officers regarding deadly force:[11]

> In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …
>
> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. [Penal Code Section 835a(b)]
>
> A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. [Penal Code Section 835a(c)]
>
> Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. ==An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.== [Penal Code Section 835a(e)(2)] …
>
> Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

If CHP Officer Bell reasonably believed that deadly force was necessary, Officer Bell complied with CHP policy HPM 70.6, 2.e which states:[12]

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

---

[11] POST Learning Domain No. 20 (Use of Force, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7
[12] Highway Patrol Manual excerpt, AGO 1280

Officers are trained that the purpose of shooting at a subject is to stop the threat. In a dynamic situation, it often takes multiple rounds to stop the threat. The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat. This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

In addition, I have attended training that demonstrates that a person who is running away from an officer with a handgun in the person's hand can point the firearm back toward the officer and fire a round in less than 1/7 of a second, which is faster than anyone can react to the deadly threat.

A peer-reviewed article entitled, "Reasonableness and Reaction Time" appeared in Police Quarterly, and it states in relevant part: [13]

> A person can act faster than an officer can react. The typical training example given is that a person who has a gun in their hand at their side will be able to shoot it before an officer with a gun, already pointing at the suspect, can fire in response. The time it takes an officer to respond to a threat, also known as the perception-reaction time, can be summed up as follows:
>
> > Mental Sequence (reaction time) + Physical Sequence (movement time) = Response Time
>
> > Reaction time is further broken down into essentially three components:
> > 1. Stimulus identification (see what is happening)
> > 2. Response selection (interpret what is happening and choose)
> > 3. Response programming (send signal to body to react)
>
> The officer, reacting to the action of the suspect, is at a tremendous disadvantage since he or she must move through all three components. The suspect does not, since they have already assessed the situation and decided on an action, all without the officer's knowledge. All the suspect must do is complete the physical action of firing his weapon. …

---

[13] Blair J, Pollock J, Montague D. et al. Reasonableness and Reaction Time. *Police Quarterly*, 2011;14(4):323–343; see generally Lewinski W. and Hudson B. Reaction Times in Lethal Force Encounters: Time to Start Shooting? Time to Stop Shooting? The Tempe Study. *Police Marksman*. 2003;28(May):26–29; Schmidt RA and Lee T. *Motor Control and Learning: A Behavioral Emphasis (5th ed.)*. Human Kinetics: Champaign, Ill., 2011

> This is the reality of human performance and response. Reactions to changes in stimuli do not occur instantaneously.

> In a complex environment …the officer's response time can range from .7 to 1.5 seconds.[14] During that time the suspect may be moving. In the time it takes the officer to complete the response (from identification of the stimulus to the physical sequence), the suspect may end up in a completely different location or facing a different direction. Then we must add more time for the same process to occur in reverse—meaning it will also take time for the officer to perceive the movement of the person and respond. This process is why some suspects are shot in the back. In such cases, when the officer started the process of firing his or her weapon, the suspect was facing them, but in the time it took to fully respond, the suspect had turned. …

> This is the reality of human performance and response. Reactions to changes in stimuli do not occur instantaneously. Consider a couple simple examples: You are ending a phone call and are reaching for the end button when the other caller says, "Oh, one more thing" but your finger hits the button, ending the call. You heard it, it registered in your brain at some level, but your brain could not catch up to the motor program already being executed to stop it. Another example is a basketball player going up on a layup, but the ball is rejected by a defender. The shooter's hands still complete the motion of the shot, even though the ball is no longer in his or her hands. It takes time to register the change in stimuli and generate a response.

A tragic, specific example of the reaction-time problem that officers face is the story of the murderers of Officer James MacDonald and Officer Kevin Burrell of the Compton (CA) Police Department by suspect Regis Thomas. As I wrote in the tactical "Lessons Learned" section of a recent book that featured that case:[15]

> Regis Thomas had a gun in his waistband when his vehicle was pulled over for a traffic violation. He did not want to go to jail, and he decided to shoot the officers if given the opportunity.
> During the detention of Regis Thomas, it appears that Officers Burrell and MacDonald were standing in close proximity to him. When Thomas pulled a gun from his waistband, he was able to shoot the officers in one quick motion. By the time the officers learned of Thomas' murderous intent, it was too late. Both officers died with their service revolvers still in their holsters.

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution. See

---

[14] Lewinski W and Hudson B. The Impact of Visual Complexity, Decision Making and Anticipation: The Tempe Study Experiments 3 & 5. *Police Marksman*. 2003;28(Nov/Dec): 24–27
[15] Cooley S and Schirn R. Blue Lives in Jeopardy: When the Badge becomes the Target (2019), page 97

*Graham v. Connor* 490 U.S. 386 (1989). *Graham* states in part, "The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances. In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case. Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

> The seriousness of the crime or suspected offense [**According to CHP Officer Bell, Plaintiff Solis (who was wanted for three outstanding felony warrants) was armed and acting in a manner that Bell stated caused an imminent fear of death or serious bodily injury.**]*;*
>
> The level of threat or resistance presented by the subject  [**According to CHP Officer Bell, Plaintiff Solis (who was wanted for three outstanding felony warrants) was armed and acting in a manner that Bell stated caused an imminent fear of death or serious bodily injury.**]*;*
>
> Whether the subject was posing an imminent threat to officers or a danger to the community  [**According to CHP Officer Bell, Plaintiff Solis (who was wanted for three outstanding felony warrants) was armed and acting in a manner that Bell stated caused an imminent fear of death or serious bodily injury.**]*;*
>
> The potential for injury to citizens, officers or subjects  [**According to CHP Officer Bell, Plaintiff Solis (who was wanted for three outstanding felony warrants) was armed and acting in a manner that Bell stated caused an imminent fear of death or serious bodily injury.**]*;*
>
> The risk or apparent attempt by the subject to escape [**If Plaintiff Solis escaped capture, the armed suspect would put the community at great risk.**];
>
> The conduct of the subject being confronted (as reasonably perceived by the officer at the time) [**According to CHP Officer Bell, Plaintiff Solis (who was wanted for three outstanding felony warrants) was armed and acting in a manner that Bell stated caused an imminent fear of death or serious bodily injury.**]*;*
>
> The time available to an officer to plan [**There was no opportunity to plan after the armed wanted felony suspect fled the original detention. It was imperative that CHP**

> **Officer Bell act quickly to capture the Plaintiff and end the threat to the officers and the community.]**;
>
> The availability of other resources **[Multiple officers were responding to the scene. CHP Officer Bell was alone when both of his shooting sequences occurred.]**;
>
> The training and experience of the officer **[CHP Officer Bell had 10 years of experience as a peace officer. His POST training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**
>
> The proximity or access of weapons to the subject **[According to CHP Officer Bell, the Plaintiff held a handgun.]**;
>
> The environmental factors and/or other exigent circumstances **[The incident occurred during daylight hours in a residential neighborhood as CHP Officer Bell and others were attempting to arrest Plaintiff Solis for three outstanding felony warrants.]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers. POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance? **[Yes, all three criteria apply.]**

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to CHP Officer Bell, the Plaintiff was armed with a handgun and refused multiple commands to put it down, was running toward a house, and ignored a warning that Bell would shoot.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury? **[CHP Officer Bell was chasing an armed wanted felony suspect who was running toward a house and running toward other responding officers.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**

**Opinion No. 3**
**Mr. Solis chose to resist arrest for three outstanding felony warrants, and to arm himself with a handgun, thus Mr. Solis set in motion a series of events that resulted in the shooting.**

<mark>Had Mr. Solis merely obeyed the law and surrendered when Officer Bell attempted to detain and arrest him, the shooting incident would not have occurred.</mark>

Case 5:23-cv-00515-HDV-JPR   Document 62-12   Filed 09/10/24   Page 19 of 19   Page ID #:804

Edgar Solis v. County of Riverside, State of California, et al.   Greg Meyer's Rule 26 Report

**EXHIBITS**

1. Curriculum Vitae (Greg Meyer)

**EXPERT QUALIFICATIONS, PUBLICATIONS, AND OTHER CASES**

My *curriculum vitae* (see **EXHIBIT NO. 1**) documents my qualifications, the relevant publications I have authored in the past 10 years (per Rule 26), and it lists all cases in which I have testified at trial or deposition in the past 4 years (per Rule 26). A brief summary of my qualifications appears on pages 2-3 of this report.

**COMPENSATION**

My normal fee for work including document review, research, meetings, and reports is $450 per hour after a $5,000 retainer that covers the first eight hours. Travel within California is charged at $150 per hour (one-way only), plus IRS mileage rate, plus direct expenses (hotel, food, etc., if any). In-court days are charged at $3,000 flat per day.

**Depositions are charged at $450 per hour payable at the time of deposition; if remote, the anticipated deposition fee must be mailed to me or counsel by check 10 days in advance.** (If the amount of time for the deposition is less than the prepaid amount, I will quickly refund the pro-rated difference; if the deposition takes longer than the number of prepaid hours, the deposing side must commit on the record to quickly pay the difference.)

Executed on May 31, 2024 at Glendale, California.

*[Signature]*
GREG MEYER