ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General
DAVID KLEHM
Deputy Attorney General
State Bar No. 165302
 600 West Broadway, Suite 1800
 San Diego, CA 92101
 P.O. Box 85266
 San Diego, CA 92186-5266
 Telephone: (619) 738-9733
 Fax: (619) 645-2581
 E-mail: David.Klehm@doj.ca.gov

*Attorneys for Defendant State of California
(by and through the California Highway Patrol)
[erroneously sued as "State of California"]
and Michael Bell*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EDGAR SOLIS,**<br><br>Plaintiff,<br><br>v.<br><br>**COUNTY OF RIVERSIDE; STATE OF CALIFORNIA; SALVADOR WALTERMIRE; and DOES 1-10, inclusive,**<br><br>Defendants. | 5:23-cv-00515-HDV-JPR<br><br>**DECLARATION OF DAVID KLEHM IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE TESTIMONY OF DR. RITTER**<br><br>Date: October 1, 2024<br>Time: 9:00 a.m.<br>Courtroom: 10D<br>Judge: *Honorable Hernán D. Vera*]<br>Trial Date: October 29, 2024<br>Action Filed: 2/02/2023 |

**DECLARATION OF DAVID KLEHM**

I, David Klehm, declare as follows:

1. I am a duly appointed Deputy Attorney General and am assigned to represent defendants in the above-captioned action. I make this declaration in

1

1 | support of the attached motion. The facts set forth herein are within my
2 | personal knowledge.
3 |     2. Attached hereto as Exhibit "A" is a true and correct copy of the relevant
4 | excepts from the Deposition of Dr. Michael Ritter.
5 |     I declare under penalty of perjury under the laws of the United States of
6 | America that the foregoing is true and correct.
7 |     Executed on September 23, 2024, at San Diego, California.
8 |                   /s/ David Klehm
9 |                   David Klehm
10 | SD2023800661

# EXHIBIT A

EDGAR SOLIS vs COUNTY OF RIVERSIDE, ET AL.
Michael Ritter, M.D. on 07/26/2024

```
 1                   UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   EDGAR SOLIS,                            )
                                             )
 5              Plaintiff,                   )
                                             )
 6              vs.                          ) Case No.
                                             ) 23-CV-00515-HDV-JPR
 7   COUNTY OF RIVERSIDE; STATE OF           )
     CALIFORNIA; SALVADOR WALTERMIRE,        )
 8   MICHAEL BELL, and DOES 1-10,            )
     inclusive,                              )
 9                                           )
                Defendants.                  )
10   _____)

11

12

13

14           REMOTE VIDEOCONFERENCE DEPOSITION OF

15                    MICHAEL RITTER, M.D.

16                    FRIDAY, JULY 26, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  86900
```

Page 11

1    A.   I did.

2    Q.   I don't know if I saw it or not.

3         Does your report contain your fee schedule?

4    A.   It should.  If it doesn't, I can give it to you

5    here.

6    Q.   Do you have your report handy?

7    A.   I have it in front of me, yes.

8    Q.   Could you tell me what page your fee schedule is

9    on?

10   A.   I just have the report.  I don't have the exhibits

11   that go with it.  So I don't know that -- I don't know if you

12   got it or not.  I'm sorry.

13   Q.   How much do you charge for deposition?

14   A.   Deposition $750 an hour.

15   Q.   And what about to testify in court?

16   A.   $3500 per half day.

17   Q.   How much do you charge for your evaluation of a case

18   up to writing the report?

19   A.   $600 an hour.

20   Q.   And I saw that your billing was included, I believe,

21   yesterday.

22        Do you have any other billing in this case?

23   A.   The only other billing is I spent maybe an hour this

24   morning just reviewing everything in preparation for the

25   deposition, but that's current.

1  report related to this case?

2    A.   Looks like the report of Doctor Ryan O'Conner who is

3  an emergency physician.

4    Q.   Anything else?

5    A.   No.  It doesn't appear so.

6    Q.   Did your review Dr. O'Conner's report change your

7  pinions at all?

8    A.   He just talked about the injuries that were

9  obtained.

10    Q.   It's states that you had reviewed the Riverside

11  University Health System Medical Records; is that right?

12    A.   That's correct.

13    Q.   Do you a Bates stamp number of the records that you

14  reviewed?

15    A.   Yeah.  There is a Bates stamp at the bottom, yes.

16    Q.   For instance, were you given just a sample of the

17  records, a few 100 pages, or were you given several thousand

18  pages of records?

19    A.   Couple thousand pages of records.  There was a

20  lot.

21    Q.   Do you know if the Bates stamp range was 1 through

22  another number that you can give me?

23    A.   I don't without opening the reports of looking at

24  them.

25    Q.   Would that take too long, or do you have them in

1  front of you?  I saw you look down.

2    A.   No.  I'm not looking at a report in front of me.

3          I'm looking at my handwritten notes that I did got

4  some Bates stamp pages.  It looks like the biggest number

5  that's on here is 2673.  So there's at least 2,673 pages of

6  records.  It's probably more, but that's the handwritten

7  notes here.

8    Q.   And you reviewed all those medical records?

9    A.   Yes.  I looked through them.

10    Q.   And the Ring video that you mentioned in your

11  report, is that the surveillance video that shows front yard

12  of the incident?

13    A.   I think it's the front yard.  I don't know.

14    Q.   Do you know if there is a Bates stamp number on the

15  video that you reviewed?

16    A.   I don't believe so.

17    Q.   Do you recall whether or not the video that you

18  reviewed depicted something that occurred before or after the

19  shooting?

20    A.   I think it was after the shooting, but I can't tell

21  you for certain.

22    Q.   In the video were you able to see Mr. Solis at

23  all?

24    A.   No.

25    Q.   Were you able to hear Mr. Solis at all?

Page 15

1   A.   Yes.
2   Q.   Okay.
3   A.   I'm assuming it's him.  I don't see, you know, his
4   lips moving.
5   Q.   What did you hear from Mr. Solis in the video that
6   you reviewed?
7        MR. KLEHM:  Objection.  Calls for speculation; lacks
8   foundation.
9        You can answer.
10       THE WITNESS:  Something about his leg was all that I
11  heard.
12  BY MR. SINCICH:
13  Q.   And you reviewed deposition of Officer Michael
14  Bell?
15  A.   I did.
16  Q.   Did you review the deposition of Mr. Solis at all?
17  A.   No.
18  Q.   In the beginning of your report it looks like you
19  summarized some of the medical records; is that fair to
20  say?
21  A.   Yes.
22  Q.   Is it fair to say Mr. Solis was shot several times
23  in this incident by law enforcement?
24  A.   Yes.
25  Q.   He had penetrating wounds to his hand, wrist, back,

Page 54

1  beyond?

2  A. Yes. It may have actually been started sooner than
3  that. Remember, the charting and documentation sometimes lag
4  in trauma patients, you know, because it takes two nurses to
5  set up the whole blood transfusion thing. And so patient
6  care first, then documentation. We try to get the exact
7  times, but they can lag.

8  Q. Do you have any evidence of lag in this case?

9  A. As I mentioned before, yes. The nurse put there was
10 an addendum, and so that's an example of lag.

11 Q. Is there any evidence of lag in terms of the timing
12 of the transfusion?

13 A. I doubt it because he hadn't been there very long
14 when these times are entered.

15 Q. When did the medical staff take the blood that was
16 ultimately given to Biotox Laboratories?

17 A. I can't tell you exactly when that specimen was
18 obtained. That would probably be in the police report.
19 Usually, the police would document that because they're the
20 ones that take custody of any blood samples to go for any
21 kind of testing like that. That's been my experience working
22 in the trauma room or in ER.

23 Q. Do you see Biotox report? Do you have that in front
24 of you?

25 A. I do.

Page 55

```
 1      Q.   Do you see how it says the specimen was collected at
 2   15:05?
 3      A.   Yes.  And that's not possible because he wasn't even
 4   in the ER at that time.
 5      Q.   Right.  Did you see evidence that there was, I
 6   think, they call it a rainbow draw; is that a common term in
 7   the ER?
 8      A.   Yeah.  Rainbow draw it just means you get multiple
 9   blood tubes, different color blood tubes, different
10   laboratory tests.  So when you say rainbow, you get kind of
11   one of everything.
12      Q.   When did they do his blood draw in the ER?
13      A.   It would be right when he arrived.  I don't know
14   right off the top of my head an exact time, but it's very
15   early priority in the resuscitation.
16      Q.   Do you know if they did the blood draw prior to
17   17:07 when they started the transfusion?
18      A.   Yes.  You would have to because if we don't draw the
19   blood before we start transfusing blood, it would mess up
20   future blood typing that has to be done.  So everybody's got
21   a blood type, right?  And the universal blood -- say you came
22   in with a gunshot wound and you need a emergency transfusion,
23   even though we don't know your blood type, we give you
24   O-negative blood, kind of the universal blood.  So the
25   problem is if we transfuse with O-negative and then draw your
```

Page 56

1  blood and send it to a laboratory for typing for additional
2  blood, they're going to have a hard time figuring out what
3  your blood type is because it's going to come up as -- let's
4  say you're A-positive, they're going to check A-positive and
5  O-negative blood.  So it has to be -- blood has to be
6  obtained before we start the transfusion.
7      Q.   So you stated in your report that because of the
8  transfusion, and I'm trying to find it exactly where you
9  stated, but you sate that the PCP and amphetamine levels
10 would be doubled or triple what was determined by Biotox
11 because it was diluted by the transfusion.
12           Do you recall that?
13     A.   Yes.
14     Q.   Is it fair to say that it wouldn't be diluted by the
15 transfusion if the blood draw occurred before the
16 transfusion?
17     A.   If it occurred before that, it would only be IV
18 fluids alone that was given so there would be less of an
19 effect.  It was my understanding from looking at the records
20 that this was done after the blood transfusion, but I can't
21 tell you -- there is not an exact time anywhere.  There is
22 this time that's on the Biotox report, but that was before he
23 was even at the hospital.
24     Q.   Is it fair to say that you don't know whether or not
25 Mr. Solis's blood toxicology altered because of the blood

Page 57

1  transfusion because we don't know the timing?
2      A.   If I could get that time I could give you a more
3  specific effect of that.  So if it was just IV fluids, the
4  level might only be one and half to two times what was
5  detected because of the IV fluids -- diluted down.  It was
6  done after the blood transfusion that was be -- it was my
7  assumption from looking at the records that it was done after
8  the blood transfusion.
9      Q.   And how much IV fluids did he receive prior to the
10 blood draw?
11     A.   I believe it was about a liter of normal saline,
12 might have been one and a half liters.
13     Q.   Okay.  And would the IV fluid alone without
14 transfusion dilute his blood and have an effect on his
15 toxicology result?
16     A.   It would.
17     Q.   Would it have a direct effect, meaning, if it was
18 one liter of IV fluid on his approximate five liters of
19 blood, that it would have a 20 percent effect?
20     A.   Well, it's more complicated than that because you
21 got blood that's lost, right?  We don't know what that volume
22 once it was lost.  Then you got IV fluid that goes in.  So
23 it's kind of a double whammy.  You're not just diluting it
24 with one liter, and some of it has a normal blood volume, and
25 taken -- to six liters of blood volume.

1    You got blood that comes out that's got the drug in
2    it now it's been replaced with something that has new drug.
3    So the calculation gets a little more complicated unless you
4    have the exact volume of blood that's lost, and nobody can
5    measure that when someone's bleeding and they just -- the
6    you're not collecting the exactly you know 571 milliliters of
7    blood.
8        Q.   So is it fair to say that we don't know how much
9    Mr. Solis's blood was diluted, if at all?
10       A.   It was definitely diluted.  We know because of his
11   blood pressure being down.  He lost blood.  There is no doubt
12   because it would not be another explanation.  PCP and meth
13   would normally make your blood pressure go up, not down.
14            And so there was nothing else in the system that
15   would cause his blood pressure to drop.  The only thing that
16   would cause that would be blood loss from hemorrhagic shock
17   from the shooting and subsequent blood loss.
18       Q.   But we don't know how much is diluted?
19       A.   I can't give you an exact number as I explained
20   because I don't know how much blood actually came out of his
21   body.  I know that he's got significant hemorraghic shock to
22   the point that it lowers your blood pressure.
23       Q.   Okay.
24            MR. KLEHM:  Counsel, we've been going for over an
25   hour.  Is there a good time for us to take a break?